FILED by _CBK_ D.C.

DEC 1 3 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. -- MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI, FLORIDA

UNITED STATES OF AMERICA; and
The STATE OF FLORIDA, ex rel,
THEODORE A. SCHIFF, M.D.

**Sealed**

    Plaintiffs,

CASE NO.: **13-24503**
UNDER SEAL

v.

GARY L. MARDER, D.O.;
ALLERGY, DERMATOLOGY & SKIN
CANCER CENTER, INC. ,
a Florida corporation
MEGAN BOCK, PA; and
MARTIN BURKE, PA
ROBERT I. KENDALL, M.D.
KENDALL MEDICAL LABORATORY,
INC., a Florida corporation

**CIV-MOORE**

**/TORRES**

    Defendants.

_____

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT
## AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................... 2

III.    THE PARTIES ...................................................................................... 3

IV.     GOVERNMENT HEALTHCARE PROGRAMS.................................. 5

V.      THE LAW............................................................................................. 6

    A.   The False Claims Act.................................................................. 6

    B.   The Anti-Kickback Statute ......................................................... 7

    C.   Medical Necessity Rules ............................................................ 9

    D.   The Stark Law ........................................................................... 10

VI.     DEFENDANTS' FRAUDULENT SCHEMES ................................... 12

    A.   Medically Unnecessary Biopsies, False Cancer Diagnoses, Medically
Unnecessary Radiation, and Fraudulent Billing Practices for Radiation Doses ...... 12

    B.   Fraudulent Billing ..................................................................... 18

    C.   Physician Assistants Billing as Physicians .............................. 23

    D.   Stark Law ................................................... **Error! Bookmark not defined.**
................................................................................................... 25

VII.    COUNTS .............................................................................................. 25

I.    **INTRODUCTION**

1.    This is an action brought on behalf of the UNITED STATES OF AMERICA and the STATE OF FLORIDA (collectively, the "Government"), to recover treble damages and civil penalties against Defendants, pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended, and the Florida False Claims Act, Fla. Stat. § 68.082 et seq. (collectively "The False Claims Acts").

2.    Plaintiff Theodore A. Schiff, M.D. ("Relator") brings this *qui tam* action to recover treble damages and civil penalties on behalf of the Government. The allegations in this Complaint arise from Plaintiff's evidence, as set forth more specifically below, that the above-captioned Defendants have submitted false and fraudulent claims for reimbursement to the Government.

3.    Defendant, Gary L. Marder D.O. ("MARDER") has billed for tens of thousands of services which are not medically necessary, such as biopsies of patently benign tissue. After ordering the unnecessary biopsies, MARDER compounds the fraud by performing medically unnecessary radiation therapy and/or surgeries on benign and non-cancerous skin lesions. Moreover, MARDER utilizes a specialized, rarely used and medically unnecessary type of radiation therapy that he performs incorrectly, thus increasing the potential for adverse side effects to the patient. Further, MARDER permits Defendants Megan Bock PA ("BOCK") and Martin Burke PA ("BURKE") to routinely administer radiation therapy/treatment to MARDER patients, although BOCK and BURKE are neither qualified nor licensed to lawfully administer such treatments.

4.    Additionally, Defendant MARDER and Defendant Robert I. Kendall, M.D. ("KENDALL") have come to an illegal arrangement for profit pursuant to which MARDER refers pathology work to KENDALL, KENDALL performs the work at KENDALL's office, and

1

KENDALL permits MARDER to bill globally for the work performed by KENDALL as if performed by MARDER.    Thus, MARDER is engaging and paying KENDALL to perform MARDER's pathology work for which MARDER and KENDALL receive fees and/or referrals which violate the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS") and the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 ("FCA").  KENDALL benefits because MARDER sends referrals to KENDALL. MARDER benefits because he bills for work performed by KENDALL.

## II.    JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Section 131 and 31 U.S.C. Sections 3730(b) and 3732(a), which specifically confers jurisdiction.

6.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. section 3732(a) which authorizes nationwide service of process.  Defendants can be found in, reside in, or have transacted business in the Southern District of Florida.

7.      Venue is proper in this District pursuant to 31 U.S.C. Section 3732(a) because the Defendants can be found in, reside in, or have transacted business in the Southern District of Florida, and the alleged acts occurred in this District.

8.      No allegation set forth in this Compliant is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a Congressional, administrative or General Accounting Office report, hearing audit, or investigation, or from the news media. Further, to the extent Relator is aware of any public disclosures, this complaint (the "Complaint") is not based upon such public disclosures. Plaintiff SCHIFF has direct and independent knowledge, within the meaning of 31 U.S.C. Section 3730(e)(4)(B) and the

analogous provisions of the Florida FCA, of the information on which the allegations set forth in this Complaint are based.

