UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-24503-CIV- MOORE/TORRES

UNITED STATES OF AMERICA; and the
STATE OF FLORIDA, *ex rel*.
THEODORE A. SCHIFF, M.D.

       Plaintiffs,

                                        FILED IN CAMERA
                                        AND UNDER SEAL

v.

GARY L. MARDER, D.O.;
ALLERGY, DERMATOLOGY & SKIN
CANCER CENTER, INC., a Florida corporation
ROBERT I. KENDALL, M.D., and
KENDALL MEDICAL LABORATORY, INC.,
a Florida corporation,

       Defendants.
_____/

## UNITED STATES' COMPLAINT IN INTERVENTION

The United States brings this action to recover damages and penalties under the False

Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover all available damages for common law

fraud, payment under mistake of fact and unjust enrichment.  This action is based upon false

claims submitted to the Medicare and TRICARE programs as a result of the sustained fraudulent

course of conduct of defendants Gary L. Marder D.O. ("Marder"), Allergy, Dermatology & Skin

Cancer Center, Inc., a Florida corporation ("ADSCC"), Robert I. Kendall, M.D. ("Kendall") and

Kendall Medical Laboratory, Inc., a Florida Corporation ("KML").

In connection with the first scheme, which commenced on or before January 1, 2008,

Marder and ADSCC submitted numerous false claims to Medicare and TRICARE for radiation

therapy and other related services that were (1) not rendered, (2) not properly supervised, (3)

rendered by unqualified personnel or (4) were billed in violation of applicable guidelines.  All claims submitted or caused to be submitted in furtherance of this scheme violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. and common law.

In connection with the second scheme, which also commenced on or before January 1, 2008, Marder and ADSCC entered into a kickback arrangement to obtain financial compensation from Kendall and KML in return for Medicare referrals. Kendall and KML allowed Marder and ADSCC to bill and collect payment from Medicare for laboratory work that had been performed by Kendall and KML.  In return for being allowed to bill and collect funds for these services from Medicare, Marder and ADSCC referred Medicare patients to Kendall and KML, and paid Kendall and KML a discounted amount for the services.  All claims submitted or caused to be submitted in furtherance of this kickback scheme violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., and common law.

## I.     NATURE OF ACTION

1.      This is an action brought by Plaintiff, the United States of America ("United States" or "Government"), to recover treble damages and civil penalties under the FCA, 31 U.S.C. §§ 3729-3733, and to recover damages under common law theories of payment by mistake of fact and unjust enrichment.

2.      Relator Theodore A. Schiff, M.D. originally filed this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).  The United States files this complaint in intervention as to defendants Marder, ADSCC, Kendall and KML pursuant to 31 U.S.C. § 3730(b)(3).

### a. Services not Rendered or Supervised, or Rendered by Unqualified Personnel

3.      From January 1, 2008 through the present, Marder and ADSCC submitted or caused to be submitted to Medicare and TRICARE numerous claims for services which were (1) not rendered, (2) not properly supervised, (3) rendered by unqualified personnel or (4) were billed in violation of applicable guidelines.  For example, ADSCC billed for radiation administered by employees lacking proper training and supervision because Marder was absent from the country when the radiation was administered and because Marder was the sole physician supervising two geographically separate medical offices. ADSCC also billed for the administration of radiation therapy in violation of numerous Medicare and TRICARE rules, including billing for high energy radiation with a device it did not even own.

### b. Laboratory Kickback Scheme

4.      From January 1, 2008 through the present, Marder and ADSCC solicited and received remuneration from Kendall and KML in return for the referral of Medicare patients to Kendall and KML.  Kendall and KML provided remuneration to Marder and ADSCC by allowing them to bill and collect payment from Medicare for laboratory work that had been performed by Kendall and KML.

5.      Kendall and KML provided this remuneration with the intent to induce patient referrals from Marder and ADSCC, and to reward Marder and ADSCC for prior referrals, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b.  This remuneration also created a financial relationship with Marder and ADSCC, causing the referrals to be prohibited and in violation of the Stark Law, 42 U.S.C. § 1395nn.  Marder and ADSCC were not entitled to reimbursement for the claims submitted for payment for laboratory services arising out of this illegal scheme and therefore submitted claims in violation of the FCA as well.  Marder and

3

ADSCC knew ADSCC was not entitled to payment for services procured through violations of the AKS and Stark Law.

6.     The United States' claims against Marder, ADSCC, Kendall and KML under the FCA are based upon false certifications and false or fraudulent claims that they presented or caused to be presented to Medicare for laboratory services provided to patients referred by Marder and ADSCC to Kendall and KML due to financial inducements and relationships that were illegal under the AKS and Stark Law.

## II.    JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 because this action is brought by the United States as a plaintiff pursuant to the FCA.

8.     This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) and because defendants reside and transact business in the Southern District of Florida.

9.     Venue is proper in the Southern District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because defendants reside and transact business in this District.

## III.    PARTIES

10.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration).  HHS, through CMS, administers the Medicare program, which was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395, et seq., to provide federally-funded health insurance, including for laboratory services, for

persons age 65 or older, persons under 65 with certain disabilities, and persons of all ages with end-stage renal disease.  The United States also brings this action on behalf of the Department of Defense ("DOD").  DOD administers the TRICARE program which is the federal health care system for uniformed service members, retirees, and their families worldwide established by 10 U.S.C. §§ 1071-1110.

11.     Relator Theodore A. Schiff is a resident of Palm Beach County, Florida, and filed this action on behalf of himself, the STATE OF FLORIDA, and the UNITED STATES OF AMERICA. Relator is a double Board Certified Medical Doctor in Dermatology and Dermatopathology licensed to practice Medicine in the State of Florida.

12.     Defendant Marder (a/k/a Gary L. Marder D.O.) (MARDER) is a physician, who resides in Palm Beach County, Florida, and who was licensed to practice Medicine in the State of Florida at all times relevant to this Complaint.

13.     Defendant, Allergy, Dermatology & Skin Cancer Center, Inc. (ADSCC) is a Florida Corporation owned and operated by MARDER doing business at 9580 South Federal Highway, Port St. Lucie, FL 34952, with a satellite office located at 202 NE 2nd Street #2 Okeechobee, Florida 34972.

14.     Marder was the President of and controlled the operations of ADSCC at all times relevant to this Complaint.

15.     Since on or before January 1, 2008, Defendant ADSCC has submitted claims to Medicare and TRICARE for radiation oncology services and clinical laboratory services rendered to patients at two locations in Florida which are approximately 40 miles driving distance from each other:

> a.     9580 South Federal Highway
>         Port St. Lucie, FL  34592

       b.      202 NE 2d St., Suite #2
                  Okeechobee, FL  34972

16.     Defendant Kendall (a/k/a Robert I. Kendall M.D.) (Kendall) is a physician and a Board Certified Pathologist, who resides in Miami-Dade County, Florida, and who was licensed to practice Medicine in the State of Florida at all times relevant to this Complaint.

17.     Defendant, Kendall Medical Laboratory, Inc. (KML) is a Florida Corporation owned and operated by Kendall. doing business at 2500 Douglas Road, Suite A, Coral Gables, FL 33134.

18.     At all times relevant hereto, Defendants Marder, ADSCC, KML and Kendall were enrolled as participating providers in the Medicare program. In order to enroll in the Medicare program, Defendants submitted a Medicare Enrollment Application, Clinics/Group Practices and Certain Other Suppliers, Form CMS 855B, in which they certified that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

19.     At all times relevant hereto, Defendant Marder and ADSCC have submitted or caused to be submitted claims to Medicare for radiation oncology services and clinical laboratory services performed at its two locations and received payment from Medicare for those claims.

On each claim, Marder and ADSCC certified that they were in compliance with the applicable regulations.

## IV.    THE LAW

### a.    The False Claims Act

20.    Defendants Marder, ADSCC, Kendall and KML knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Medicare program and by the TRICARE program, in violation of the FCA, 31 U.S.C. § 3729(a)(1), for claims up to and through May 19, 2009, and in violation of § 3729(a)(1)(A), for claims from and after May 20, 2009.[1]  In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).[2] The FCA provides for treble damages and penalties.

21.    The term "knowingly" under the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  No proof of specific intent to defraud is required to show a person acted knowingly under the FCA.

22.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

---

[1]  On May 20, 2009, the Fraud Enforcement and Recovery Act of 2009 (FERA), P.L. 111-21, became law.  Section 4 of FERA revised certain provisions of the False Claims Act. Congress amended the FCA again as part of the Patient Protection and Affordable Care Act on March 23, 2010.

[2]  Section 3729(a)(1)(B) was also revised on May 20, 2009, but is retroactive and applies to all FCA cases pending as of June 7, 2008.

Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### b. The Anti-Kickback Statute

23.    The AKS arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt professional healthcare decision-making and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  The AKS prohibits the payment of kickbacks in order to protect the integrity of Medicare.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

24.    The AKS prohibits any person or entity from offering, making, or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made in whole or in part by a federal health care program.  In pertinent part, the statute provides:

(b)  Illegal remunerations
(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for

> which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

> > (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–

> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

25.     The AKS not only prohibits outright bribes, but also prohibits any remuneration by a laboratory company to a physician that has, as one of its purposes, inducement of the physician's referrals to the laboratory company.

26.     Claims that are submitted to Medicare in violation of the AKS are false or fraudulent under the FCA.  *See* 42 U.S.C. §1320a-7b(g) (incorporating FCA amendment clarifying that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].")

27.     There is a statutory safe harbor provision of the AKS that exempts "any amount paid by an employer to an employee (who has a bona fide employment relationship with such

employer) for employment in the provision of covered items or services."  42 U.S.C. § 1320a-

7b(b)(3)(B); *see also* 42 CFR § 1001.952(i).  But ADSCC does not fall under this exemption

because Kendall was not a "bona fide" employee of ADSCC.  *See* Medicare and Medicaid

Programs; Fraud and Abuse OIG Anti-kickback Provisions, 54 Fed. Reg. 3088, 3093 (Jan. 23,

1998) (the exemption "follows the statute in that it applies only to bona fide employer-employee

relationships.").

### c.  The Stark Law

28.     The Stark Law prohibits physicians and certain other entities providing healthcare

items and services from submitting Medicare claims for payment for items and services that are

the product of patient referrals from physicians having an impermissible ″financial relationship″

(as defined in the statute) with the physicians.  *See* 42 U.S.C. § 1395nn.  The Stark Law requires

that the Medicare program deny payment for claims for any services billed in violation of its

provisions.  42 U.S.C. § 1395nn(g).  In addition, it requires that providers who have collected

Medicare payments for a healthcare service "performed under a prohibited referral must refund

all collected amounts on a timely basis."  42 C.F.R. § 411.353.

29.     The Stark Law establishes the presumptive rule that providers may not bill and

the Medicare program will not pay for designated health services (as defined in the statute)

generated by a referral from a physician with whom the provider has a financial relationship.  42

U.S.C. §§ 1395nn(a)(1), (g)(1).  Congress enacted the Stark Law because it found that financial

relationships between physicians and entities to whom they refer patients can compromise the

physicians' professional judgment as to whether an item or service is medically necessary, safe,

effective, and of good quality.  Congress relied upon various academic studies consistently

showing that physicians who had financial relationships with entities to which they referred used

10

more of those entities' services than similarly situated physicians who did not have such

relationships.   The Stark Law was designed to protect the taxpayer from paying for the costs of

questionable utilization of services by removing monetary influences on referral decisions.

      30.     At all times relevant to this Complaint, the Stark Law has applied to payments to

referring physicians by physicians and the resulting claims to the Medicare program.  *See* 42

U.S.C. §§ 1395nn(h)(6)(I), (h)(5)(B).

      31.     Relevant here, the Stark Law provides:

(a) Prohibition of certain referrals
(1) In general
          Except as provided in subsection (b) of this section, <u>if a
physician</u> (or an immediate family member of such physician) <u>has
a financial relationship with an entity</u> specified in paragraph (2),
then --
(A) <u>the physician may not make a referral to the entity</u> for
the furnishing of designated health services for which
payment otherwise may be made under this subchapter, and

          (B) <u>the entity may not present or cause to be
presented a claim under this subchapter or bill</u> to any
individual, third party payor, or other entity for designated
health services furnished pursuant to a referral prohibited
under subparagraph (A).

*See* 42 U.S.C. § 1395nn (emphasis added).

      32.     The Stark Law specifically prohibits physicians from referring to entities where

the "physician (or an immediate family member of such physician) has a financial relationship."

42 U.S.C. § 1395nn(a)(1).  The Stark Law broadly defines "financial relationship" to include any

"compensation" paid directly or indirectly to a referring physician (or his/her immediate family

member).  42 U.S.C. § 1395nn(a)(2).

33.     There are statutory and regulatory safe harbor exceptions to the Stark Law that permit certain financial relationships between health care providers and physicians without triggering the Stark Law's referral, billing, and payment provisions.  *See* 42 U.S.C. § 1395nn(e); 42 C.F.R. § 411.357.  The Stark Law contains an exception, for example, for:

> "Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if –

(A) the employment is for identifiable services,
(B) the amount of the remuneration under the employment--

> (i) is consistent with the fair market value of the services, and

>> (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

> (C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

> (D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

*See* 42 U.S.C. § 1395nn(e)(2).

34.     ADSCC does not fall under this Stark Law exemption because Kendall was not a "bona fide" employee of ADSCC.

### d. Medicare Enrollment

35.     KML executed a Medicare Participating Physician Agreement and was assigned an identification code in September 1988.  The agreement was executed by Kendall on behalf of KML.

36.     KML executed an Electronic Data Interchange agreement with Medicare in June 1998.  The agreement was executed by Kendall on behalf of KML

37.    Marder was added to the Medicare Provider file in 1998 and was assigned a Medicare Provider Transaction Access Number (PTAN) to allow for the submission of claims to Medicare.

38.    KML applied to re-validate its enrollment in Medicare in January 2010 when it submitted a Form CMS-855B enrollment application ("Application").  The Application was executed by Kendall on behalf of KML.

39.    Marder applied to re-validate his enrollment in Medicare in January 2013 when he submitted a Form CMS-855I enrollment application ("Application").  The application also covered both office locations of ADSCC.

40.    On their respective Applications, Marder and Kendall signed and certified a statement that included the following:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

(emphasis added).

41.    Marder and Kendall also certified on the Application that they "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

42.    Marder is listed on the Application as the president of ADSCC.

## V.    REGULATORY SCHEME FOR MEDICARE AND TRICARE PAYMENT FOR RADIATION ONCOLOGY SERVICES

### a.    MEDICARE

43.    The United States Medicare Healthcare Program (hereafter "Medicare") is a federal health insurance program for persons aged 65 or older, persons with permanent kidney failure, and persons receiving Social Security disability benefits.

44.    Overall responsibility for the administration of Medicare, as authorized by 42 U.S.C. § 1395, et seq., (hereafter "Social Security Act or SSA"), resides with the Secretary of the Department of Health and Human Services (hereafter "HHS"). Within HHS, the responsibility for administration of the Medicare program has been delegated to the Centers for Medicare and Medicaid Services (hereafter "CMS").

45.    Medicare provides two basic types of coverage – hospitalization insurance (commonly known as Medicare Part A) and medical insurance (commonly known as Medicare Part B). Part A hospital insurance provides coverage for inpatient hospital charges, post-hospital extended care for 100 days following hospital discharge, and hospice care. Part B medical insurance covers physician services, home health services, most skilled nursing home services, and other non-hospital related medical services. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

46.    The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS. To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare administrative contractors (MACs). 42 U.S.C. § 1395u. MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS. Id. First Coast Service Options, Inc. (First Coast) is the MAC responsible for the payment of Part B claims to Defendants on behalf of CMS.

14

47.     Florida providers claim Medicare Part B reimbursement from First Coast pursuant to written provider agreements. First Coast receives, processes, and pays or rejects those claims according to Medicare rules, regulations, and procedures.

48.     At all relevant times hereto, Defendants signed or caused to be executed provider agreements with Medicare that permitted Defendants to submit claims and accept payment for services provided by Defendants.

49.     As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies. In particular, when Defendants submitted their Medicare Enrollment Applications, Defendants certified to the following requirements:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare. I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity. (emphasis added).

50.     Accordingly, Defendants had a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services, which include the policies relevant to radiation oncology and related services.

15

51.     Defendants certified in their provider enrollment applications that they were knowledgeable regarding Medicare's requirements.

52.     Medicare covers, and participating providers agree to submit claims, only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physician's orders, physician's review of work, and other pertinent documentation corroborating the treatment administered. 42 U.S.C. §1395y(a)(1)(A).

53.     Absent certain exceptions, Medicare Part B does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

54.     In short, in order for Defendants to be properly reimbursed for patient care by the Medicare program, CMS requires that the treating physician order the applicable services, appropriately document the justification and administration of those services, submit only those codes that correlate with the notes made by the physician in the medical record, and that the physicians adhere to coding guidelines when assigning applicable codes.

55.     After enrollment as a Medicare health care provider, Medicare assigns each participating provider a unique billing National Provider Identifier ("NPI"). Here, ADSCC had a NPI number for which it submitted claims for the two ADSCC clinics. KML submitted claims under its own NPI number.

56.     A physician who treats a Medicare patient is required to submit an electronic or hard-copy Medicare Health Insurance Claim Form (CMS form 1500) to the carrier, here First Coast, who on behalf of CMS, pays for the claim. A sample claim form is attached hereto as

Exhibit 1. During all times set out in this complaint, providers have been required to submit these CMS-1500 forms electronically.

57.     When filing the electronic equivalent of the CMS-1500, a provider certifies that:

> The services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

See Exhibit 1.

