UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-24503-CIV- MOORE/TORRES

UNITED STATES OF AMERICA; and the
STATE OF FLORIDA, *ex rel.*
THEODORE A. SCHIFF, M.D.

     Plaintiffs,

v.

GARY L. MARDER, D.O.;
ALLERGY, DERMATOLOGY & SKIN
CANCER CENTER, INC., a Florida corporation
ROBERT I. KENDALL, M.D., and
KENDALL MEDICAL LABORATORY, INC.,
a Florida corporation,

     Defendants.

_____/

**THE UNITED STATES' CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS**

The United States hereby submits its consolidated opposition to the motions to dismiss
the United States' Complaint in Intervention (D.E. 30, hereafter referred to as the "Complaint")
filed by the Defendants (D.E. 50 and 51), and respectfully states as follows:

**I.    INTRODUCTION**

Defendants primarily assert that the Complaint is not pled with sufficient particularity
under Fed. R. Civ. P. 9(b). This argument fails because the Complaint includes highly detailed
allegations that meet and exceed Rule 9(b)'s pleading requirements and provides Defendants
with ample notice regarding the facts of their alleged conduct. The defendants' other arguments
challenge the sufficiency of the remuneration underlying certain claims and assert a defense
based upon a purported employment relationship. However, those positions were advanced with
no citation to legal authority, and are plainly wrong or have been squarely rejected more than
once on essentially identical facts.

## II.     SUMMARY OF THE ALLEGATIONS OF THE COMPLAINT

The United States' Complaint alleges two separate schemes, only one of which is the subject of the motions to dismiss.  The first scheme, alleged only against defendants Gary L. Marder D.O. ("Marder") and Allergy, Dermatology & Skin Cancer Center, Inc. ("ADSCC") primarily relates to massive overbilling in connection with radiation treatments administered to patients at the medical clinics operated by Marder and ADSCC.  Defendants' motions to dismiss do not in any manner allege any deficiencies related to the allegations underlying this scheme for which relief is sought in the First, Third, Sixth and Seventh Counts.  Thus, the question of whether those four Counts survive the motions to dismiss as to the claims of massive overbilling for radiation claims is not at issue.

The second scheme, alleged against all four defendants including Marder, ADSCC, Robert I. Kendall, M.D. ("Kendall") and Kendall Medical Laboratory, Inc. ("KML"), primarily relates to fraud in connection with the more than 35,000 pieces of tissue removed from patients by Dr. Marder and then sent for laboratory tests (Complaint, ¶ 226) performed solely by Kendall and KML, but billed to Medicare by Marder and ADSCC, and generating payments of over $2.8 million.  (Complaint, ¶ 227.)  The sufficiency of the allegations as to the laboratory scheme is the sole subject of the motions to dismiss.  The Complaint seeks relief against all four defendants in connection with the laboratory scheme in Counts 2, 4, and 5 under the False Claims Act for the presentation of false claims, the use of false records and for conspiracy, respectively.[1]  The underlying fraudulent conduct is the defendants' violation of the Stark Act, 42 U.S.C. § 1395nn (the "Stark Act") and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS").  The Complaint seeks relief against two of the defendants, Marder and ADSCC, in connection with the laboratory scheme (and the radiation scheme) in the Sixth Count for Unjust Enrichment and in the Seventh Count for Payment by Mistake.

---

[1] Because the motions only attack the sufficiency of the allegations underlying the laboratory scheme, but relief for the laboratory scheme is **not** sought in the First and Third Counts, the motion filed by Marder and ADSCC should be denied forthwith to the extent that they seek the dismissal of those Counts.

### III.    ARGUMENT
#### A.  Applicable Legal Standards.
##### 1.   The Rule 12(b)(6) Standard

Defendants challenge the Complaint under Fed. R. Civ. P Rule 12(b)(6), which permits dismissal for failure to state a claim upon which relief can be granted.  Applying the standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Eleventh Circuit has stated that the "complaint must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

The Eleventh Circuit has repeatedly emphasized that "[w]e 'accept[ ] the factual allegations in the complaint as true and construe[ ] them in the light most favorable to the plaintiff.'" *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012) (quoting S*peaker v. United States Dep't of Health & Human Servs. Ctrs. for  Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010)).  All reasonable inferences are to be drawn in favor of the plaintiff. *See Bryant v. Avado Brands, Inc.*, 187 F.3d. 1271, 1273 n.1 (11th Cir. 1999).

##### 2.   The Purpose of Rule 9(b) Is Notice.

The Defendants also argue that the Complaint fails to meet Rule 9(b).  The purpose of Rule 9(b) is "to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery." *United States ex rel. Longest v. Dyncorp*, No. 03-816, 2006 U.S. Dist. LEXIS 1838, at *14 (M.D. Fla. Jan. 9, 2006).

Thus, Rule 9(b) must be read in conjunction with Rule 8, which requires merely that a complaint provide a "short and plain statement of the claim" made by "simple, concise, and direct allegations."   Fed. R. Civ. P. 8(a)(2), 8(d)(1).  As stated by the Eleventh Circuit, in "considering a motion to dismiss for failure to plead fraud with particularity [a court] should always be careful to harmonize the directive of rule 9(b) with the broader policy of notice pleading" found in Rule 8.  *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985).  Under Rule 8, a complaint need not allege an exhaustive roadmap of a plaintiff's claims, but must be sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).  In

3

other words, although Rule 9(b) adds particularity requirements for allegations of fraud or mistake, Rule 9(b)'s requirements "may not . . . abrogate the concept of notice pleading." *Dyncorp*, 2006 U.S. Dist. LEXIS 1838, at *6; see also *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 503 (6th Cir. 2007) ("[T]he purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct.").