## III.   THE PARTIES

9.      Relator Theodore A. Schiff is a resident of Palm Beach County, Florida, and brings this action on behalf of himself, the STATE OF FLORIDA, and the UNITED STATES OF AMERICA. Relator is a double Board Certified Medical Doctor in Dermatology and Dermatopathology licensed to practice Medicine in the State of Florida. Relator has among one of his specializations the treatment of skin cancer. Relator is the president and principal owner of Water's Edge Dermatology, LLC ("Water's Edge Dermatology"). The allegations set forth in this Complaint are based on personal investigation, testimony of witnesses, and the fact that Water's Edge Dermatology often receives patients who have been treated by Defendant Marder and are seeking a second opinion after receiving a "skin cancer" diagnosis from Defendant Marder.

10.     Defendant Marder (a/k/a Gary L. Marder D.O.) (MARDER) is a physician, who resides in Palm Beach County, Florida, and who was licensed to practice Medicine in the State of Florida at all times relevant to this Complaint.

11.     Defendant, Allergy, Dermatology & Skin Cancer Center, Inc. (ALLERGY) is a Florida Corporation owned and operated by MARDER doing business at 9580 South Federal Highway, Port St. Lucie, FL 34952, with a satellite office located at 202 NE 2nd Street #2 Okeechobee, Florida 34972.

12.     Allergy, Dermatology & Skin Cancer Center, Inc. sometimes does business under an expired (as of October 31, 2007) fictitious name of Gary L. Marder D.O., Medical Lab (MARDER LABORATORY).

3

13.     MARDER D.O., ALLERGY, and MARDER MEDICAL LABORATORY shall be collectively referred to as MARDER.

14.     Defendant BOCK is a physician assistant (PA) who resides in Port Saint Lucie County, Florida, and who was licensed as a physician assistant in the State of Florida at all times relevant to this Complaint.

15.     Defendant BURKE is a physician assistant (PA) who resides in Port Saint Lucie County, Florida, and who was licensed as a physician assistant in the State of Florida at all times relevant to this Complaint.

16.     Defendant Kendall (a/k/a Robert I. Kendall M.D.) (KENDALL) is a physician and a Board Certified Pathologist, who resides in Miami-Dade County, Florida, and who was licensed to practice Medicine in the State of Florida at all times relevant to this Complaint.

17.     Defendant, Kendall Medical Laboratory, Inc. (KML) is a Florida Corporation owned and operated by KENDALL M.D. doing business at 2500 Douglas Road, Suite A, Coral Gables, FL 33134.

18.     KENDALL M.D. and KML shall be collectively referred to as KENDALL.

19.     MARDER and KENDALL shall be collectively referred to as Defendants or MARDER and KENDALL.

20.     MARDER and his affiliated entities are now, and at all times relevant hereto in the past, have been separate and distinct legal entities from KENDALL and his affiliated entities.

21.     MARDER and his affiliated entities along with KENDALL and his affiliated entities do not qualify as a "group practice" as that term is defined under relevant sections of the Stark Law (more fully described  below).

4

22.     The sole association of MARDER and KENDALL is by virtue of an illegal scheme and agreement (the "Arrangement") that is the subject of this proceeding.

## IV.     GOVERNMENT HEALTHCARE PROGRAMS

23.     The UNITED STATES OF AMERICA, through the Department of Health and Human Services (DHHS), administers and funds the Medicare Program (MEDICARE) under title XVIII of the Social Security Act 42 U.S.C. section 1395-1395ccc.  MEDICARE is a federally subsidized health insurance system for disabled persons and persons over the age of sixty-five. Part A of the MEDICARE Program, 42 U.S.C. sections 1395c- 1395i-2, provides payments for basic hospitalization insurance costs. Part B of the MEDICARE Program, 42 U.S.C. sections 1395j- 1395 ww, provides payments for physician services and certain medical and other health services. Either MEDICARE Part A or Part B covers the expenses of medically necessary treatments and services, provided that the individual meets the qualifications for enrollment in MEDICARE.

24.     For outpatient treatment, all MEDICARE reimbursement is subject to Part B.  42 U.S.C. §§ 1395j-1395w-4.  To obtain MEDICARE reimbursement pursuant to Part B, providers submit claims using forms known as CMS 1500s.  Among the information the provider includes on a CMS 1500 form are certain five-digit codes, known as Common Procedural Codes, or CPT codes, that identify the services rendered and for which reimbursement is sought.

25.     Any provider seeking MEDICARE reimbursement through Part B must certify on a CMS Form 1500 that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

5

26.     When procedures are performed that could be split between technical component (TC) and professional component (PC) – such as an x-ray, which involves the image itself (the technical component) and the "reading" of the image by a radiologist (the professional component – there are modifiers that when included in the bill, indicate to CMS that a specific physician is only billing for either of those services.  The presence of no modifier indicates that the physician is billing MEDICARE globally (for both TC and PC).