58.     When submitting a claim using the CMS-1500 form, the provider/supplier also "certif[ies]" that (i) the information on the form is "true, accurate and complete"; (ii) payment of the claim will be from federal funds; and (iii) "any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal * * * laws."

### b. TRICARE

59.     TRICARE is the federal health care system for uniformed service members, retirees, and their families worldwide. TRICARE, formerly known as CHAMPUS, is a federal health benefits program, established by 10 U.S.C. §§ 1071-1110, that offers a triple option benefit plan: an HMO option; a PPO option; and a fee for service option.

60.     The regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying, to the extent practicable, the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2)(institutional providers), (h)(1)(individual health care professional) (citing 42 U.S.C. § 1395, *et seq*.). Services and supplies that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness or injury are specifically excluded from coverage. 32 C.F.R. § 199.4(g)(1). Moreover, TRICARE providers are obligated to provide services which are

17

"(i) furnished at the appropriate level and only when and to the extent medically necessary . . .; (ii) of a quality that meets professional recognized standards of health care; and, (iii) supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. § 199.6(a)(5).

61.    TRICARE prohibits improper billing practices such as unbundling and fragmenting as a means of manipulating billing codes to increase reimbursement; misrepresenting the dates, frequency, duration, description of the services involved, or the identity of the person who rendered the services; and overutilization of services. 32 C.F.R. § 199.9(c). Such practices are considered fraudulent and abusive and a misrepresentation of services. 32 C.F.R. §§ 199.9(c)(1) - (c)(13).

62.    Overall responsibility for the administration of TRICARE resides with the Secretary of the Department of Defense (DOD). The DOD has contracted with Humana Military Healthcare (Humana) for administration of the TRICARE program in the South Region, which includes Florida. Humana subcontracted with Palmetto Government Benefits Administrators, LLC (PGBA, LLC) to process claims for several states, including Florida.

63.    In order to participate, Defendants Marder and ADSCC filed service provider applications wherein they certified that they would comply with TRICARE policy and regulations.

64.    Marder submitted claims to TRICARE using his individual provider identification number for his individual services from at least 2008 through 2011 and using his group and individual NPIs and covers the period of 2008 through 2015.

65.    As part of the TRICARE billing process, Defendants Marder and ADSCC filed

CMS form 1500s whereon they certified: necessary to the health of this patient and were

personally furnished by me or my employee under my personal direction.

*See* Exhibit 1, side 2.

### c.  MEDICARE COVERAGE AND CLAIMS SUBMISSIONS

66.    Pursuant to the Social Security Act, Medicare pays physicians under the Medicare

Physician's Fee Schedule for "all physicians' services." 42 U.S.C. § 1395w-4(a)(1). The SSA

defines "physicians' services" for the purposes of the Medicare Physician's Fee Schedule to

include certain items and services described in the SSA. 42 U.S.C. § 1395w-4(j)(3).

67.    The American Medical Association assigns and publishes numeric codes, known

as Current Procedural Terminology (CPT) and Health Care Financing Administration Procedure

Coding System (HCPCS) codes. The codes are a systematic listing of procedures and services

performed by health care providers. They include codes for radiation oncology and related

services, based on complexity, supervision, and documentation requirements. Health care

providers and health care benefit programs use CPT and HCPCS codes to describe and evaluate

the services for which they claim, and to decide whether to issue or deny payment. Each health

care benefit program establishes a fee reimbursement for each procedure described by a CPT or

HCPCS code.

68.    In the Medicare Physician's Fee Schedule, which Medicare publishes yearly, all

of the CPT codes are listed, together with the reimbursement Medicare allows for each code.

Medicare lists the amount of reimbursement paid in the facility setting (*i.e.*, hospital) and the

non-facility setting (*i.e.*, office).

19

69.     CPT Codes often are comprised of a Technical Component and a Professional Component.  The Technical Component represents the cost of the equipment, supplies and personnel to perform the procedure.  The Professional Component represents the physician or other healthcare professional work portion.  A "Global Service" includes both the Technical Component and the Professional Component.

70.     When completing the CMS 1500 claim form, the use or absence of a "modifier" with the applicable CPT code can supply additional information regarding the scope of the service being billed.

71.     In order to bill globally when a CPT code includes both a technical and a professional component, no modifier is used with the CPT code for the procedure, indicating that the claim is for both the technical and professional services.

72.     CPT Modifier "TC" is utilized for the technical component of a service in circumstances where a charge may be made for the technical component alone.

73.     CPT Modifier "26" is utilized for the professional component.

74.     CPT Modifier "59" is utilized to indicate a "Distinct Procedural Service" for procedures or services that are not normally reported together, but are appropriate under the circumstances because they were distinct or independent from other services performed on the same day. This may represent a different session or patient encounter, different Procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same physician. However, when another already established modifier is appropriate, it should be used rather than modifier 59. Only if there is not a more descriptive

20

modifier available, and the use of modifier 59 best explains the circumstances, should modifier 59 be used.

75.    CPT Modifier "76" is utilized to indicate a Repeat Procedure by Same Physician where a procedure or service was repeated subsequent to the original procedure or service.

76.    Fiscal intermediaries or carriers, such as First Coast, may issue decisions known as Local Coverage Determinations (LCDs) on whether to cover to cover a particular service. Such LCDs may also include requirements that a practitioner providing the service must complete to receive payment from Medicare.

77.    In addition, Medicare covers, and participating providers agree to submit, medically necessary claims for which the provider maintains adequate supporting documentation, justifying the treatment administered. 42 U.S.C. Section § 1395y(a)(1)(A). Medicare will not reimburse a physician for medically unnecessary services. *See* Medicare Claims Processing Manual, Chapter 23, Section 30(A) ("If a service is not reasonable and necessary to treat illness or injury for any reason, carriers consider the service noncovered notwithstanding the presence of a payment amount for the service in the Medicare fee schedule." (internal parenthetical omitted)).

78.    Accordingly, documentation of the medically necessity of these services requires legible, complete, dated, timed, and authenticated or signed entries in the patient's medical record by the person responsible for providing or evaluating the services provided. *See* First Coast LCD, L29200, August 2009; CMS Medical Learning Network, Fact Sheet: Complying with Medicare Signature Requirements (March 2011); TRICARE Policy Manual 6010.57-M, Chapter 1, Section 5.1 (2008).

#### d. RADIATION ONCOLOGY

79.     Radiation oncology is a cancer treatment wherein ionizing radiation is utilized to control malignant cells. The radiation is used to damage the DNA of the malignant cells in hopes of causing the cells to die or reproduce at a slower rate. Radiation oncology is used as a palliative treatment (where cure is not possible and the aim is for local disease control or symptomatic relief) or as therapeutic treatment (where the therapy has survival benefit and it can be curative).

80.     Radiation oncology items and services provided pursuant to the SSA include: (1) diagnostic X-ray tests . . . diagnostic laboratory tests, and other diagnostic tests, 42 U.S.C. § 1395x(s)(3); and (2) X-ray, radium, and radioactive isotope therapy, including materials and services of technicians, 42 U.S.C. § 1395x(s)(4).

#### 1. Supervision Requirements for Radiation Therapy

81.     The predominant CPT codes at issue here for therapeutic radiation services are covered under 42 U.S.C. § 1395x(s)(4) and are billed using CPT Codes 77261 through 77427 (hereafter referred to as "Radiation Therapy").

82.     In the Medicare Benefit Policy Manual defining "covered services," Medicare covers radiation therapy services furnished in an office or free standing radiation therapy center rendered under the "direct personal supervision" of a physician. *See* Medicare Benefit Policy Manual, Chapter 15, Section 90 (Revised October 1, 2003).

83.     "Direct personal supervision" requires the supervising physician to "be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." *Id*.

84.     If the supervising physician leaves the office or freestanding radiation therapy center, Medicare will not cover any radiation therapy services submitted by that supervising physician during his or her absence.

85.     The availability of a physician by phone or other electronic means does not constitute direct personal supervision.

## 2.   Training Requirements for Radiation Therapy

86.     In an LCD effective February 13, 2011, First Coast explicitly informs providers that services are covered by Medicare only if ordered and furnished by qualified personnel with training acquired in an approved residency:

> "CMS Manual System, Pub. 100-08, Program Integrity Manual, Chapter 13, Section 13.5.1 outlines that "reasonable and necessary" services are "ordered and/or furnished by qualified personnel." Services will be considered medically reasonable and necessary only if performed by appropriately trained providers.
>
> A qualified physician for this service is defined as follows: Training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty."

See First Coast LCD, L31510.

87.     Marder has not acquired training or expertise in radiation oncology within the framework of an accredited residency and/or fellowship program.

## 3.   Payment for Radiation Therapy

88.     The CPT codes used to submit claims for the actual administration of radiation primarily at issue in this case, CPT codes 77401, 77402, 77407 and 77412, were first utilized in 1991.

89.     CPT code 77401 is used when physicians administer low level radiation known as "superficial radiation" or "ortho-voltage" and is defined as "Radiation treatment delivery, superficial and/or ortho voltage."