### 3.  The Rule 9(b) Standard in an FCA Case

In an FCA case, Rule 9(b) requires that a plaintiff allege the *who, what, when, where and how* of the fraudulent submissions to the United States.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  In other words, "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them.'"  *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.,* 19 F.3d 562, 567–68 (11th Cir. 1994)).

With respect to allegations regarding the actual submission of claims, the primary requirement is simply that there be "some indicia of reliability" in the complaint.  *Id.* at 1311 ("*some* indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." (emphasis supplied)).  This standard does not demand an exhaustive recitation of every detail of every claim. For example, in *Clausen* it was clearly stated that not all information was required as to all claims. Rather, "some" allegations as to "some" of the claims would be sufficient:

> … **this discussion** merely lists some of the types of information that might have helped Clausen state an essential element of his claim with particularity **but does not mandate all of this information for any of the alleged claims.** Although Clausen has provided none of these items of information here, **some of this information for at least some of the claims must be pleaded** in order to satisfy Rule 9(b).

*Clausen*, 290 F.3d at 1312, n. 21.

Other decisions take the same approach. In *U.S. ex rel. Matheny v. Medco Health Solutions, Inc*., 671 F.3d 1217, 1226-27 (11th Cir. 2012) the Court noted that the Complaint's exhibits included details "on only a portion of the accounts alleged to contain Overpayments" but that "the inclusion of some records for some of the accounts is sufficient." The Court also noted "that Rule 9(b) does not mandate all of that information for each alleged claim, only "some of

the information for at least some of the claims" citing to the decision in *United States ex rel Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006) which in turn was quoting *Clausen*, 290 F.3d at 1312 n. 21); *Matheny* at 1227(emphasis added). In sum, even in *Clausen, Matheny,* and *Atkins* where the complaints were dismissed, there is powerful language supporting the rule that inclusion of details regarding a portion of the claims at issue is sufficient to survive a 9(b) challenge. *See also United States ex rel. Butler v. Magellan Health Servs., Inc*., 74 F. Supp. 2d 1201, 1215 (M.D. Fla. 1999) ("[C]ourts recognize that if the alleged fraud occurred over an extended period of time and consisted of numerous acts, the specificity requirements are applied less stringently.")

### 4.  False Claims Based on the Stark Act and the Anti-Kickback Statute

The AKS and Stark Act both advance the goal of eliminating the serious problem of the corrupting influence of inappropriate financial incentives on the delivery of health care in this country.  Appropriately, it is a settled matter in this Circuit that claims submitted to Medicare in violation of the AKS or Stark Act are false under the FCA.  Compliance with the AKS and Stark is a condition of payment for the Medicare program.  *See Freedman* 781 F. Supp. 2d at 1279; *see also Pogue*, 565 F. Supp. 2d at 159 (noting the "absurdity" of an argument that compliance with the Anti-Kickback Statute is not a precondition of payment as it "would put the government in the position of funding illegal kickbacks after the act.").  In addition, the AKS was amended in 2009 to specifically state "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of … [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

### a.  The Stark Act

The Stark Act prohibits the submission of Medicare claims for items and services that are the product of prohibited patient referrals. The purpose of the Stark Act is to protect the integrity of the Medicare program by preventing a doctor's personal financial interests from influencing the medical decision-making process, thereby ensuring that medical decisions are based solely on the best interests of the patient and not the financial interests of the physician.

Pursuant to the Stark Act, the United States will not pay for items or services ordered by physicians who have improper financial relationships with another entity. 42 U.S.C. § 1395nn(g)(1); see also *United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), aff'd 517 F.3d 449 (7th Cir. 2008). Violations of the Stark Act may also subject the entity billing the

service to exclusion from participation in federal health care programs and other financial penalties. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).The primary thrust of the Stark Act is actually quite simple.  A physician is prohibited from making a referral for certain "designated health services" to an entity with which he has a financial relationship.  And, if a prohibited referral is made, no claim for payment can be presented to any third party:

> Except as provided in subsection (b) of this section, **if a physician** (or an immediate family member of such physician) **has a financial relationship with an entity** specified in paragraph (2), then –
>
> > (A) **the physician may not make a referral to the entity for** the furnishing of **designated health services** for which payment otherwise may be made under this subchapter, and
> >
> > (B) **the entity may not present** or cause to be presented **a claim** under this subchapter or bill **to any individual, third party payor, or other entity** for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (a)(1) (emphasis supplied).  The "designated health services" ("DHS") referenced in this section are defined in section (h) of the statute and include, among other things, clinical laboratory services. *See* 42 U.S.C. § 1395nn(h)(6)(A).

In addition to prohibiting the submission of claims for DHS under these circumstances, the Stark Act also directly prohibits Medicare from making any payment on such claims. "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

The Stark Act defines a prohibited "financial relationship" very broadly to include "compensation arrangements" between the physician and the entity providing the service.  See 42 U.S.C. §§ 1395nn(a)(2)(B).  A compensation arrangement is defined as "any arrangement involving any remuneration between a physician … and an entity".  The Stark Act then defines remuneration to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." See 42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1)(A) & (B); 42 C.F.R. § 411.354(c).