27.     Other government healthcare programs – such as Florida Medicaid and TRICARE – have similar structures and reimbursement rules.

28.     As to Florida Medicaid, that program is jointly funded by the United States and by the State of Florida.  Thus, to the extent the above-captioned defendants defrauded Florida Medicaid, they defrauded both the United States and the State of Florida.

V.     **THE LAW**

     A.     **The False Claims Act**

29.     The FCA, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

30.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

31.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

32.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

33.     Florida has enacted a False Claims Act which is modeled after the Federal FCA, and each contains provisions similar to those quoted above.  Relator asserts claims under the Florida FCA for the State portion of Medicaid false claims detailed in this complaint.

**B.      The Anti-Kickback Statute**

34.     The  Anti-Kickback Statute  is violated by:

    (1)     who ever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind

        (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .

        (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

* * *

7

(2)  who ever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person

    (A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

    (B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

U.S.C. § 1320a-7b(b).

    35.    A "Federal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government.  42 U.S.C. § 1320a-7b(f).  The Anti-Kickback Statute applies to claims submitted to Medicare, Medicaid, and the other government payers such as Tricare, etc.

    36.    Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d. Cir. 1985).  Because kickback schemes negatively affect the integrity of federal health care programs, the Government has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks.  *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.,* (3d Cir. Oct. 2010)(No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant)("Amicus Brief").

    37.    To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare program. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.,* 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies,* 423 F.3d 1256, 1259-1260

(11th Cir. 2005); and *United States v. Rogan,* 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008).

38.     These and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes.  Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[1]

39.     Moreover, the AKS was recently amended to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).

C.     **Medical Necessity Rules**

40.     Medicare does not reimburse for devices which are not "reasonable and necessary" for the diagnosis and treatment of illness or injury.  42 U.S.C. § 1395y(a)(1)(A).  Moreover, a device that is hazardous to patient health when used as directed in its labeling is "misbranded," FDCA § 502(j); 21 U.S.C. § 352(j), and certainly is not "safe and effective."  Submitting a bill to

---

[1] *See, e.g., United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.,* 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp.,* 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.,* 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis,* 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America,* 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.,* 234 F.R.D. 113, 121 (W.D. Pa. 2001).   When enrolling in Medicare, providers certify on CMS Form 855A that they "agree to abide by Medicare laws, regulations and program instructions that apply to me . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark Law), and on my compliance with all applicable conditions of participation in Medicare."

the Government for a medically unnecessary or misbranded item or service – i.e., submitting a bill

to Medicare for a non-reimbursable item or service – constitutes a false claim.  In re

Pharmaceutical Industry Average Wholesale Price Litigation, 147 F.Supp.2d 39, 52-53 (D. Mass.

2007) (knowing submission of non-reimbursable claims creates liability under the FCA).  Stated

differently, "[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is

ineligible for payment under a federal healthcare program, either because the program bars

coverage for a particular off-label use of a device or because the program places other conditions

on coverage that are not satisfied, the claim is false." U.S. ex rel. Nowak v. Medtronic, Inc., Case

Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of Americas Statement of Interest),

at 6.  Further, services *related* to a non-covered device are, similarly, not covered by Medicare.  42

C.F.R. § 405.207 ("payment is not made for medical and hospital services that are related to the

use of a device that is not covered because CMS determines that the device is not 'reasonable' and

'necessary' . . . or because it is excluded from coverage for other reasons").

### D.      The Stark Law

41.      Section 1877 of the Social Security Act (42 U.S.C. 1395nn), also known as the

Stark Law (Stark), imports a prohibition against physicians referring patients to receive designated

health services (DHS) payable by MEDICARE or Medicaid from entities with which the physician

or an immediate family member has a financial relationship, unless an exception applies.

42.      Stark is a strict liability statute which provides as follows:

(a) Prohibition of certain referrals:

(i) In general . . . Except as provided in subsection (b) of this section, if a physician
(or an immediate family member of such physician) has a financial relationship
with an entity specified in paragraph (2), then—

10

(a)      the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(b)      the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. §1396nn(a)(1).

43.      Stark also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. 42 U.S.C. §1396b(s).

44.      Under Stark, "[t]he term 'remuneration' includes any remuneration, direct or indirect, overt or covert, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B). "Designated health services" include certain outpatient hospital services, including the biopsies and other clinical laboratory work which are addressed in this complaint.  42 U.S.C. §1395nn(h)(6).

45.      A referral is defined as a request, order, or certification by a physician for a DHS including any request for a test from another physician.