90.     CPT code 77401 is used to bill for any administration of superficial radiation, regardless of the level of complexity.

91.     CPT codes 77402, 77407 and 77412 are used when physicians administer radiation at levels up to 5 MeV, a level which is up to 50 times higher than the superficial radiation described by CPT code 77401.

92.     CPT codes 77402 is used for simple treatments at higher energy levels and is defined as "Radiation treatment delivery, two separate treatment areas, three or more ports on a single treatment area, use of multiple blocks; up to MeV."

93.     CPT code 77407 is used for intermediate complexity treatments at higher energy levels and is defined as "Radiation treatment delivery, two separate treatment areas, three or more ports on a single treatment area, use of multiple blocks; up to5 MeV."

94.     CPT code 77412 is used for complex treatment delivery at higher energy levels and is defined as "Radiation treatment delivery, three or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; up to 5 MeV."

95.     First Coast LCD 31510 explicitly informs providers that it is not expected that the treatment delivery codes 77407, 77408, 77409, 77411, 77412, 77413, 77414, and 77416 will be utilized for treatment basal cell carcinoma or squamous cell carcinoma where the lesions are less than or equal to 2 cm (referred to as. T1 lesions).

96.     In a 2003 Medicare Program Memorandum, Medicare specified for CPT codes 77401 through 77416 that "Only one of these codes may be reported for each treatment session

24

no matter how many areas are treated or no matter how much radiation is delivered**."** Medicare Program Memorandum, Transmittal No. A-03-020, dated April 2, 2003. The only exception to this rule was if there was a distinct break in the service and the same region or regions were treated again the same day (as might be the case for treatment referred to as Hyperfractionation), In that case only, a second unit of service is appropriate.

97.     On January 1, 2008, CMS took steps to enforce this policy when it implemented national Medically Unlikely Edits (MUEs) for the 77401-77416 radiation delivery codes and those edits were set to deny anything greater than "2" services for the same beneficiary, same date of service, same provider, billed on one claim line. However, at that time, the national MUEs applied to a single claim line only. If the provider split the units across multiple claim lines or multiple claims and did not bill more than a quantity billed (QB) of 2, the MUE would not trigger a denial. Effective April 1, 2013 CMS enhanced its MUE logic to apply to the whole claim for certain CPT/HCPCS codes.

### 4.    Payment for Hyperfractionation Radiation Therapy

98.     Hyperfractionation Radiation Therapy refers to a treatment modality whereby the total dose of radiation is divided into small doses and treatments are given more than once in a single day, and may also span multiple days. In addition, the doses administered during the course of a single day need to be at least 6 hours apart.

99.     First Coast LCD 31510 explicitly informs providers that hyperfractionation Radiation Therapy is not covered for basal cell carcinoma or squamous cell carcinoma where the lesions are less than or equal to 2 cm (referred to as. T1 lesions)": "Hyperfractionation (BID treatment delivery) is non-covered for treatment of BCC or SCC stage T1 lesions."

**5.    Payment for Professional Services Performed by the Physician**

100.    In addition to a physician's supervision of these services, several of these codes include integral physician-specific components and/or professional services that must be rendered, documented, dated, and signed to make the Medicare claim properly payable.

101.    For instance, clinical treatment planning (CPT codes 77261 – 77263) reimburses physicians for evaluating the patient's overall medical condition and extent of disease, including a review and interpretation of multiple tests, before prescribing a specific type of radiation therapy for treatment. These are professional-only codes that reflect the work of the physician. The appropriate code is determined by the complexity of the planning required. *See* First Coast LCD, L29200, August 2009; ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

102.    After the plan is completed, simulations (CPT codes 77280 – 77295) ensure accurate treatment delivery through the use of simulation equipment (similar to an X-ray or MRI) to define the exact and correct treatment position for the patient. The physician reviews these simulation images prior to treatment to ensure that the patient is properly aligned for the radiation beams to target the tumor. Supporting documentation should include "patient positioning and immobilization device, target verification, possible utilizing [sic] radiographic studies, and a description of the physician's work." The appropriate code is determined by the complexity of the simulation required. *See* First Coast LCD, L29200, August 2009; *see also* ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

103.    A physician also must be directly involved in the use of treatment devices (CPT codes 77332 – 77334) to position the patient and ensure accurate radiation delivery. In particular, the physician must be involved in the design, selection, and placement of devices during the

patient's course of radiation therapy. The appropriate code is determined by the complexity of the device(s) required. *See* ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

104.    Continuing medical physics is appropriate for the weekly continuing medical physics process and reports the work and oversight of the medical physicist in the care of the IMRT patient, and is billed under CPT Code 77336.  It is not appropriately reported for work associated with the creation of the original IMRT plan.

105.    A Radiation therapy dose plan (CPT code 77300) is used to report dosimetry calculations that arrive at the relationship between monitor units (or time) and dose, and the physician's verification, review and approval of this. The documentation should contain the independent check for each field, separate from the computer-generated IMRT plan. *See* First Coast LCD, L29200, August 2009.

106.    During radiation treatment delivery, a physician may bill for radiation treatment management (CPT code 77427) to assess the patient's response to treatment and coordinate subsequent treatments. Because this code reports only the work of the physician, the code has only a professional component. It is not appropriate to charge for the weekly radiation treatment management if the physician is not meeting face-to-face with the patient and documenting this evaluation weekly. *See* First Coast LCD, L29200, August 2009; ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

### e.  PHYSICIAN SERVICES AND OFFICE VISITS

107.    Many CPT codes are dedicated to billing for physician services, and in some cases they apply to services rendered by qualified "non-physician practitioners" such as nurse practitioners or physician assistants.  For these codes, the concept of Professional Component

and Technical Component does not apply since physician services cannot be split into professional and technical components. Modifiers 26 & TC cannot be used with these codes.

108.    If the physician does not provide a face-to-face encounter and the patient is only seen by the non-physician practitioner, or the procedure is performed by the non-physician practitioner, the services can be billed using these CPT Codes only in limited circumstances.

109.    In certain circumstances, these CPT codes can be billed under the "incident to" rules.  "Incident to" services are defined as those services that are furnished incident to physician professional services in the physician's office. These services are billed and paid as if the physician personally provided them.  To qualify as "incident to," the services must be part of the patient's normal course of treatment, during which the physician personally performed an initial service and remained actively involved in the course of treatment. Although the physician does not have to be physically present in the patient's treatment room while these services are provided, the services must be rendered under the direct supervision of the physician.

110.    Direct supervision requires the physician to be present in the office suite to render assistance, if necessary.

111.    If the physician does not directly supervise these services and the services were otherwise performed following applicable rules, the claim must be submitted using the provider number of the non-physician practitioner to identify the performing provider and payment is made in a reduced amount.

## 1. Evaluation and Management (E/M) Services

112.    One group of CPT codes relating to physician services are those used to bill for evaluation and management (E/M) services.  E/M services refer to visits and consultations furnished by physicians.  E/M codes are categorized and sub-categorized to define the following:

where the patient's service was provided; if the patient is new or established; and what level of service was provided by the physician.  E/M codes 99201 through 99215 establish the medical requirements for services provided to patients treated at the physician's office (hereafter referred to as "E&M Services").

113.    The higher the CPT code level within each category, the more substantial the services provided by the doctor to the patient, the more thorough the patient history taken, the more elaborate the physical examination given, the more complex the medical decision making required, the more severe the patient's problem, and the more time the physician typically spends face-to-face with the patient and/or family.  The physician must ensure that all of the key components, i.e., history, examination, and medical decision making, meet or exceed the stated requirements for that particular level of E/M service to be charged.

114.    CPT Code 99203 is used to bill for an office visit with a new patient and requires a detailed history, a detailed examination and medical decision making of low complexity.  The code expressly provides that "Typically, 30 minutes are spent face-to-face with the patient and/or family."

115.    CPT Codes 99211 through 99215 are used to bill for office visits with established patients.

116.    CPT Code 99211, the lowest level for office visits with established patients, is used to bill for an office visit "for the evaluation and management of an established patient that may not require the presence of a physician. Usually the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

117.    CPT Codes 99212 through 99215 are for higher level visits with established patients, with each requiring more detailed histories, examinations and more detailed decision

29

making, and typically requiring face-to-face time between the physician and the patient or family

of between 10 and 40 minutes depending on the code

### 2. Dermatological Surgery Codes

118.     Other CPT codes are used to bill for other dermatology related surgical services

for biopsies, removal of malignant growths, removal of skin and tissue, repairs of wounds, tissue

transfer repair of wounds, destruction of skin growths, and related repairs.  These CPT codes are

hereafter referred to as the "Surgery Services."  In this case, those items were billed by Marder

and ADSCC using CPT Codes 11040 through 69100.

119.     Marder and ADSCC submitted numerous claims for E&M CPT Codes and for

Surgery CPT Codes.  All of the claims for these codes indicated that Marder was the performing

physician.