### b.  The Anti-Kickback Statute

The AKS prohibits any person or entity from soliciting, receiving, offering, or making any payment to induce any person to refer, recommend, or arrange for the purchase of any item for which payment may be made in whole or in part by a federal health care program.  42 U.S.C. § 1320a-7b(b)(1) and (2).   The prohibition of the AKS encompasses "**any remuneration**

(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind". 42 U.S.C. § 1320a–7b(b)(1)(A)

As can be seen, the definition of remuneration under the AKS uses the same operative language as the definition under the Stark Act. In both sub-sections (b)(1) and (b)(2) of the AKS, the reference is to "any remuneration" whether conveyed **_directly or indirectly, overtly or covertly, in cash or in kind_**, including but not limited to any kickback, bribe, or rebate. In the Stark Act, the reference is similarly to "any remuneration" whether conveyed **_directly or indirectly, overtly or covertly, in cash or in kind_**." _See 42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1)(A) & (B); 42 C.F.R. § 411.354(c)._

## IV.   THE MOTIONS TO DISMISS SHOULD BE DENIED

An examination of the Complaint reveals that (1) it plainly alleges remuneration within the meaning of both the Stark Act and the AKS; (2) it need not affirmatively allege the non-applicability of every one of the numerous exceptions to the Stark Act and the AKS (which instead must be asserted as affirmative defenses, including any exception based upon employment); and (3) it easily satisfies the requirements of Rule 9(b). The defendants have largely advanced their arguments on these points by failing to consider any relevant case law.

### A.  The United States Properly Alleges Violation of the Stark Act and the AKS

The defendants challenge the sufficiency of the Complaint's allegations regarding the Stark Act and the AKS on two bases. First, they assert that the United States' allegations fail to establish sufficient remuneration to support claims under those laws. Second, they claim that the allegations in the Complaint establish an employment relationship, thereby mandating dismissal pursuant to an exception to the Stark Act and the AKS. An examination of relevant case law easily establishes the defendants' positions are simply contrary to applicable law and have been squarely rejected more than once on essentially identical facts.[2]

#### 1.   Remuneration under the Stark Act and the AKS Has Consistently Been Broadly Interpreted as Anything of Value

Remuneration under the Stark Act and the AKS has been broadly defined as "anything of value." _United States ex rel. Daugherty v. Bostwick Laboratories_, 2012 WL 6593804 at * 11,

---

[2] The United States notes that the defendants' have not otherwise challenged whether the Complaint sufficiently alleges the elements of causes of action under the Stark Act and the AKS. Accordingly, the United States does not address each element, but only the two issues raised by the defendants regarding remuneration and employment.

2012 U.S. Dist. LEXIS 178641 (S.D. Ohio Dec. 18, 2012);  *U.S. ex rel. Ruscher v. Omnicare, Inc.*, Slip Copy, 2014 WL 2618158 at *8 (S.D.Tex. June 12, 2014.)(anything of value in any form whatsoever); *Publication of OIG Special Fraud Alerts*, 59 Fed.Reg. 65372, 65375 (Dec. 19, 1994)("anything of value"); *Klaczak v. Consolidated Med. Transp.*, 458 F.Supp.2d 622, 678 (N.D.Ill.2006) ("Remuneration, for purposes of the [Anti-Kickback Statute], is defined broadly, meaning 'anything of value.'")  The reasoning is that "'[t]he Anti-Kickback Statute uses the term any remuneration, which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading.'" *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc*., No. 2:08–CV–00114, 2012 WL 628515, at *5 (S.D.Ohio Feb.27, 2012) (quoting *United States ex. rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03–CV–001672008, 2008 WL 5282139, at *7 (S.D.Ohio Dec.18, 2008)).  In *Fry*, the court relied on the Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed.Reg. 35952, 35958 (July 29, 1991), which it read to be "unambiguous in offering a broad definition of the term 'remuneration' as 'anything of value in any form whatsoever.' " *Fry*, 2008 WL 5282139, at *7. Those regulations explain that Congress's intent in placing the term 'remuneration' in the statute "was to cover the transferring of anything of value in any form or manner whatsoever." 56 Fed.Reg. at 35958.

The broad definition of remuneration as "anything of value" fully supports the conclusion that conveying to another party the right to bill and collect money from Medicare qualifies as remuneration.  In this case, the allegations of the Complaint clearly articulate that Kendall and KML provided pathology reports to Marder and ADSCC to allow them to bill Medicare (thereby collecting $2.8 million).  (Complaint, ¶ 227.)  The provision of those reports and the resulting payments from Medicare are both of great value and qualify as remuneration.  Indeed, when faced with the question of remuneration on essentially the same facts as presented herein, courts have concluded that the arrangement conveyed value constituting remuneration under Stark, the AKS, or both.

For example, in *United States ex rel. Daugherty v. Bostwick Laboratories*, 2012 U.S. Dist. LEXIS 178641 (S.D. Ohio Dec. 18, 2012), a case based upon both the Stark Act and the AKS, the relator alleged that Bostwick, the laboratory owner, offered physicians the opportunity to bill for the professional component of tests that the physicians did not perform in order to induce the physicians to refer testing to Bostwick.  In particular, it was alleged that Bostwick

offered to provide the professional interpretation with the analysis and a draft report with the physician practice's logo and a place for the physician signature. *Id.*at *11. This provided the physician with the results of the professional component of the test without the physician having to actually conduct any professional analysis or incur any of the costs associated with performing the professional component of the test. *Id.*

The court's conclusion was unequivocal as to whether the ability to bill Medicare provided by the laboratory to the doctor constituted remuneration under the Stark Act and the AKS. The court stated that it was "***clearly*** an arrangement whereby something of value was given in order to induce referrals, ***exactly the scenarios contemplated by the AKS and the Stark laws***. Simply put, ***not having to do the work*** of the professional component of the test and ***not having to set up and maintain the infrastructure in order to do the test*** and, instead, merely reviewing work that is already complete and signing one's name ***is certainly something of value***." *Id.* (emphasis supplied).