46.      Clinical laboratory services are deemed to be DHS.

47.      There are various financial relationships to which the Stark Law applies.  A direct compensation arrangement is one of them. A direct compensation arrangement exists if remuneration passes between the referring physician and the entity furnishing DHS without any intervening person.  Once the plaintiff proves that Stark applies – that is, once the plaintiff establishes that there is a financial relationship between the two providers, and that referrals are passing between them – the burden shifts to the defendant to prove that the conduct fits into one of the exceptions. *U.S. ex rel Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3rd Cir. 2009); *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

11

48.     The main exceptions to the rule are the physician services exception and the in-office ancillary services exception. The physician services exception allows a physician to refer a DHS to another physician who is either: a (1) member of the same group or practice as the referring physician or (2) a physician in the same group or practice as the referring physician.

49.     The in-office ancillary services exception permits a group practice to provide and bill for DHS that are ancillary to professional services provided by either (1) a member of the same group practice as the referring physician or (2) a physician in the same group practice as the referring physician.

50.     For purposes of both exceptions, to constitute a "group practice" the practice must be:

> (1) a single legal entity, (2) have at least two members,  (3) each physician must perform a full range of service and (4) substantially all of the patient care services of all the physician members of the group must be furnished by the group.

51.     For purposes of both exceptions "member of the group practice" or a "physician in the group practice" means a physician owner of a group practice, a physician employee of the group practice, a locum tenens  physician, or an on-call physician while the physician is providing on –call services for members of the group practice.

## VI.     DEFENDANTS' FRAUDULENT SCHEMES

### A.     Medically Unnecessary Biopsies, False Cancer Diagnoses, Medically Unnecessary Radiation, and Fraudulent Billing Practices for Radiation Doses

52.     MARDER performs and bills the Government for large volumes of medically unnecessary biopsies.

53.     MARDER requires his physician assistants, Defendants BOCK and BURKE, to perform a minimum daily quota of at least 50 biopsies, regardless of whether patients have lesions

which justify being biopsied.   By way of example, MARDER instructs BOCK and BURKE to perform biopsies on skin disorders for which biopsies are not appropriate, such as acne, areas of dried skin, skin that has been scratched, and other obviously benign lesions. MARDER then sends the biopsied specimen to KENDALL, who performs an unnecessary biopsy analysis.  The biopsy and the analysis are both paid for by the Government.

54.     But that is not all.  MARDER and KENDALL subsequently diagnose as cancerous biopsy slides which show benign skin conditions such as warts, excoriated (scratched) skin, and non-cancerous conditions such as actinic keratosis and solar lentigos ("freckles").

55.     The MARDER-KENDALL pathology reports evidence a pattern of misdiagnosing non-cancerous lesions as cancerous.

56.     Attached as Exhibit "A" is Report #1  ("Report #1") for Patient #1.  Seven (7) specimens on Report #1 are misdiagnosed.  Specimens B, D, E, F, H, J and L are all diagnosed as "SCC" (squamous cell carcinoma), a form of skin cancer.  None of the specimens are cancerous. Of the seven (7) specimens, three (3) are warts, one (1) is most likely a wart but is clearly non-cancerous, one (1) is irritated skin, one (1) is dried blood, and one (1) is actinic keratosis.

57.     Attached as Exhibit "B" is Report #2 Report #2 for Patient #2   Specimen E on Report #2 is a benign skin growth which is misdiagnosed as SCC.

58.     Attached as Exhibit "C" is Report #3 3 ("Report #3") for Patient #3.  Specimens C and E on Report #3 are freckles which are mis-diagnosed as SCC.

59.     Attached as Exhibit "D" is Report #4  ("Report #4") for Patient #4.  Specimen B on Report #4 reflects a case of actinic keratosis which was misdiagnosed as SCC.

60.     Attached as Exhibit "E" is Report #5 ("Report #5") for Patient #5.  Specimens B and D on Report #5 reflect actinic keratosis which was misdiagnosed as SCC.

61.     Non-cancerous lesions are intentionally misdiagnosed as cancerous by MARDER and KENDALL to afford MARDER the opportunity to offer procedures resulting in additional billing opportunities.  Specifically, when patients are told they have cancer, they are easily persuaded by MARDER to undergo a highly specialized and rarely used technique of radiation therapy called hyper-fractionation, which generates considerable revenue for MARDER.  As with the previously described unnecessary biopsies and analyses, the radiation treatments are paid for by the Government.

62.     Even if such patients *did* have malignant lesions, this type of radiation therapy (hyper-fractionated) is never medically necessary for the treatment of skin cancer.  In fact, the vast majority of patients who have skin cancer undergo a surgical procedure to have the cancer removed.  The National Comprehensive Cancer Network  (NCCN)[2] guidelines are the most relied upon source in this field and are the guidelines relied upon by competent dermatologists, oncologists and  radiation oncologists.  According to the NCCN guidelines, hyper-fractionated radiation therapy is only indicated for advanced and unresectable head and neck cancers that cannot be treated by surgery.  In fact, according to NCCN guidelines, *hyper-fractionation is never recommended or endorsed for the treatment of skin cancer*.[3]  Despite this, MARDER, BOCK and BURKE  use hyper-fractionation on virtually 100% of the patients that are diagnosed with "skin cancer."