### f. PATHOLOGY SERVICES

120.     The pathology laboratory services at issue in this case are included in the Stark

Law's definition of Clinical Laboratory Services and are therefore within the definition of

Designated Health Services.  42 CFR 411.351  Those items were billed using CPT Codes 88305,

88312 and 88342 (hereafter referred to as "Pathology Services").

121.     Pathology Services are also comprised of a Professional Component and a

Technical Component, both of which may be performed independently or by different providers.

122.     The Technical Component for Pathology Services encompasses the multiple steps

required to properly prepare samples of tissue for examination.

a.          Fixation is a step used to prevent decay and preserve cells and
tissues in a "life-like" state.

b.          Grossing, also referred to as "cut-up", involves an examination and
description of the specimen that will include the appearance, the number

of pieces and their dimensions. Larger specimens may require further dissection to produce representative pieces from appropriate areas.

c.        Processing is where batches of specimens are processed to allow the specimens to be infiltrated with a sequence of different solvents finishing in molten paraffin wax.

d.        The specimens then are placed in an embedding center where they are placed in wax-filled molds known as specimen blocks.

e.        Sectioning is where the specimen blocks are cut using extremely fine steel blades. Paraffin sections are usually cut at a thickness of 3 - 5µm ensuring that only a single layer of cells makes up the section.

f.        The cells and other elements making up most specimens are largely colorless. In order to reveal structural detail using microscopy some form of staining is required.

g.        After staining, the sections are covered with a glass coverslip, at which point the specimen is ready.

123.    The foregoing steps require specialized laboratory equipment operated by properly trained personnel.

124.    After the forgoing steps are completed, the specimens are then ready to be sent to a pathologist who will view them under a microscope to make an appropriate diagnosis and prepare a report.  The work of the pathologist in viewing the slide under a microscope and preparing a report is the Professional Component of these laboratory services.

## VI.    NON-RENDERED, UNSUPERVISED AND UNQUALIFIED SERVICES

125.    From at least January 1, 2008 through May 2014, Marder and ADSCC massively overbilled for radiation related services claimed to have been rendered to Medicare and TRICARE patients.

126.    The total amount billed by Marder and ADSCC was over $49 million.

127.    Marder and ADSCC acted with actual knowledge or in deliberate ignorance or reckless disregard of the falsity of these claims.

31

128.    Marder and ADSCC had knowledge of the applicable Medicare statutes, rules and regulations governing the submission of claims for these services.

129.    Marder and ADSCC submitted these claims with knowledge that they were being submitted in violation of applicable Medicare statutes, rules and regulations.

### a.  Upcoding of Radiation Levels

130.    Marder and ADSCC utilize a total of three (3) radiation machines for treating patients at the two clinics. Two of the machines are located in the Port St. Lucie office. The third machine is located in the Okeechobee office.

131.    All three machines are only capable of administering "superficial radiation" and this has been the case at all times relevant herein.

132.    Originally, Marder and ADSCC only used CPT Code 77401 to bill for radiation treatments.  From at least January 1, 2008 through to mid-June 2010, Marder and ADSCC submitted claims to Medicare and TRICARE only utilizing CPT Code 77401 for radiation treatments.  During that time period, Marder and ADSCC were paid for over 22,000 services under CPT Code 77401. No claims were submitted during that time frame using CPT Codes 77402, 77407 and 77412.

133.    In 2008, CPT Code 77401 was reimbursed by Medicare at approximately $51.06.

134.    In 2009, reimbursement for CPT Code 77401 was reduced by Medicare to approximately $37.93.

135.    In 2010, reimbursement for CPT Code 77401 was again reduced by Medicare, this time to approximately $26.89, about half of what it had been in 2008.

136.    The amount ultimately paid to Marder and ADSCC was 80% of the amounts described above because 20% of the allowed amount is owed by the beneficiary as a co-payment.

137.    In mid-June 2010, although Marder and ADSCC did not acquire any new equipment with which to administer radiation treatment to patients, Marder and ADSCC began submitting claims to Medicare and TRICARE under CPT Codes 77402, 77407 and 77412.

138.    The reimbursement for CPT Codes 77402, 77407 and 77412 increased from 2008 to 2009 and again in 2010.  In 2010, CPT Codes 77402, 77407 and 77412 were reimbursed at approximately $131.86, $224.86 and $203.60 respectively.

139.    In 2011 and 2012, the total amount paid to Marder and ADSCC under CPT Code 77401 was less than $50.

140.    In contrast, from June 2010 through approximately August 2014, the total amount paid to Marder and ADSCC under CPT Codes 77402, 77407 and 77412 was over $6 million for over 40,000 services.

141.    All of the claims submitted by Marder and ADSCC to Medicare and TRICARE using CPT Codes 77402, 77407 and 77412 were false claims because the radiation devices owned by Marder were incapable of administering anything but superficial radiation and every claim should have been submitted using CPT Code 77401.

### b.  Unqualified personnel

142.    All of the claims submitted by Marder and ADSCC to Medicare for radiation oncology services were false claims because he was not qualified under Medicare guidelines to render or supervise such services.

### c.  Hyperfractionation

143.    The vast majority of claims for radiation treatment billed by Marder and ADSCC included a second claim for the same date of service using Modifier 76 to indicate a Repeat Procedure as would be done if the patient were receiving Hyperfractionation treatment.

144.    All of the claims submitted by Marder and ADSCC to Medicare for twice a day hyperfractionation treatments for basal cell carcinoma or squamous cell carcinoma where the lesions were less than or equal to 2 cm were in direct violation of Medicare rules and were false claims because such treatments are not a covered service.

145.    In addition, Marder and ADSCC routinely administered twice a day hyperfractionation treatments separated by far less than the six hours required by the applicable standard of care, typically administering such treatments less than an hour apart and thereby putting patients at risk of harm from the radiation. Marder authorized this as an inducement to patients who might otherwise reject the treatment because of the inconvenience of returning to the clinic twice a day.  The shorter interval between treatments also allowed Marder and ADSCC to process more patients per day and also to double revenues by billing two times per day.

146.    All of the claims submitted by Marder and ADSCC to Medicare for twice a day hyperfractionation treatments in circumstances where there was less than 6 hours between treatments were below the standard of care and were false claims.

### d.   Billing in Excess Quantities

147.    Marder and ADSCC routinely billed radiation services in quantities in excess of the single treatment per patient per day limit established by Medicare policy.

148.    All of the claims for quantities in excess of the single treatment per patient per day allowed by Medicare are false.

### e.  Failure to Supervise Due to Travel

149.     Marder traveled extensively outside the local Florida region during the time period at issue in this complaint.  Many of his travels took him outside of the United States.  Set

34

forth below is a partial listing of the time periods during which Marder engaged in international travel and therefore was completely absent from both office location of ADSCC:

| Departure | Return | Length |
|-----------|--------|--------|
| 07/11/08 | 07/29/08 | 18 |
| 10/12/08 | 10/23/08 | 11 |
| 01/11/09 | 01/18/09 | 7 |
| 09/29/09 | 10/11/09 | 12 |
| 12/17/09 | 01/04/10 | 17 |
| 02/03/10 | 02/11/10 | 8 |
| 03/17/10 | 03/19/10 | 2 |
| 06/23/10 | 07/16/10 | 23 |
| 09/19/10 | 10/01/10 | 12 |
| 06/27/11 | 07/18/11 | 21 |
| 10/01/11 | 10/21/11 | 20 |
| 07/08/12 | 08/06/12 | 28 |
| 09/27/12 | 10/09/12 | 12 |
| 01/23/13 | 01/27/13 | 4 |
| 07/20/13 | 08/04/13 | 14 |
| 09/15/13 | 09/27/13 | 12 |
| 12/22/13 | 01/20/14 | 28 |
| 02/28/14 | 03/07/14 | 7 |

150.    Although not even in the country, Marder continued to bill for numerous physician services or services that required his direct supervision and direct personal supervision during the time periods identified above.

151.    A summary of the Medicare claims for which Marder and ADSCC billed and were paid during the time periods described above is attached hereto as Exhibit 2.

152.    A chart identifying each item on a line-by-line basis for which Marder and ADSCC billed and were paid by Medicare during the time periods described above is attached hereto as Exhibit 3.

153.    The claims include services allegedly rendered by Marder and ADSCC to 579 different Medicare patients.

154.    A summary of the TRICARE claims for which Marder and ADSCC billed and were paid during the time periods described above is attached hereto as Exhibit 4.

155.    A chart identifying each item on a line-by-line basis for which Marder and ADSCC billed and were paid by TRICARE during the time periods described above is attached hereto as Exhibit 5.

156.    Marder and ADSCC continued to bill for radiation therapy services that required the direct personal supervision of Marder during the time periods identified above.  All of the claims submitted for radiation therapy while Marder was out of the country were false claims and are listed on the attached Exhibits 3 and 5.  Those items were billed using CPT Codes 77261,77280,77300,77332,77334,77336,77401,77402,77407,77412 and 77427.  Marder and ADSCC billed Medicare over $2.7 million for over 8,000 procedures under those codes and were paid over $830,000.00.