The facts in *United States ex rel. Freedman v. Suarez-Hoyos, M.D.*, 781 F.Supp.2d 1270 (M.D. FL 2011), a case construing the AKS, are also practically identical. In *Suarez-Hoyos,* the dermatologist, Wasserman, "would send TPL [the laboratory] a biopsy specimen he had excised from a patient for testing." *Id.* at 1273. Upon receipt of the tissue specimen, the laboratory would "prepare a slide", "interpret the slide and prepare a pathology report." *Id.* The laboratory then "would provide that report to Wasserman." *Id.* Next, "in an effort to increase the number of Medicare referrals Wasserman made to TPL, [the owner of TPL] and TPL allowed Wasserman to bill Medicare for the professional component for the specimen, even though he did not do the work that would permit him to seek such reimbursement. *Id.* This Court also found that the provision of the pathology reports was remuneration under the statute. *Id.* at 1281.

The Court in *Suarez-Hoyos* also approvingly noted the Governments' position that "remuneration in this case can be considered either the gratuitous provision of pathology reports or the Medicare payments themselves, since, in essence, [the laboratory's] conduct is equivalent to billing Medicare for the slide reading and then writing [the dermatologist] a check for the amount of the Medicare payment that TPL received." *Id.* n.7. The same analysis is applicable here.

The factual descriptions contained in *Bostwick* and *Suarez-Hoyos* are so close to the Complaint's allegations that they almost could be used to describe this case without revision.

Both *Bostwick* and *Suarez-Hoyos* directly considered whether a laboratory's provision of pathology reports to a doctor so that the doctor could bill Medicare qualified as remuneration. And both cases strongly came down on the side of the conclusion that value was conveyed which qualified as remuneration under the statutes   The conclusions in those cases, that the arrangements "*clearly*" and "*certainly*" conveyed something of value in order to induce referrals and were "*exactly the scenarios contemplated by the AKS and the Stark laws*" is fully applicable to this case.   See also *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F.Supp.2d 267, 273-74 (D.Mass.2010)(scheme which allowed physicians to bill Medicare conveyed remuneration).

In sum, pervasive support exists for the proposition that remuneration when interpreting the Stark Act and the AKS is to be construed quite broadly as "anything of value," *infra*, p. 7-8. Thus, in three cases, none cited by the defendants, courts have found that the ability to bill and collect money from Medicare is of substantial value and constitutes remuneration under the Stark Act and the AKS.   In the two laboratory cases, *Bostwick* and *Suarez-Hoyos*, the primary factual difference makes this a more compelling case.   In those cases, the doctors were only billing for the professional component of the tests whereas in this case, Kendall and KML allowed Marder and ADSCC to bill both for the technical component of preparing the slide and the professional component of interpreting the slide and preparing the report.[3]   Thus, in the instant case, the value was even greater leading to payments of over $2.8 million.[4]   Thus, the Complaint sufficiently

---

[3]   Another impact of the difference in the arrangement was that in *Suarez-Hoyos* the laboratory received its share of the scheme by directly billing and being paid by Medicare for the technical component of the services and was thereby able to provide the report to the doctor without getting a separate payment from the doctor.   Thus, the Court in *Suarez-Hoyos* described the provision of the report to the doctor as being gratuitous.   In this case the laboratory did no billing at all and allowed the doctor to bill for the professional and technical components of the laboratory services.   Thus, the laboratory in this case received its share of the scheme from Marder.   However, the essential arrangement was the same.   Kendall was providing Marder with the valuable and profitable ability to bill and collect millions of dollars from Medicare. Complaint, ¶ 227 ("Marder and ADSCC were paid over $2.8 million by Medicare for the Pathology Services").

[4]   The Complaint also alleges that from 2010 forward the share of the scheme enjoyed by Kendall and KML was approximately $120,000 annually (disguised as salary).   Complaint, ¶223. If that annual payment was paid for all six years of the scheme alleged in the Complaint the total payments to Kendall and KML would be in the neighborhood of just $720,000, a figure that is dwarfed by the $2.8 million collected by Marder and ADSCC.   The difference between the payments of $2.8 million and the amount funneled back to Kendall and KML is an alternative

alleges remuneration under the Stark Act and the AKS.

### 2.   Defendants, Not the United States, Must Prove They Meet the Employment Exception to the Stark Act and the AKS

Defendants Marder and ADSCC, without citation to any cases interpreting the allegations necessary to support a FCA case based upon the Stark Act or the AKS, argue that the Complaint should be dismissed because it "acknowledges" that there is an employment exception to the Stark Act and the AKS, and that it "acknowledges" that Kendall was an employee.  *See* Defendants' Mem. at 2.  However, the defendants' assertions are both legally and factually incorrect.  The law does not support dismissal and the Complaint does not at all acknowledge that Kendall was an employee, but very clearly alleges just the opposite.