63.     In addition to defrauding the Government, this practice presents considerable risk to patients.  Hyper-fractionation therapy uses high-energy radiation to shrink tumors and kill cancer

---

[2]  The NCCN is an alliance of 23 of the world's leading cancer centers.

[3]  See generally National Comprehensive Cancer Network, NCCN Guidelines- Basal Cells and Squamous Cell Skin Cancers (2013).

cells by damaging DNA. This radiation therapy not only damages the cancer cells present in the body, but it is also has a damaging effect on healthy tissue which surround the tumor being treated. Side effects of radiation therapy can occur immediately after treatment or a considerable period of time thereafter.  Side effects during the time radiation therapy is being received include skin irritation, damage at regions exposed to radiation, damage to salivary glands, hair loss when the head or neck is treated, and fatigue. Long-term effects include atrophy, fibrosis, telangiectasia, tooth loss, and gum damage. Moreover, hyper-fractionated radiation therapy yields higher rates of acute skin toxicity compared with conventional radiotherapy.[4]

64.     Moreover, the Defendants perform the procedure in a manner that is both ineffective and dangerous.  With hyper-fractionation, the total daily dose is usually ten or twenty percent greater than with standard fractionation.  It is usually achieved by giving two treatments per day, five days per week. It is standard practice that time intervals between radiation doses on the same day be no less than six hours apart.[5]

65.     The reason that time intervals between fractions must be sufficiently separated so as to be independent doses is to allow for the repair of sub-lethal damage to healthy tissue from the first dose to be completed before the next dose is delivered.[6]

---

[4] Cancer Care Ontario, Hyper-fractionated Radiotherapy for Locally Advanced Squamous Cell Carcinoma of the Head and Neck (2003) ;  see Radiology for the Radiobiologist supra 3 at 401 ;

[5] Edward C. Halperin, David E. Wazer, Carlos A. Perez & Luther W. Brady, Principles and Practice of Radiation Oncology 85 (6th ed. 2013); Radiation Therapy for Skin Cancer 15 (Armand B. Cognetta Jr. & William M. Menderhall 2013).

[6] Eric J. Hall & Amato J. Giaccia, Radiology for the Radiobiologist 135 , 401 (7th ed. 2012); see Radiation Therapy for Skin Cancer, supra at 15.

66.    Notwithstanding the guidelines and the associated risks, MARDER, BOCK and BURKE perform the procedures less than two hours apart from each other, and in most instances less than one hour apart.

67.    The improperly short interval between fractions renders the hyper-fractionation treatment protocol dangerous because of the increased risk of injury to the healthy tissue surrounding the tumor when the healthy tissue is re-irradiated within 6 hours.
The 6 hour or longer interval is necessary to allow sufficient time for healthy tissue to recover from the effects of the first dose of radiation. This is standard practice and is supported by medical studies and reports performed by radiation biologists and radiation oncologists who have verified the necessary interval as being between 6 and 12 hours. [7] If the healthy tissue is not fully recovered when the second dose of radiation is administered, the healthy tissue is more susceptible to the side effects described above.

68.    There are three reasons why offering hyper-fractionated treatment in short intervals is beneficial to MARDER. First, a short interval treatment regimen is an easier "sell" to a patient, particularly when a patient is faced with a 20 day regimen of 2 treatments per day. A patient unknowing of the side effects is far more likely to agree to wait 45 minutes between treatments, as compared with 6 hours or more. Second, administering the treatments in short intervals enables MARDER to process more cases with less support staff. Third, and most significantly, hyper-fractionated treatments affords MARDER the ability to double revenues by billing MEDICARE for two (2) fractionations per day rather than one (1). MARDER's typical case involves a

---

[7] Radiation Therapy for Skin Cancer 89 (Armand B. Cognetta Jr. & William M. Menderhall 2013)

16

regimen of forty (40) fractions; this is at least four (4) times the maximum number of fractions for a typical radiation therapy regime according to literature in the field.[8]

69.     Based on his knowledge of the standard of care for the procedures at issue in this case, Relator estimates that MARDER uses hyper-fractionation more than any single MEDICARE provider in the United States.

70.     In addition to providing medically unnecessary and dangerous radiation treatments to healthy patients, MARDER blatantly violates the Government's reimbursement guidelines for radiation procedures.