157.    Marder and ADSCC continued to bill for E&M services that required his physical presence with the patient during the time periods identified above.  All of the claims submitted for E&M services while Marder was out of the country were false claims and are listed on the attached Exhibits 3 and 5. Those items were billed using CPT Codes 99203, 99212, 99213, 99214 and 99215.  Marder and ADSCC billed Medicare over $56,000 for almost 600 office visits under those codes and were paid over $33,000.00.

158.    Marder and ADSCC continued to bill for Surgery CPT Codes indicating that Marder personally performed the services during the time periods identified above. All of the claims submitted for Surgery CPT Codes while Marder was out of the country were false claims and are listed on the attached Exhibits 3 and 5. Those items were billed using CPT Codes 11040

through 69100.  Marder and ADSCC billed Medicare over $400,000 for almost 2100 of those surgical procedures under those codes and were paid over $100,000.00.

159.    Marder and ADSCC continued to bill for Pathology CPT Codes indicating that Marder personally performed the services during the time periods identified above. All of the claims submitted for Pathology CPT Codes while Marder was out of the country were false claims and are listed on the attached Exhibits 3 and 5. Those items were billed using CPT Codes 88305, 88312 and 88342.  Marder and ADSCC billed Medicare over $400,000 for over 1800 pathology procedures under those codes and were paid over $145,000.00.

### f.   Failure to Supervise Due to the Operation of Two Geographically Separate Offices

160.     Marder treated patients at two geographically separate offices.

161.     Marder's primary office was the one located at 9580 South Federal Highway, Port St. Lucie, FL  34592 (the "Port St. Lucie office").

162.    Marder also operated a medical clinic at 202 NE 2d St., Suite #2, Okeechobee, FL 34972 (the "Okeechobee office").

163.    Marder was only physically present in the Okeechobee office for half a day, twice a month.

164.    Marder was often absent from the Port St. Lucie office, frequently taking time off, arriving late or departing early.

165.    Marder and ADSCC submitted claims to Medicare and TRICARE without indicating whether the patient was treated at the Port St. Lucie office or the Okeechobee office.

166.    The claims submitted to Medicare and TRICARE did not include information regarding the time of day the services were rendered.

167.     The detailed information regarding whether the patient was treated at the Port St. Lucie office or the Okeechobee office, and the time of day the patient was treated, is exclusively within the possession of Marder and ADSCC.

168.     All of the claims submitted for radiation therapy in one office while Marder was in the other office were false claims.

169.     All of the claims submitted for E&M services in one office while Marder was in the other office were false claims.

170.     All of the claims submitted for Surgery CPT Codes in one office while Marder was in the other office were false claims.

### g.  Additional Examples of False Claims

#### 1.  Medicare Beneficiary BM

171.     Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary BM during multiple encounters between 2010 through 2014.  In total for this one patient, Marder and ADSCC were paid for over 1847 services for which they billed over $535,000 and were paid over $200,000.  The co-payment owed by this patient for these services totaled over $52,000.  The paid services included over 1000 radiation treatments, and over 200 biopsies/excisions and pathology services.

172.     Beneficiary BM underwent a one-month course of radiation beginning September 11, 2013 and ending on October 8, 2013.  Marder and ADSCC billed Medicare for the radiation services rendered during that time period, but the payments were denied.  Marder and ADSCC billed Medicare for those services a second time, but on that occasion the claims were paid.

173.     The first time they were billed, those claims reflected a recurring pattern of radiation treatments for each of the 20 days on which services were rendered.  On each of the 20

days, Marder and ADSCC billed for a total of 8 radiation treatments under CPT Code 77402. Two treatments were billed using CPT Code 77402 with no modifier, two treatments were billed using CPT Code 77402 with a 76 modifier for a repeat procedure, two treatments were billed using CPT Code 77402 with a 59 modifier for Distinct Procedural Services and two treatments were billed using CPT Code 77402 with both modifier 76 and 59. The amount billed for the 160 radiation treatments was $2,200 per day for a total $44,000.

174.    Marder and ADSCC thereafter billed the radiation treatments for those same 20 days a second time. This time, the radiation services were billed under CPT Code 77412 with a quantity of 2 and no modifiers were used. Each pair of treatments was billed at $700 and paid at $376.53. The total paid by Medicare for the radiation treatments during those 20 days was $7,530.60.

175.    On October 9, 2013, Marder sent a letter to Medicare on the Letterhead of ADSCC. In that letter, he attested that the "signatures/notations" contained in the medical record for Beneficiary BM for September 11, 2013 and ending on October 8, 2013 were made by him when he "treated/diagnosed" the beneficiary. The letter additionally stated that "I do hereby attest that this information is true, accurate and complete to the best of my knowledge and I understand that any falsification, omission or concealment of materials fact may subject me to administrative, civil or criminal liability."

176.    The accompanying medical record for Beneficiary BM included a "Tumor Dose Record" containing a separate dated line for each radiation treatment. Marder's signed initials appear eight times on the Tumor Dose Record. Four of the initials correspond to dates of service of September 17, 2013, September 23, 2013, September 25, 2013 and September 27, 2013.

177.    On September 15, 2013, Marder departed for a trip to Frankfurt and did not return to the United States until September 27, 2013.

178.    The October 9, 2013 letter sent by Marder to Medicare did not disclose any information regarding his absence from the country for 12 days of the time frame at issue.

## 2.  Medicare Beneficiary AW

179.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary AW during multiple encounters between 2010 through 2014.  In total for this one patient, Marder and ADSCC were paid for 730 services for which they billed over $200,000 and were paid over $73,000.  The co-payment owed by this patient for these services totaled over $18,000.

180.    Beneficiary AW underwent a one-month course of radiation beginning November 5, 2012 and ending on December 4, 2012.  During that time period, Marder and ADSCC billed a recurring pattern of radiation treatments for each of the 20 days on which services were rendered. On each of the 20 days, Marder and ADSCC billed for a total of 8 radiation treatments under CPT Code 77402.  Two treatments were billed using CPT Code 77402 with no modifier, two treatments were billed using CPT Code 77402 with a 76 modifier for a repeat procedure, two treatments were billed using CPT Code 77402 with a 59 modifier for Distinct Procedural Services and two treatments were billed using CPT Code 77402 with both modifier 76 and 59. Each pair of treatments was billed at $550 and paid at $308.45 for a total of $1,233.80 just for the radiation treatments each day.  The total paid by Medicare for the radiation treatments during those 20 days was $19,908.

181.     In addition to the radiation treatments themselves, Marder and ADSCC billed for another $18,790 in radiation management related services which, in part, were inflated by the

overbilled radiation treatment claims because some of the radiation management related services are paid based on the number of radiation treatments.  Marder and ADSCC were paid an additional $8,163.39 for the radiation management related services

182.   In total during that one-month, Marder and ADSCC were paid over $28,000 by Medicare.  In addition, the patient owed another $7,017.97 to Marder and ADSCC as a co-payment.

### 3.  Medicare Beneficiary SS

183.   Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary SS during multiple encounters from January 2013 through February 2014.  In total for this one patient, Marder and ADSCC were paid for over 500 services for which they billed over $168,000 and were paid over $64,000.  The co-payment owed by Beneficiary SS for these services totaled over $16,800.

184.   Marder and ADSCC billed for radiation treatments allegedly administered to Beneficiary SS on a regular basis beginning December 10, 2013 and ending on February 18, 2014.  There were also services billed and paid for biopsies, destruction of lesions and pathology on December 9, 2013.

185.   Prior to December 9, 2013, the most recent services billed by Marder and ADSCC for Beneficiary SS were in April 2013, eight months earlier.

186.   On December 9, 2013, in addition to billing for a Level V office visit under CPT Code 99215, Marder and ADSCC billed for four biopsies under CPT Codes 11100 and 11101, the destruction of four lesions under CPT Codes 17000 and 17003 and for four pathology services under CPT Codes 88305.

187.    The very next day, Marder and ADSCC began billing for radiation treatments to Beneficiary SS.

188.    During that time period, Marder and ADSCC billed for radiation treatments on each of the 41 days on which services were rendered to Beneficiary SS.  On each of the 41 days, Marder and ADSCC billed for a total of 2 radiation treatments under CPT Code 77412 with no modifier.  Each pair of treatments was billed at $700 and paid at $374.83.  The total paid by Medicare for the radiation treatments during those 20 days was $15,018.70.

189.     In addition to the radiation treatments themselves, Marder and ADSCC billed for another $20,630 in radiation management related services which, in part, were inflated by the overbilled radiation treatment claims because some of the radiation management related services are paid based on the number of radiation treatments.  For example, Marder and ADSCC billed 14 times using CPT Code 77427 (used to bill for every 5 treatments) thereby indicating that a total of 70 treatments were managed during the 41 days of treatment.  Marder and ADSCC billed using CPT Code 77300 (for calculating the radiation dose) eight times on four different days: December 10, 2013, December 27, 2013, January 20, 2014 and February 5, 2014.