Exceptions to the Stark Act and AKS are affirmative defenses that need not be denied in the complaint.  *United States v. Vernon*, 723 F.3d 1234, 1270–71 (11th Cir. 2013); *U.S. v. Halifax Hosp. Medical Center*, 2012 WL 921147 at *5 (M.D. Fla. Mar. 19, 2012)(" it is the Defendants' obligation to plead" the exception for bona fide employment relationships."); *United States ex rel. Parikh v. Citizens Medical Center*, 977 F.Supp.2d 654, 668-69 (S.D. Tex. 2013)("the AKS and Stark employment exemptions are affirmative defenses on which [the defendant] Citizens has the burden of proof"); *see also United States ex rel. Kosenke, 554 F.3d at 95* (the government's initial burden extends only to the elements of a violation under the [Stark] Act, at which point "the burden shifts to the defendant to establish that the conduct was protected by an exception."); *Rogan*, 459 F. Supp. 2d at 716 (it is not an element of the Government's case to prove "that defendant's conduct does not fit within a safe harbor or exception.")  The defendants do not otherwise challenge whether the United States has satisfied its obligation to allege a violation of the Stark Act and the AKS.  It is now Defendants' obligation to allege, by way of their Answers, any applicable affirmative defenses, including any claimed exceptions to the statutes.[5]  Thus, dismissal under Rule 12(b)(6) based on any exception to the

---

method of estimating the value of the reports further demonstrating the value of the remuneration.

[5]  Given that Defendants have not yet filed an Answer, it would seem counterintuitive to require the United States to allege Defendants fail to meet all the elements of one or more exceptions to the Stark statute and the AKS that Defendants may (or may not) ultimately assert. The Stark statute and regulations contain approximately 35 exceptions that remove financial relationships that fit certain enumerated criteria from the statutory prohibition on making referrals. The AKS contains an additional 25 exceptions.  42 CFR § 1001.952(a)-(y).  If Defendants' argument is correct, the United States would, as an initial matter, have to plead that a defendant fails to meet

Stark Act or the AKS is completely inappropriate.

In support of the Defendants' other claims, that Dr. Kendall was a bona fide employee, Defendants cite to paragraphs 214 and 223 of the Complaint.  However, Paragraph 214 of the Complaint does not mention an employment relationship.  Instead, this paragraph alleges that Marder had a laboratory license of a limited nature and therefore could not have performed the tests.   The defendants offer no explanation of how that allegation can be read as an acknowledgement by the United States that Kendall was Marder's employee.  Paragraph 223 of the Complaint is similarly unavailing as it directly **denies** the existence of any employment relationship.   Paragraph 223 states that payments made from Marder back to Kendall were "**disguised** as a salary to Kendall on the **fictitious** basis that Kendall was an employee of Marder or ADSCC."   Moreover, in two paragraphs of the Complaint not cited by the Defendants, the United States affirmatively alleges that the relationship does not fall under the AKS employee exception because Kendall "was not a "bona fide" employee of ADSCC' and "does not fall under this Stark Act exemption because Kendall was not a "bona fide" employee of ADSCC." Complaint ¶ 27 and 34.  In sum, there is no plausible basis on which to conclude that any allegations in the Complaint establish an employment relationship between Marder and Kendall. Plus, the applicability of any exception needs to be asserted as an affirmative defense. Accordingly, dismissal on this basis should be denied.

### B.  All Necessary Allegations of the Complaint are Set Forth With Sufficient Particularity

Defendants advance various arguments claiming that the Complaint fails to allege claims under the FCA with sufficient particularity regarding the laboratory scheme.  These arguments evidence a willful blindness to the contents of the Complaint which painstakingly details the nature of the scheme and the entwined conspiracy along with the resulting false.  Defendants cannot credibly claim that they are not on notice of the scheme, that the allegations are spurious, or that there is insufficient basis to conclude that claims were actually submitted to Medicare and TRICARE.

---

each element of each exception to the Stark Act and the AKS in order to satisfy the requirements of Rule 12(b)(6). Given the requirement of Rule 8 for a short and plain statement of the claim, Defendants' argument to the contrary would turn the pleading standard on its head.

### 1. The Complaint Satisfies Rule 9(b)

The Complaint sets forth the "who, what, when, where, and how" of the alleged scheme to submit false laboratory claims, *Corsello,* 428 F.3d at 1014.  The Complaint also alleges with sufficient reliability and particularity that false claims were actually submitted to and paid by federal health care programs, *Clausen*, 290 F.3d at 1313; *Magellan Health Servs., Inc*., 74 F. Supp. 2d at 1215.  In addition, the actual presentment of a claim is not required under Sections 3729(A)(1)(b) and 3729(A)(3) of the FCA upon which the Third, Fourth and Fifth Counts are based.  Therefore, the Complaint satisfies Rule 9(b).

### a. The Who, What, When, Where, and How of the False Claims

The Complaint alleges the "**who**" of the scheme: Marder, ADSCC, Kendall and KML. (*See, e.g.* Complaint ¶¶ 12, 13, 16, 17 and 206–09)

The Complaint alleges the "**what**" of the scheme:  Marder, ADSCC, Kendall and KML submitted, caused to be submitted, and conspired to submit false claims for laboratory tests when Kendall and KML did all of the work required by the tests but Marder and ADSCC, who controlled the number of pieces of tissue to be removed from their patients, billed all of the tests to Medicare without having done any of the work.  (*See, e.g.* Complaint ¶¶ 12, 13, 16, 17 and 206–09)

The Complaint alleges the **when** of the scheme:  From 2008 to the present.  (Complaint ¶ 207).