71.     To be safe and effective, radiation therapy must be administered properly by a properly trained and licensed physician or radiation therapist under the direction of a physician. CMS therefore imposes reimbursement guidelines for coverage when radiation therapy is performed in a doctor's office or freestanding radiation therapy center. For radiation therapy services provided in a physician's office or in a free standing radiation therapy center to be covered by MEDICARE, the Government requires direct personal supervision by a physician.[9] Specifically, the Government mandates that the physician, at the very least, needs to be on premises and immediately available to provide assistance in order to charge any fee whatsoever for radiation therapy services. If at any point during the radiation therapy treatment the physician leaves the office, any radiation therapy provided during his/her absence will not be covered at all by MEDICARE. [10]

---

[8] Radiation Therapy for Skin Cancer, supra. pgs.93-118; see also,
 "*Dosage and Fractionation (standard treatment regimens)*"; www.xstrahl.com; November 27, 2013.

[9] CFR 410.32(b)(3)
[10] CFR 410.32(b)(3)

72.     Per all of the above requirements, all claims for radiation treatments performed when MARDER was not present in his office (i.e. Tuesdays, Thursdays or Fridays in Port St. Lucie and any time other than the 3 hours every other week during which MARDER is present in the Okeechobee office) constitute false claims. **(See, *infra.* ¶99).**

73.     Finally, neither BOCK, nor BURKE hold the requisite licenses as required under Florida statute §468.203 to administer radiation therapy treatment in the state of Florida. Only MARDER is qualified to lawfully administer radiation therapy treatment to his patients.

74.     If the Government was aware that unqualified and unsupervised personnel were performing medically unnecessary and dangerous radiation treatments on human beings, the Government would not have paid for said procedures.

**B.      Fraudulent Billing, AKS Violations, and Stark Law Violations**

75.     Relator operates an in-house dermatopathology laboratory.  Relator prepares and reads his own slides in his lab and has done so for more than 10 years.  Accordingly, Relator is uniquely qualified to comment on practices, procedures, and standards of practice in this specialized field.

76.     Dermatologists who do not operate their own in-office dermatopathology lab must send their specimens to an outside independent laboratory for the preparation of a slide, and the preparation of a report which contains a gross microscopic description of the specimen.  This work is known as the technical component (TC).

77.     Some dermatologists read/analyze the slides and accompanying reports.  This analysis is known as the professional component (PC).

78.     When the lab is only preparing the slide for reading by the dermatologist, the lab is only allowed to bill under CPT code 88305-TC (TC indicating to the Government that the lab has

only performed the technical component). After the dermatologist reads the slide prepared by the lab, he/she is entitled to bill the Government using CPT code 88305-26 (26 indicates that the professional component of the service has been performed by the dermatologist).

79.     Some dermatologists do not read the slides, and instead allow the independent laboratory to both prepare and read the slides. If the lab performs both the TC and the PC in the same location/zip code, the lab is entitled to send one "global" bill to the Government, using CPT code 88305, for both the technical component and the professional component. In such a situation, item 32 of the CMS 1500 requires the lab to provide its address, so CMS can determine the appropriate reimbursement for code 88305 in the lab's zip code.[11] The dermatologist – having performed none of the work – is not entitled to bill the Government.

80.     But this is exactly what is happening. Here, KENDALL performs both the TC and the PC, signs the report, then sends it to MARDER, who simply stamps the report without looking at the slides or changing anything thereon.

81.     Further, the reports contain dual signatures for both KENDALL and MARDER. This practice is highly unusual and is being done to create ambiguity as to which party is performing the services.

82.     In fact, MARDER neither possesses the requisite computer software or hardware, nor employs support clerical staff such as transcription personnel, which would be required if MARDER was actually operating a pathology lab and creating pathology reports. Moreover, MARDER does not maintain an on-site daily control slide or a quality control log at his Port St.

_____

[11] Pub. 100-04 Medicare Claims Processing, Trans. 2714 CR 8013 (2013).

Lucie office, both of which are required to be maintained on-site in a pathology lab under the federal Clinical Laboratory Improvement Amendments (CLIA).

83.     Moreover, if MARDER was actually reading slides at his office (as would be required to qualify for the professional component billing, not to mention global billing) the slides would need to be returned to him at essentially the same frequency as which he was sending them out for preparation of the technical component.  While biopsy specimens are shipped by MARDER to KENDALL on a daily basis, slides are retuned by KENDALL to MARDER only once or twice per month, generally via UPS.

84.     This Arrangement violates the Stark Law.  Here, MARDER and KENDALL have a "financial relationship" within the meaning of Stark, and large volumes of referrals for designated health services (clinical laboratory work) are flowing between MARDER and KENDALL. Moreover, as discussed above, this Arrangement does not fit within any of Stark's exceptions.