190.    Marder and ADSCC were paid an additional $3,781.64 for the radiation management related services.

191.    Marder and ADSCC also billed and were paid for an office visit using CPT Code 99212 on January 9, 2014.

192.     On December 22, 2013, Marder departed for a trip to France and Israel and did not return until January 20, 2014.  While Marder was out of the country, Marder and ADSCC billed $15,500 for services allegedly rendered to Beneficiary SS for which payment was made in the amount of $5,694.15.

4.      **Medicare Beneficiary EW**

193.      Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary EW during encounters on 22 days from October 26, 2009 through December 10, 2009.  In total for this one patient, Marder and ADSCC were paid for 153 services for which they were paid over $10,000, including 80 radiation treatments and 30 pathology services.

194.      The following is a summary of the paid claims for beneficiary EW during that time period:

| CPT Code | Quantity | Paid |
|---|---|---|
| 11100 | 1 | $37.78 |
| 11101 | 9 | $223.92 |
| 11303 | 1 | $48.22 |
| 11312 | 1 | $45.55 |
| 11313 | 1 | $114.92 |
| 11604 | 2 | $224.32 |
| 11623 | 1 | $108.65 |
| 11626 | 1 | $152.50 |
| 13101 | 1 | $295.94 |
| 13121 | 1 | $325.90 |
| 13132 | 2 | $853.72 |
| 17111 | 1 | $47.64 |
| 77261 | 2 | $119.26 |
| 77280 | 2 | $315.10 |
| 77401 | 80 | $2,427.20 |
| 77427 | 16 | $2,519.20 |
| 88305 | 30 | $2,600.65 |
| 99213 | 1 | $50.52 |
| Total | 153 | $10,510.99 |

5.   **Medicare Beneficiary PB**

194.      Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary PB during multiple encounters between 2008 through 2013.  In total for this one patient, Marder and ADSCC were paid for over 645 services for which they billed over $191,000

43

and were paid over $53,000.  The co-payment owed by this patient for these services totaled over $13,000.

195.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary PB during encounters on 22 days from January 5, 2010 through February 18, 2010. In total for this time period for this patient, Marder and ADSCC were paid for 110 services for which they were paid over $5,200, including 86 radiation treatments and 18 treatment management services.

196.    The following is a summary of the paid claims for beneficiary EW during that time period:

| CPT Code | Quantity Billed | Amt Billed | Amt Paid |
|---|---|---|---|
| 77261 | 1 | $395.00 | $60.54 |
| 77280 | 1 | $375.00 | $146.44 |
| 77300 | 1 | $550.00 | $56.58 |
| 77332 | 1 | $200.00 | $62.49 |
| 77336 | 2 | $550.00 | $87.68 |
| 77401 | 86 | $19,350.00 | $1,849.86 |
| 77427 | 18 | $12,150.00 | $2,956.86 |
| Total | 110 | $ 33,570.00 | $   5,220.45 |

### 6.  Medicare Beneficiary CE

197.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary EW during encounters on 22 days from May 15, 2012 through July 16, 2012 with actual radiation treatment first commencing on June 11, 2012.  In total for this one patient during this time period, Marder and ADSCC were paid for 236 services for which they were paid over $30,000, including 160 radiation treatments and 14 treatment management services.

44

198.     During that time period, Marder and ADSCC billed a recurring pattern of radiation treatments for each of the 22 days on which services were rendered.  On each of the 22 days, Marder and ADSCC billed for a total of 8 radiation treatments under CPT Code 77402. Two treatments were billed using CPT Code 77402 with no modifier, two treatments were billed using CPT Code 77402 with a 76 modifier for a repeat procedure, two treatments were billed using CPT Code 77402 with a 59 modifier for Distinct Procedural Services and two treatments were billed using CPT Code 77402 with both modifier 76 and 59.  Each pair of treatments was billed at $550 and paid at $308.45 for a total of $1,233.80 just for the radiation treatments each day.  The total paid by Medicare for the radiation treatments during those 20 days was $24,676.

199.     The following is a summary of the paid claims for beneficiary EW during that time period:

| CPT Code | Quantity Billed | Amt Paid |
|----------|-----------------|----------|
| 11100 Total | 1 | $88.95 |
| 11101 Total | 11 | $309.94 |
| 14021 Total | 1 | $764.74 |
| 77261 Total | 2 | $120.84 |
| 77280 Total | 2 | $315.46 |
| 77300 Total | 4 | $228.40 |
| 77332 Total | 1 | $65.23 |
| 77336 Total | 14 | $552.44 |
| 77402 Total | 160 | $24,676.00 |
| 77427 Total | 14 | $2,113.72 |
| 88305 Total | 15 | $1,327.07 |
| 99203 Total | 1 | $90.01 |
| 99212 Total | 2 | $72.24 |
| J3303 Total | 8 | $9.16 |
| Grand Total | 236 | $30,734.20 |

### 7.  Medicare Beneficiary BL

200.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary BL during multiple encounters between 2008 through 2014.  In total for this one patient, Marder and ADSCC were paid for over 1200 services for which they billed over $344,000 and were paid over $113,000.  The co-payment owed by this patient for these services totaled over $28,000.

201.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary BL during encounters on 16 days from January 2011 through February 7, 2011 with actual radiation treatment first commencing on January 19, 2011.  In total during this time frame, Marder and ADSCC were paid for 145 services for which they were paid over $20,000, including 56 radiation treatments, 10 treatment management services and 35 pathology services.

202.    The following is a summary of the paid claims for beneficiary EW during that time period:

| CPT Code | Quantity | Amt Paid |
|---|---|---|
| 11100 | 2 | $161.66 |
| 11101 | 17 | $478.72 |
| 11604 | 1 | $132.85 |
| 13121 | 1 | $379.87 |
| 14021 | 1 | $758.66 |
| 14060 | 1 | $677.04 |
| 77261 | 2 | $123.26 |
| 77280 | 2 | $315.40 |
| 77300 | 4 | $235.04 |
| 77332 | 1 | $66.21 |
| 77336 | 10 | $438.60 |
| 77407 | 56 | $11,896.77 |
| 77427 | 10 | $1,543.50 |
| 88305 | 35 | $3,081.11 |
| 99212 | 1 | $35.15 |
| 99213 | 1 | $58.40 |
| | 289 | $40,706.08 |

46

8.      **Medicare Beneficiary LG**

203.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary LG during multiple encounters between 2008 through 2013.  In total for this one patient, Marder and ADSCC were paid for over 1745 services for which they billed over $439,000 and were paid over $135,000.  The co-payment owed by this patient for these services totaled over $34,000.

204.    Marder and ADSCC submitted and were paid for numerous claims for Medicare Beneficiary LG during encounters on 21 days from June 12, 2008 through July 14, 2008.  In total during this time frame, Marder and ADSCC were paid for 245 services for which they were paid over $16,000, including 138 radiation treatments and 29 treatment management services for the 21 days on which radiation was administered.  On three days, Marder and ADSCC billed as many as 14 separate line items using CPT Code 77401 on each day.  On June 17, 2008, Marder and ADSCC billed over $11,000 for 33 different services.

205.    The following is a summary of the paid claims for beneficiary EW during that time period:

| CPT Code | Quantity Billed | Amt Billed | Amt Paid |
|---|---|---|---|
| 11100 | 1 | $190.00 | $71.15 |
| 77261 | 7 | $2,765.00 | $394.45 |
| 77280 | 7 | $2,625.00 | $1,095.99 |
| 77300 | 11 | $6,050.00 | $707.85 |
| 77332 | 21 | $4,200.00 | $1,385.01 |
| 77334 | 7 | $2,625.00 | $1,009.82 |
| 77336 | 22 | $6,050.00 | $1,566.39 |
| 77401 | 138 | $31,050.00 | $5,606.49 |
| 77427 | 29 | $19,575.00 | $4,165.64 |
| 88305 | 1 | $225.00 | $84.57 |
| 99212 | 1 | $65.00 | $30.81 |
| Total | 245 | $75,420.00 | $16,118.17 |

## VII.        THE ILLEGAL LABORATORY REFERRAL SCHEME

### a.        False and Fraudulent Claims and Statements

206.        Marder and ADSCC referred large volumes of laboratory tests for Medicare patients to Kendall and KML in return for remuneration paid by Kendall and KML.  The remuneration was paid by Kendall and KML through the device of allowing Marder and ADSCC to bill and collect payment from Medicare for the work performed by Kendall and KML.

207.         From at least 2008 to the present, ADSCC submitted, and Marder, Kendall and KML caused to be submitted, and Marder and ADSCC received payment for, millions of dollars in false Medicare claims based on these illegal patient referrals.  They made, and caused to be made, numerous false statements material to support the payment of these claims.

208.        Marder, ADSCC, Kendall and KML acted with actual knowledge or in deliberate ignorance or reckless disregard of the falsity of these claims.

209.        Marder, ADSCC, Kendall and KML submitted or caused the submission of these claims with knowledge that they were being submitted in violation of applicable Medicare statutes, rules and regulations.