Finally, the Complaint alleges the **how** of the scheme.  The Complaint first sets forth in great detail the background and context necessary to understand the scheme and its implementation.  Medicare and TriCare provide federally funded health insurance, including for laboratory services.  (Complaint ¶10 and 59–60).  Defendants were all enrolled in Medicare and TRICARE and certified their agreement to abide by all applicable Medicare laws, regulations and program instructions, Kendall and KML since 1988 and Marder and ADSCC since 1998. (Complaint ¶¶ 18, 35–40 and 63).  Claims are submitted to and paid by Medicare and TRICARE using numeric codes with "modifiers" available to indicate whether the claims are being billed for the "Technical Component" of the service, the "Professional Component of the service, or both, in this case using Codes 88305, 88312 and 88342 and Modifiers TC and 26 (Complaint  ¶¶ 67–73, 120–24, 159 and 215).  The performance of the "Technical Component" of the laboratory claims at issue entailed multiple steps and required specialized laboratory equipment operated by

properly trained personnel.  (Complaint ¶¶ 122–23.)  Marder and ADSCC were not licensed to operate the laboratory equipment or facilities needed to perform the Technical Component of processing of skin samples.  (Complaint ¶ 214.)

The Complaint then sets the forth the details of the manner in which the scheme was implemented by these defendants.  Marder and ADSCC operated medical clinics in Port St. Lucie and Okeechobee, Florida, and performed numerous biopsies and excisions on patients resulting in the need for a tissue specimen to be examined microscopically.  (Complaint ¶ 216). Marder and ADSCC then had the tissue samples delivered over 120 miles away to Kendall and KML on a regular basis.  (Complaint, ¶¶ 212 and 217).  Kendall and KML performed all of the necessary laboratory work on the tissue specimens including the Technical Component of processing the tissue for placement on a slide and the Professional Component of examining the specimen on the slide and preparing a report of the findings.  (Complaint ¶¶ 69, 121, 122, 124 and 218).  Although all of the laboratory work was performed by Kendall and KML, a report was generated by Kendall and KML on letterhead of Marder or Marder Medical Laboratory along with a place for Marder's signature.  (Complaint ¶¶ 219–21).  Then, instead of the parties who rendered the services billing Medicare, i.e. Kendall or KML, all of the laboratory services were billed by Marder and ADSCC using their National Provider Identifiers ("NPI")[6] .  (Complaint ¶¶ 55, 64 and 222).  Marder and ADSCC billed Medicare and TRICARE using billing codes using CPT Codes 88305, 88312 and 88342, and thereby falsely represented that they had performed the Technical Component and the Professional Component of the laboratory services on all but 61 claims.  (Complaint ¶¶ 120, 151–52, 154–55, 159, 215 and 226).  Over 35,000 tissue samples were handled in this manner for which Marder and ADSCC were paid in excess of $2.8 million by the United States.  (Complaint ¶¶ 151–52, 154–55, 159, 226-27).

The facts in *Suarez-Hoyos,* 781 F.Supp.2d 1270, were virtually identical, and based upon a recitation of the facts mirroring that which is set forth herein, concluded that the scheme was alleged with sufficient particularity.  *Id.* at 1276–77.  The same conclusion is appropriate in this case.

---

[6] An NPI is a unique provider identification number issued by the Centers for Medicare and Medicaid, which is used to identify providers on a claim.

### b. The Complaint Contains Adequate Indicia of Reliability of False Claims Having Been Submitted to the Government

The Complaint also sufficiently alleges the submission of claims.  As noted, *infra* pp. 4–5, the burden under Rule 9(b) is for the complaint to contain "some" indicia of reliability to support the allegation of an actual false claim for payment being made to the Government. *Clausen*, 290 F.3d at 1311.  The Complaint contains detailed allegations regarding numerous laboratory claims having been billed by Marder and ADSCC.  In addition, when the plaintiff *is* the government, not a relator in a declined case with unknown information regarding the actual submission of claims, a showing that there is "some" indicia of reliability of an actual false claim having been submitted is not a high burden.

The question of whether the Complaint contains some indicia of reliability as to the actual submission of false claims is readily answered in the affirmative. The Complaint provides detailed information regarding the submission of claims, including: (1) the type of service billed, (2) the payer (Medicare and/or TRICARE), (3) the dates of service, (4) the entity under whose NPI the claim was submitted, (5) the rendering physician identified on the claim, (6) the amount the federal health care programs actually paid for the claims, and (7) and the reasons why the claims were false. *See infra pp*. 13–14.

The Complaint also contains more than a thousand examples of specific laboratory claims billed by Marder and ADSCC.  The Complaint clearly alleges that the laboratory claims at issue were billed using billing codes 88305, 88312 and 88342.  (Complaint ¶¶ 120, 159, 186 and 215).  The Complaint also identifies specific examples of laboratory claims billed under those codes. *See, e.g.,* Complaint  ¶¶ 193, 194, 199, 202, 205, Exhibit 2 and Exhibit 3.  Exhibit 2 to the Complaint alleges in the aggregate that during the time that that he was engaged in international travel, Marder billed for over 1800 laboratory services which were in fact performed in Florida. Then, for each of the 1800 laboratory services summarized in Exhibit 2, Exhibit 3 provides on a line by line basis the (1) date, (2) billing code(s), (3) modifier(s) to the billing code, (4) number billed, (5) amount billed, (6) amount allowed and (7) amount paid.  Identifying information regarding the beneficiaries was, of course, redacted.  Comparable information for the TRICARE claims is contained in Exhibits 4 and 5.

The Motions completely deny the existence of any claims information in the Complaint and did not acknowledge or discuss the information addressed above.  Defendants now perhaps would assert that the individual claims information referenced above was contained in the

section of the Complaint more directly focused on the radiation fraud.  However, each Count of the Complaint incorporates the preceding paragraphs, thereby relying upon those specific allegations as well.  And in light of the overall allegations of the scheme which spanned the entire time period and included over 35,000 services, drawing an inference in favor of the United States that those laboratory claims were submitted as part of the alleged laboratory scheme on a motion to dismiss is fully warranted.