85.     This Arrangement also violates the AKS, because remuneration is being provided in exchange for referrals.  Specifically, KENDALL is effectively assigning – to MARDER – KENDALL'S rights to bill for services KENDALL provided.  In exchange, MARDER refers all of his MEDICARE and MEDICAID laboratory work, to KENDALL and the profits are split by unknown means.  As per the legal authority cited *supra*, no claims arising from these transactions are eligible for reimbursement.

86.     This is true even if the claims were submitted by KENDALL instead of MARDER, because the claims are still tainted by the kickback arrangement.  Consequently, all claims arising from the MARDER-KENDALL Arrangement are ineligible for payment and constitute false claims under the FCA. Several specific examples are outlined below.

87.     Attached hereto as Exhibit "F" is the Explanation of Benefits ("EOB #1") of Patient

20

Number 6. This document establishes that MARDER billed Medicare globally for both procedures (the technical component and the professional component) of the pathology work for this patient.   MARDER was paid $54.36 for the first (biopsy) pathology procedure (CPT Code 88305) and $597.99 for additional (biopsies) pathology procedures (CPT 88305-76).

88.     As described in the first column of EOB #1, modifiers are used to bill for certain procedures. However, the billing of code 88305 in EOB #1 has no modifiers. This falsely indicated to MEDICARE that both the PC and the TC were performed by MARDER, when in fact MARDER performed no work.  This is a material falsehood which establishes FCA liability. Moreover, because the claim arose from an illegal referral arrangement which violates the AKS, the claim is not reimbursable.  As outlined in the legal section, *infra*, knowingly submitting a non-reimbursable claim creates FCA liability.[12]  Finally, on the CMS 1500 form which accompanied this claim, MARDER falsely certified, *inter alia*, that the services were performed in a manner which complied with the AKS.  This false certification provides a third foundation for FCA liability.

89.     Attached hereto as Exhibit "G" is the EOB ("EOB #2") of Patient Number 7.  EOB #2 also shows that MARDER billed globally for pathology.

---

[12] Knowingly submitting or causing the submission of claims to the Government for products or services which are not reimbursable creates liability under the FCA and the Florida FCA.  *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001); *See also U.S. ex rel. Nowak v. Medtronic, Inc.,* Case Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of America's Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false"), and *U. S. v. Medco Physicians Unlimited*, 2000 U.S. Dist. LEXIS 5843, at *27 (N.D. Ill. Mar. 15, 2000) (granting partial summary judgment for plaintiff on the issue of liability with respect to its claim that Medco submitted false claims for non-reimbursable meals and transportation costs.)

90.    In EOB #2, the first column labeled "Service Provided" identifies the modifiers used to bill for various procedures. However, the billing of code 88305 has no modifiers. This falsely indicated to MEDICARE that both the PC and the TC were performed by MARDER, when in fact MARDER performed no work. This is a material falsehood which establishes FCA liability. Moreover, because the claim arose from an illegal referral arrangement which violates the AKS, the claim is not reimbursable. As outlined in the legal section, *infra*, knowingly submitting a non-reimbursable claim creates FCA liability. Finally, on the CMS 1500 form which accompanied this claim, MARDER falsely certified, *inter alia*, that the services were performed in a manner which complied with the AKS. This false certification provides a third foundation for FCA liability.

91.    Attached hereto as Exhibit "H" is the EOB ('EOB #3") of Patient Number 8. EOB #3 also shows that MARDER bills globally for pathology.

92.    In EOB #3, some "Procedure Codes" are billed with their corresponding modifiers (see, for example, page 21, line 1, line 2 and line 3.). However, none of the entries for billing code 88305 which appear on page 1, line 4; page 21, line 4; and page 22 line 3, include a modifier. This falsely indicated to MEDICARE that both the PC and the TC were performed by MARDER, when in fact MARDER performed no work. This is a material falsehood which establishes FCA liability. Moreover, because the claim arose from an illegal referral arrangement which violates the AKS, the claim is not reimbursable. As outlined in the legal section, *infra*, knowingly submitting a non-reimbursable claim creates FCA liability. Finally, on the CMS 1500 form which accompanied this claim, MARDER falsely certified, *inter alia*, that the services were performed in a manner which complied with the AKS. This false certification provides a third foundation for FCA liability.

22

93.     MARDER and KENDALL may seek to argue that MARDER performs the PC –
i.e., he reads/analyzes the slides – and thus he is entitled to bill for his work.  This is not
happening, for all of the reasons set forth above.  However, even if MARDER was analyzing the
slides, the Arrangement violates Medicare's global billing rules.  Specifically, Pub. 100-04
Medicare Claims Processing, Trans. 2714 CR 8013 (2013) states, *inter alia*, as follows:

> Billing globally for services that are split into separate PC and TC services is only
> possible when the PC and TC are furnished by the same physician or supplier
> entity. For example, where the PC and the TC of a diagnostic service are provided
> in the same service location, this is reflected as the address entered into Item 32 on
> CMS Form 1500, which provides the ZIP Code to pay the right locality/GPCI. In
> this case, the physician/entity may bill globally. However, if the PC and the TC are
> each provided in different service locations (enrolled practice locations), the PC and
> the TC must be separately billed.  Merely applying the same place of service (POS)
> code to the PC and the TC does not permit global billing for any diagnostic
> procedure.