### b.        Background

210.        Marder, ADSCC, Kendall and KML have all participated in the Medicare Program for many years.  As a result, they have had an obligation to be familiar with the Medicare laws, regulations, and program instructions during all times relevant herein.

211.        The Stark Law, 42 U.S.C. § 1395nn, was first enacted in 1989, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, was first enacted in 1972.

212.    KML is located over 120 miles driving distance from Marder's clinic in Port St. Lucie and over 130 miles driving distance from Marder's clinic in Okeechobee.

213.    Approximately 80% of the laboratory work referred by Marder and ADSCC to Kendall and KML was for patients age 65 or older, and who were thereby eligible for Medicare.

214.    Marder applied for and received a license to perform laboratory services in his Port St. Lucie clinic.  However, the only laboratory equipment covered by the license was a microscope. The license, number 800016385, was issued to Marder individually.  The license did not encompass the operation of any laboratory equipment or facilities needed to perform the Technical Component of processing of skin samples.

215.    Marder and ADSCC billed Medicare for Clinical Laboratory Services using CPT Codes 88305 (Level IV – Surgical Pathology, gross and microscopic examination), 88312 (Special stained specimen slides to identify organisms including interpretation and report) and 88342 (Tissue or cell analysis by immunologic technique)(hereinafter referred to collectively as "Pathology Services").

### c. The Operation of the Illegal Laboratory Referral

216.    Marder and ADSCC performed numerous biopsies and excisions on their patients which resulted in the need for a tissue specimen to be examined microscopically.

217.    Marder and ADSCC had the tissue samples delivered to Kendall and KML on a regular basis.

218.    In order to advance the scheme to defraud, Kendall and KML performed both the Technical Component and the Professional Component of all laboratory work referred by Marder and ADSCC.

219.    Then, rather than issuing a report on the letterhead of KML, Kendall and KML created a pathology report on letterhead indicating that the report had been prepared by Marder when that was not the case.

220.    The false pathology report generated by Kendall and KML included a signature line for Marder, often with Marder's signature already digitally inserted.

221.    In at least some cases, the false report was on the letterhead of a laboratory named "Marder Medical Laboratory."  No legal entity by the name of Marder Medical Laboratory has ever existed.  Marder's attempts to secure a laboratory license in the name of Marder Medical Laboratory were rejected for that reason.

222.    Kendall and KML did not submit any claims to Medicare for any of the services rendered to the Medicare beneficiaries referred by Marder and ADSCC, but instead transmitted the false pathology reports to Marder and ADSCC in order to allow them to submit the false claims to Medicare.

223.    In return, Marder shared the proceeds of the fraud with Kendall for his role in the scheme.  Since at least 2010, Marder has paid Kendall approximately $120,000 a year in payments disguised as a salary to Kendall on the fictitious basis that Kendall was an employee of Marder or ADSCC.

224.    As a result of the scheme, Marder and ADSCC were paid for laboratory work that they never performed.  And, because Marder was the owner and sole physician at ADSCC, he was in a position where he made the decisions on the number of biopsies and excisions to perform on his patients knowing that the more biopsies and excisions he subjected his patients to, the more he would profit by being paid by Medicare for pathology services he never rendered.

225.    Marder and ADSCC generally imposed a quota upon their employed physician assistants of at least 50 biopsies per day.

226.    As a result of the scheme, between 2008 through approximately August 2014, Kendall and KML caused to be submitted and Marder and ADSCC submitted false claims to Medicare for over 35,000 Pathology Services. All but 61 of the Pathology Services were billed globally meaning that Marder and ADSCC were thereby claiming to have performed both the Professional Component and the Technical Component. None of the claims were submitted with Modifier 26 indicating that they were being submitted only for the Professional Component. Less than $4,000 in total was paid on the 61 claims were submitted using the Modifier TC to indicate that they were being submitted only for the Technical Component.

227.    On the basis of the false claims, Marder and ADSCC were paid over $2.8 million by Medicare for the Pathology Services that were billed globally.

## VIII.    FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) (claims up to and through May 19, 2009)
and 31 U.S.C. §3729(a)(1)(A) (claims from and after May 20, 2009))

228.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

229.    Defendants Marder and ADSCC knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States for Radiation Therapy, E&M Services, Surgery Services and Pathology Services.

230.    Defendants Marder and ADSCC knowingly presented or caused to be presented false or fraudulent claims for services that were billed in violation of applicable Medicare

statutes, regulations and rules for Radiation Therapy, E&M Services, Surgery Services and Pathology Services.

231.    By virtue of the false or fraudulent claims that Marder and ADSC made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## IX.    SECOND CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) (claims up to and through May 19, 2009)
and 31 U.S.C. §3729(a)(1)(A) (claims from and after May 20, 2009))

232.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

233.    Defendants Marder, ADSCC, Kendall and KML knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States for laboratory services that were false as a result of illegal kickbacks.

234.    Defendants Marder, ADSCC, Kendall and KML knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States by submitting claims for laboratory services that were ineligible for reimbursement under the Stark Law's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom the physicians has an illegal financial relationship.

235.    Defendants Marder and ADSCC knowingly presented or caused to be presented false or fraudulent claims for services that were billed in violation of applicable Medicare statutes, regulations and rules.

236.    By virtue of the false or fraudulent claims that Marder, ADSCC, Kendall and KML made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## X.     THIRD CAUSE OF ACTION
(False Claims Act: Presentation of False Statements Material to False Claims)
(31 U.S.C. § 3729(a)(1)(B))

237.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

238.    Defendants Marder and ADSCC knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get such claims paid by the United States with respect to Radiation Therapy, E&M Services, Surgery Services and Pathology Services.

239.    Defendants Marder and ADSCC knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get false or fraudulent claims paid by the United States  with respect to for Radiation Therapy, E&M Services, Surgery Services and Pathology Services that were billed in violation of applicable Medicare statutes, regulations and rules.

240.    By virtue of the false or fraudulent claims that Marder and ADSCC made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## XI.      FOURTH CAUSE OF ACTION
**(False Claims Act: Presentation of False Statements Material to False Claims)**
**(31 U.S.C. § 3729(a)(1)(B))**

241.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

242.    Defendants Marder, ADSCC, Kendall and KML knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get such claims paid by the United States with respect to laboratory services that were ineligible for reimbursement as a result of illegal kickbacks.

243.    Defendants Marder, ADSCC, Kendall and KML knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get false or fraudulent claims paid by the United States  with respect to laboratory services ineligible for reimbursement under the Stark Law's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom the physicians has an illegal financial relationship.

244.    Defendants Marder and ADSCC knowingly presented and caused to be presented false or fraudulent claims for services that were billed in violation of applicable Medicare statutes, regulations and rules.

245.    By virtue of the false or fraudulent claims that Marder, ADSCC, Kendall and KML made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## XII.        FIFTH CAUSE OF ACTION
### (Conspiracy (31 U.S.C. § 3729(a)(3)))

246.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

247.    Defendants Marder, ADSCC, Kendall and KML entered into an agreement to have the United States pay false or fraudulent claims by entering into a conspiracy for Kendall and KML to pay kickbacks to Marder and ADSCC in return for referrals for laboratory services to be sent from Marder and ADSCC to Kendall and KML.

248.    Defendants Marder, ADSCC, Kendall and KML entered into an agreement to have the United States pay false or fraudulent claims by entering into a conspiracy with respect to laboratory services ineligible for reimbursement under the Stark Law's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom the physician has an illegal financial relationship.

249.    By virtue of the false or fraudulent claims that Marder, ADSCC, Kendall and KML conspired to be made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## XIII.        SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

250.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

251.    The United States claims the recovery of all monies by which Marder and ADSCC have been unjustly enriched.

55

252.    As a consequence of the acts set forth above, Marder and ADSCC were unjustly enriched at the expense of the United States in an amount to be determined at trial which, under the circumstances, in equity and good conscience, should be returned to the United States.

## XIV.      SEVENTH CAUSE OF ACTION
(Payment by Mistake)

253.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

254.    The United States claims the recovery of all monies it paid to Marder and ADSCC by mistake.

255.    As a consequence of the acts set forth above, Marder and ADSCC were paid by mistake at the expense of the United States in an amount to be determined at trial which should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants as follows:

I.      On the First, Second, Third, Fourth and Fifth Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.     On the Sixth Count for unjust enrichment, for the amounts by which defendants were unjustly enriched, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

III.    On the Seventh Count for payment by mistake, for the amounts the United States paid by mistake, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The United States demands a jury trial in this case.


Dated: November 19, 2014           Respectfully submitted,
WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:          /s  Mark Lavine_____
MARK A. LAVINE
Assistant United States Attorney
Fla. Bar No. 648876
500 S. Australian Avenue, Suite 400
West Palm Beach, FL  33401
Tel.   (561) 209-1043
Fax:   (561) 805-9846
Mark.Lavine@usdoj.gov
*Attorneys for United States of America*

57