Moreover, the underlying facts of the particular situation are considered when evaluating whether a complaint contains "some" indicia of reliability to support the allegation of an actual false claim for payment being made to the Government.  Thus, for example, the Eleventh Circuit has found allegations of fraud sufficient for purpose of Rule 9(b), even when the relator could provide no details of actual claims submitted.  *United States ex. rel. Walker v. R&F Properties of Lake County, Inc*., 433 F.3d 1349, 1360 (11th Cir. 2005) (further noting that "[t]his is not a case like [*Clausen*], in which a 'corporate outsider' made speculative assertions that claims 'must have been submitted, were likely submitted, or should have been submitted to the Government'" (quoting *Clausen*, 290 F.3d at 1311)); see also *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc*., F. Supp. 2d 1264, 1277 (N.D. Ga. 2012) (finding Rule 9(b) standard met, even when the relator could not identify specific claims, based on representations that he compiled records that were used as a basis for billing).  The overarching inquiry is whether there are sufficient indicia of reliability regarding the submission of claims.  Although the burden is typically satisfied by a relator through allegations of specific claims, that is not the only way to meet the standard and a single minded focus only on the claims is not necessary.

Other cases further demonstrate that the nature of the allegations necessary to establish sufficient indicia of reliability depends on the circumstances.  For example, the burden is significantly easier to satisfy if the relator is an insider. *Walker*, 433 F.3d. at 1360 (allegations by corporate insider deemed sufficient); *Matheny*, 671 F.3d at 1226 (personal knowledge by insider further supports allegations); *Hill v. Morehouse Med. Assocs., Inc*., 2003 WL 22019936, *4 (11th Cir. Aug. 15, 2003) (insider status is relevant as stated in *Clausen*).  Similarly, the indicia of reliability are easier to satisfy if information or documents are almost exclusively in the hands of the defendant or others. *Hill*, 2003 WL 22019936, *3 (Rule 9(b) applied less stringently when specific factual information is "peculiarly within the defendant's knowledge or control"); *US ex rel. Heater v. Holy Cross Hospital*, 510 F.Supp.2d 1027, 1033 (S.D Fla. 2007) (if documentation

is peculiarly within the defendant's knowledge or control allegations can even be based upon information and belief).[7]

Here, the plaintiff is not a relator in a declined *qui tam* as in the cases cited by the Defendants.  Rather, the plaintiff here is the ultimate insider being the entity which established the program, and then received, processed and paid the claims.  Thus, there are sufficient indicia of reliability in this case that false claims were actually submitted to the government.  *See also United States ex rel. Willis v. Angels of Hope Hospice, Inc.*, No. 5:11–CV–041(MTT), 2014 WL 684657, at \*7–8 (M.D. Ga. Feb. 21, 2014) (unpublished); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09–22253–CIV, 2012 WL 2871264, at \*5–6 (S.D. Fla. July 12, 2012) (unpublished).

In sum, the Complaint provides ample notice to the Defendants, such that the Government's allegations cannot be considered spurious or ill-founded.  *See Dyncorp*, 2006 U.S. Dist. LEXIS 1838, at \*14.  And, there are more than sufficient indicia to support that claims were actually submitted.  Consequently, the Complaint meets, and exceeds, the standard set by the Eleventh Circuit.

### c.  General Allegations Of Improper Government Payments Can Satisfy The Particularity Requirements Of 9(B) Under Sections 3729(A)(1)(b) and 3729(A)(3) Of The FCA Because There Is No Presentment Requirement

The United States has also sued under 31 U.S.C. §§ 3729(a)(1)(b) and 3729(a)(3).  In *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327, 1329 (11th Cir. 2010), the Eleventh Circuit confirmed that subsection (a)(1)(b), formerly 31 U.S.C. §§ 3729(a)(2), of the False Claims Act does not require specific claims submissions.  The Court contrasted subsection (a)(1) of the Act (which requires the submission of a false claim) where the plaintiff is required to prove the "who, what, where, when and how of fraudulent submissions", with former subsection (a)(2) where "general allegations of improper government payments . . . could satisfy the particularity requirements of 9(b)" as long as supported by factual or statistical evidence. *Id.* Thus, subsection (a)(2) does not require that "the defendant's false record or statement itself was

---

[7] Likewise, the 11th Circuit has additionally stated that the inclusion of details regarding a portion of the claims at issue is sufficient.  Thus, plaintiffs need not allege a minimum number of claims to state a claim under the FCA.  *Matheny*, 671 F.3d at 1226–27; *Atkins*, 470 F.3d at 1358–59.

ever submitted to the government*." Id.* at 1329.  The language in subsection (a)(3), the conspiracy provision, has the same language as (a)(2), and therefore also has no requirement of presentment. *United States v. Bourseau*, 531 F.3d 1159, 1168–69 (9th Cir. 2008).

### 2. The Complaint States a Claim for Conspiracy under the FCA as to All Defendants.

To state a claim under section 3729(a)(3) of the False Claims Act, the "plaintiff must show '(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.'" *Corsello*, 428 F.3d at 1014 (quoting *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)).  Defendants Kendall and KML contend that the Complaint fails to sufficiently allege the first element.