94.     Under the Arrangement between MARDER and KENDALL, these rules are being
blatantly violated.  First, MARDER and KENDALL are not "the same physician or supplier
entity."  Second, the TC and the PC are not "provided in the same service location," since
KENDALL's laboratory is located 122 miles from MARDER's office.

**C.     Physician Assistants Billing as Physicians**

95.     MEDICARE guidelines are clear as to billing procedures regarding PAs.
According to CMS guidelines, services that are provided by PAs for medical and surgical services
are subject to a reimbursement rate, which is the lesser of 80 percent of the actual charge or 85
percent of the Physician's Fee Schedule amount reimbursement rate for the service being rendered.

96.     Bills submitted to MEDICARE for services rendered by PA's must indicate the
PA's National Provider Identification (NPI) to make MEDICARE aware that the payment should
be made at 85% of the Physician's Fee Schedule. This mode of billing does not require the
physical presence onsite of the physician as long as the service is being billed at the PA's rates.

23

97.    In some circumstances the practice will be allowed to bill under the Physician Fee Schedule "incident-to" services even when the services were provided by PAs. However, this would require direct supervision from the physician. Direct supervision means that the physician needs to be physically on site during the patient's visit, and immediately available to furnish assistance if required when the PA is providing care.

98.    MARDER routinely allows PA's to bill under the physician fee schedule when MARDER is not present in the office.

99.    MARDER is generally present in the Port St. Lucie office only on Mondays and Wednesdays of each week. The office is open from 8:30 a.m. to 6:00 p.m. MARDER is generally present in the Okeechobee office one morning every other week for approximately 3 hours.

100.    MARDER nonetheless submits bills to MEDICARE at the physician fee rate schedule for services performed by PA's during the periods in which MARDER is not present.

101.    All bills submitted by MARDER to MEDICARE which misrepresent the presence of MARDER in the office from where services are being billed when MARDER is not actually present in such office, are false claims. Relator estimates that MARDER submits at least 250 such false bills to the Government each week.  An example appears below.

102.    MARDER was not on-site when Patient Number Six went for his initial consultation at MARDER's Port St. Lucie office.

103.    Patient Number Six  was treated solely by PA Burke on this visit.

104.    Nonetheless, Patient Number Six's EOB indicates that MARDER billed MEDICARE for the full amount under the Physician Fee Schedule. (see  EOB #1  – attached hereto as Exhibit "F"  and made a part hereof).

24

## VII.   <u>COUNTS</u>

**COUNT ONE**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. SECTION 3729 et seq.**

105.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 104 of this Complaint as though full set forth herein.

106.   Through the acts described above, Defendants knowingly presented or knowingly caused its agents and employees to present to the United States Government false and fraudulent claims, records and statements in order to obtain reimbursement for health care services.

107.   Defendants knowingly created, used and/or caused to be created or used false records or statements in order to have false and fraudulent claims approved and paid by the United States Government.

108.   By reason of Defendants' conduct, the United States Government has been damaged by a significant loss of funds, the exact amount of which is unknown at this time.

## COUNT TWO
## THE FLORIDA FALSE CLAIMS ACT (the "Act"),
### FLA. STAT. §§ 68.082(2) et seq.

109.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

110.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

111.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

(i)    That the Court enters judgment against Defendants in an amount equal to three times the amount of damages the Government sustained as a result of Defendants' actions, as well  as a civil penalty against each Defendant of $10,000 for each violation of 31 U.S.C. section 3729 et seq. and Florida Statute Section 68.082(2)(a), et seq., and a civil penalty against each Defendant of $15,000 for each individual with respect to whom false or misleading information was given pursuant to 42 U.S.C. section 1320a-7a;

(ii)    That Relator SCHIFF is awarded all costs and expenses of this action, including attorneys' fees; and

(iii)    That the Government and Relator SCHIFF receive all such other relief as the Court deems just and proper.

26

(iv)      On the First and Second Counts under the False Claims Acts, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

## REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.


LAWRENCE S. KLITZMAN, P.A.
*Attorneys for Plaintiff*
Sawgrass Commerce Center
1391 Sawgrass Corporate Parkway
Sunrise, FL. 33323
Telephone: (954) 384-4421
Facsimile: (954) 389-3579

By: _____
LAWRENCE S. KLITZMAN, ESQ.
Fla. Bar No. 312878