To make out a claim of conspiracy, which by its very nature is a secretive agreement, the government need not allege actual communications between the parties regarding an express agreement.  To the contrary, as the Eleventh Circuit has made clear, "[t]he existence of an agreement may be proven by circumstantial evidence including 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) (quoting *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir. 1982)); see also *United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005) (when proving conspiracy, "[a]n express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice"); *United States v. Farias*, 469 F.3d 393, 398 (5th Cir. 2006) ("Because secrecy is the norm, each element may be established by circumstantial evidence"); *United States v. Morgan,* 385 F.3d 196, 204 (2d Cir. 2004) ("[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel" (citation omitted)).  Indeed, "[a] conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.  He need not even have planned or known about the injurious action." *Halberstam v. Welch*,  705 F.2d 472, 481 (D.C. Cir. 1983) (cited with approval in *Cabello v. Fernandez-Larios*,  402 F.3d 1148, 1159 (11th Cir. 2005)).

The United States' Complaint capably alleges the nature of the conspiracy and the agreement between the parties.  The Complaint alleges that "Defendants Marder, ADSCC, Kendall and KML entered into an agreement to have the United States pay false or fraudulent

claims by entering into a conspiracy for Kendall and KML to pay kickbacks to Marder and ADSCC in return for referrals for laboratory services to be sent from Marder and ADSCC to Kendall and KML." Complaint ¶ 247).  The scheme that is detailed in the Complaint (*id. at* ¶¶ 120–24 and 206–27), would not have been possible without agreement and coordination among all of the Defendants.  In particular, the Complaint alleges that all Defendants knew and understood that Marder was going to be removing tissue samples from his patients, but that instead of Marder or ADSCC performing any laboratory services on the samples, they would transmit the samples 120 miles to Kendall and KML, (Complaint ¶ 216-17), that Kendall and KML would perform the necessary pathology services on the tissue samples sent by Marder and ADSCC, (Complaint ¶ 218), that Kendall and KML would generate pathology reports under the name of Marder and/or for Marder's signature, (Complaint ¶ 219-21), that Kendall and KML would refrain from submitting claims for their services to Medicare but would instead let Marder submit the claims, (Complaint ¶ 222), that Kendall and KML as long time participants in Medicare understood the value of being able to bill Medicare for the laboratory services which they were conveying to Marder and ADSCC, (Complaint ¶ 35-6, 38), and that Kendall and KML would share in the proceeds of the conspiracy. (Complaint ¶ 223).

In the instant case, the direct and circumstantial evidence alleged in the Complaint makes clear that the Defendants agreed that the scheme would be implemented through the multiple steps described therein.  For example, it was no coincidence that Kendall and KML performed all of the work on the 35,000 tissue samples and then issued reports on Marder's letterhead or with Marder's signature.  That method of handling the tissue specimens would not have happened without an express business arrangement between Marder and Kendall.  Nor did Kendall and KML, participants in Medicare since the 1980s, refrain from submitting millions of dollars in claims to Medicare for the 35,000 tests without knowing that Marder was going to submit the claims and that Kendall would get paid for his work through Medicare proceeds funneled through Marder and ADSCC.  In sum, the multiple coordinated steps necessary to implement the alleged conspiracy which was continued over a number of years is, at a very minimum, strong circumstantial evidence of an agreement, especially when read in the light most favorable to the United States.  See *Silvestri*, 409 F.3d at 1327.  Thus, the conspiracy is alleged with sufficient particularity.

19

3.   **The Government's Complaint Alleges Common Law Actions for Payment under Mistake of Fact and Unjust Enrichment.**

Defendants Marder and ADSCC challenge the Sixth Count (Unjust Enrichment) and the Seventh Count (Payment by Mistake), solely on the basis of their arguments rooted in the employment exceptions to the Stark Act and the AKS.  D.E. 50 at 3.  Because those arguments are incorrect, *see infra* pp. 11–12, the Defendants' motion to dismiss these counts should be denied.

## V.   CONCLUSION

The United States' Complaint states a claim against the defendants upon which relief can be granted.  The United States has sufficiently pled the elements of all of its claims, and Defendants have not established that the United States' claims should be dismissed. Based on the foregoing, Defendants' motion to dismiss must be denied.

Should the Court determine that the Complaint does not meet the pleading requirements of the Federal Rules, the United States respectfully states the appropriate remedy would be to require the government to amend its pleading, not dismissal with prejudice as requested by the Defendants.  *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) ("When it appears a more carefully drafted complaint might state a claim upon which relief can be granted, we have a held that a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it");  *Czeremcha v. Int'l Ass'n of Machinists*, 724 F.2d 1552, 1556 (11th Cir. 1984) (leave to file an amendment should be "liberally granted"); see also *United States ex rel. Butler v. Magellan Health Servs., Inc*., 74 F. Supp. 2d 1201, 1217 (M.D. Fla. 1999) ("This Circuit has held that a plaintiff has the right to amend a complaint at least once to eliminate any deficiencies found by the court.").  Thus, should the Court find the Complaint before it to be deficient in any respect, the United States respectfully asks that it be granted leave to amend to address any such deficiency.

Dated: February 5, 2015                          Respectfully submitted,

                                                 WIFREDO A. FERRER
                                                 UNITED STATES ATTORNEY

                                         By:     ___/s Mark Lavine_____
                                                 MARK A. LAVINE
                                                 Assistant United States Attorney
                                                 Fla. Bar No. 648876
                                                 500 S. Australian Avenue, Suite 400
                                                 West Palm Beach, FL  33401
                                                 Tel.   (561) 209-1043
                                                 Fax:   (561) 805-9846
                                                 Mark.Lavine@usdoj.gov
                                                 *Attorneys for United States of America*


### CERTIFICATE OF SERVICE

        I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically
filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is
being served this day on all counsel of record or *pro se* parties of record via transmission of
Notices of Electronic Filing generated by CM/ECF.


                                         By:___/s Mark Lavine_____
                                              MARK A. LAVINE