UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-24503-CIV-MOORE/MCALILEY

UNITED STATES OF AMERICA    |
and the STATE OF FLORIDA, ex rel.  |
THEODORE A. SCHIFF, M.D.,    |
      |
    Plaintiff,     |
     v.      |
GARY L. MARDER , D.O.; et.al.    ,   |
INC., a Florida corporation,    |
      |
    Defendant.    |
_____ |

**UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

     The United States hereby Pursuant to Southern District of Florida Local Rule 56.1(a), Plaintiff United States of America hereby submits its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment. [1]

**UNDISPUTED FACTS**

1.     Defendant Gary L. Marder , D.O., ("Marder ") is a physician practicing in Port St. Lucie and Okeechobee, Florida through his clinic, Defendant Allergy, Dermatology & Skin Cancer Center, Inc., ("ADSCC").[2] DE 30, ¶ 12, 13, 14; DE 83, ¶ 12, 13, 14.

2.     Defendant Robert I. Kendall ("Kendall") is a physician practicing in Coral Gables, Florida through his independent laboratory, Defendant Kendall Medical Laboratories, Inc.[3] DE 30, ¶ 16, 17; DE 84, ¶ 16, 17.

3.     Marder refused to answer almost every question asked at his deposition on the basis of his assertion of his Fifth Amendment rights. A copy of the 127-p. transcript is attached hereto as App. A.

---

[1] All references to "App." are to the documents attached to the Appendix which are identified by the letters A to N.  Any reference to Exhibits contained within the Appendix documents will include the corresponding letter as a prefix, i.e. the first exhibit attached to Appendix item C will be identified as C1.

[2] Marder and ADSCC are hereafter referred to jointly as Marder.

[3] Kendall and KML are hereafter referred to jointly as Kendall.

4.     Kendall refused to answer almost every question asked at his deposition on the basis of his assertion of his Fifth Amendment rights. A copy of the 120-p. transcript is attached hereto as App. B.

5.     In 1965, Congress the Medicare program. Medicare is administered by the Center for Medicare and Medicaid Services ("CMS"). For outpatient beneficiary treatment, all Medicare reimbursement is subject to Part B. 42 U.S.C. §§ 1395j-1395w-4.  DE 30, ¶10; DE 83, ¶10; DE 84, ¶10.

6.     First Coast Service Options, Inc. ("FCSO") is the CMS contractor tasked with administering Medicare payment processing and auditing functions in the geographic regions in which Marder and Kendall have done business. Affidavit of FCSO employee John Jacobs attached as App. C, ¶2.

7.     Marder signed multiple Medicare enrollment applications, as far back as 2003, in which he expressly agreed to comply with Medicare's rules and regulations.  App. C, ¶5 and Ex. C1.

8.     Kendall signed a Medicare enrollment application, at least as far back as 2011 in which he expressly agreed to comply with Medicare's rules and regulations.  App. C, ¶5 and Ex. C2.

9.     Whether a particular medical procedure is covered by Medicare depends on the applicable statutes and regulations, and on the various manuals, coverage policies and other guidelines published by Medicare or its contractors.  Relevant guidance is also published by professional associations, such as the American Society for Therapeutic Radiation and Oncology ("ASTRO") and the American College of Radiation ("ACR"). App. C, ¶7.

10.    To obtain Medicare reimbursement providers submit claims using forms known as "CMS 1500s". The individual billed items are identified to Medicare using a 5-digit billing code based on the Current Procedural Terminology Manual ("CPT code"), published annually by the American Medical Association. App. C, ¶20.

11.    In 1997, Medicare published guidelines about the documentation required for billed services.  App. C - Ex. C14.

12.    FCSO published a Newsletter in 2006 which summarized the Medicare requirements for the documentation of medical care. App. C, ¶13 and Ex. C6.

13.    Since at least 2003, Chapter 15, Section 90 of the  Medicare Benefit Policy Manual has stated that radiation services rendered to a Medicare beneficiary must be directly and personally supervised by a physician physically who is in the office and immediately available.  Affidavit of Michael Steinberg, M.D., attached hereto as App. D, ¶21.

14.     In 2007, the AMA published a Radiology FAQ which provided guidance regarding the use of CPT Codes for radiation. App. C, ¶14 and Ex. C9.

15.     FCSO issued a Local Coverage Determination ("LCD") effective February 13, 2011 identified as L31510. App. C, ¶13 and Ex. C7 and C8.

16.     For every year at issue in this case, the first page of the Introduction to the CPT Code Book directed billed to select the code that **accurately** identifies the service performed, not one that **merely approximates** the service provided"; and that all services should be **adequately documented** in the medical record.".(emphasis added). App. C, ¶27 and Ex. C11.

17.     From 2008 through 2014, the definition in the CPT Code books for 77401 remained unchanged. App. C, ¶26 and Ex.C11.

18.     From 2008 through 201 the definition in the CPT Code books for 77402 remained unchanged. App. C, ¶26 and Ex.C11.

**19.**     From 2008 through 2014, the definition in the CPT Code books for 77407 remained unchanged. App. C, ¶26 and Ex.C11.

20.     From 2008 through 2014, the definition in the CPT Code books for 77412 remained unchanged. App. C, ¶26 and Ex.C11.

21.     Superficial radiation is universally used to refer to radiation at energy levels of up to 100,000 electron volts (100 Kev).  Marder's equipment was only capable of administering radiation at superficial energy levels.  App. C, ¶26 and Ex.C11.

22.     CPT Codes 77402, 77407 and 77412 are used to reimburse providers for the administration of radiation at levels up to 5 million electron volts (5 Mev), 50 times higher than the energy output of superficial radiation. App. C, ¶26 and Ex.C11.

23.     Between 2010 and 2014, reimbursement for 77401 had dropped to between $19.51 and $26.03 while the reimbursement amount for radiation reimbursed under 77402, 77407 and 77412 reached as high as $249.59.  App. E, ¶54 and Ex. E2 and E3.

24.     During the time period at issue in this case, the practice expense RVU for 77401 was approximately $150,000 while the practice expense for 77402, 77407 and 77412 was approximately $3 million.  The reason for the differential is that the equipment used for superficial radiation is relatively inexpensive and in layman's terms looks similar to a dental x-ray device.  App. D, ¶19-20; App. E, ¶52-53.  App. E, ¶41.

25.     In contrast, the equipment used for 77402, 77407 and 77412 is a much more expensive device known as a linear accelerator or "linac" which is so powerful that for safety purposes it requires placement inside an actual concrete bunker.  App. D, ¶19-20; App. E, ¶52-53.

26.     CPT Code 77261 is used to bill for Clinical Treatment Planning. This is the plan of care for the patient and must be documented by the physician.  Affidavit of Ron DiGiaimo attached hereto as App. E, ¶ 18; App. C, ¶26 and Ex.C11.

27.     CPT Code 77280 is used to bill for a Simulation which is a process conducted to establish the treatment area for the patient. This process is used to set the patient up on a daily basis to ensure radiation is only delivered to the area in which it is prescribed. In the event the patient is treated again, this information will ensure future treatment fields do not overlap resulting in overtreatment to any areas.  App. E, ¶ 25; App. C, ¶26 and Ex.C11.

28.     CPT Codes 77332 and 77334 are used to bill for Treatment devices utilized for shielding. When devices are utilized, the method in which they are used, the placement, etc. are thoroughly documented as well as photographed so no errors in set-up are likely. App. E, ¶ 27; App. C, ¶26 and Ex.C11.

29.     CPT Code 77300 is used to bill for Calculations of the radiation dose. For superficial radiation treatments, calculations are performed to determine the amount of time needed for the treatment machine to deliver the prescribed dose of radiation. App. E, ¶ 32; App. C, ¶26 and Ex.C11.

30.     CPT Code 77336 is used to bill for Continuing Physics which describes the ongoing support and work of the medical physicist on behalf of each patient under treatment. App. E, ¶ 45; App. C, ¶26 and Ex.C11.

31.     CPT Code 77427 is used to bill for Physician Treatment Management. This service describes the ongoing management of the patient while undergoing radiation treatments. App. E, ¶ 50; App. C, ¶26 and Ex.C11.

32.     In total from January 2008 through September 2014, Marder billed Medicare over $49 million and was paid $15,844,528.  Report of Expert Michael Petron, Affidavit of Michael Petron attached hereto as App. F, ¶18, 23 and Ex. FA13.

33.     CPT Codes in the 99xxx series are "Evaluation and Management Codes used to bill for office visits.  App. F, ¶17, 18, 23, and Ex. FA11 and FA13.

34.     CPT Codes between 10060 and 69100 are used to bill for biopsies, destruction of lesions, removal of malignant growths, and wound repair. App. F, ¶17, 18, 23, and Ex. FA11 and FA13.

4

35.     CPT Codes 88035, 88312 and 88342 are used to bill for pathology services.  App. F, ¶17, 18, 23, and Ex. FA11 and FA13.

36.     In order to identify a subset of the fraud and resulting damages in this case, the United States employed a statistically-valid, random sample.  App. F, ¶¶7-13, and Ex. FA.

37.     The grand total paid to Marder under those codes was $9,772,767, with $8,966,035.26 paid to the 249 beneficiaries in the sample frame. App. F, ¶¶7-13, and Ex. FA.

38.     Marder treated beneficiaries at two geographically separate offices. DE 30, ¶ 160-162; DE 83, ¶ 160-162. His primary office was located at 9580 South Federal Highway, Port St. Lucie, FL 34592 (the "Port St. Lucie office"). *Id*. Marder also operated a medical clinic at 202 NE 2d St., Suite #2, Okeechobee, FL 34972 (the "Okeechobee office"). *Id*. Marder is the only physician who has ever rendered services to patients in these offices. Deposition Excerpts of Elizabeth Modica-Dowling attached hereto as App. G, p. 24:13 to 24:16; Affidavit of Martin Burke attached hereto as App. H, ¶8.

39.     Both Marder's main office in Port St. Lucie and his satellite office in Okeechobee were open Monday to Friday, App. H, ¶6, but Marder was physically present in the offices on a more limited basis. App. G, p. 23:11 to 23:25; App. H, ¶6 and 18. For the Port St. Lucie office, Marder's normal schedule was to be in the office only on Mondays and Wednesdays, arriving between 10:30 and 11:00 am. App. G, p. 64:19. App. H, ¶18.

40.     For the Okeechobee office, Marder's normal schedule was to be in the office on Tuesday mornings **once every two weeks**. App. G, p. 64:17. App. H, ¶6.

41.     Marder also took many vacations, sometimes for as long as a month at a time.  App. H, ¶19; Affidavit of FBI Special Agent Wende Bardfeld attached hereto as App. I, ¶39 and Ex. I26.

42.     Marder used appointment books for each office for scheduling patient visits.  App. G, p. 20:1 to 20:25; 21:19 to 21:23; App. H, ¶24; App. I, ¶7-8 and Ex. I1. If the appointment book was blank for the entire day or said "Dr. Out", that meant that Marder was not in the office that day. Ex. G p. 22:18 to 22:25, 23:1 to 23:6; App. I, ¶7-8 and Ex. I1; App. H, ¶24.

43.     A review of Marder's appointment books for 2008 through 2014 indicate Marder was out of the office on more than 50% of all business days. App. I, ¶9-10.

44.     On the days when Marder's appointment books indicated he was not in the office, claims billed by Marder to Medicare resulted in payments of $8,189,068.00 as follows:

> a.   $5,746,399 for services billed under CPT codes in the 77xxx series for radiation related services;

      b.  $255,650 for services billed for office visits using CPT Codes 99202 through 99215;

      c.  $919,161 for biopsies and related services billed under CPT Codes 10060 through 69100;

      d.  $1,267,858 paid for 3,925 pathology procedures billed under CPT Codes 88305, 88312 and 88342.

App. F, ¶23.

45.     Marder maintained tight control over the operations of both offices.  App. G, p. 62:16 to 62:25, 63:2 to 63:2. No claims were submitted to any insurance company until he granted his approval.  Ex. G p. 62:16 to 62:25, 63:2 to 63:2; 66:17 to 71:18. Even on the hundreds of days each year that he was absent from both offices, he would routinely telephone the Port St. Lucie office and speak individually with multiple employees. App. H, ¶23.

46.     In general, Marder employed two individuals at any given time assigned exclusively to billing duties.  App. G, 12:6 to 12:16; App. H, ¶21. However, they had no experience or training in medical claims processing and billing, or in healthcare regulatory compliance. Ex. G p. 158:2 to 158:13; Marder never sent any of his employees for any such training at any time. App. G, 158:2 to 158:13; App. H, ¶22; ADSCC Interrogatory Answers attached as App. J, Answer 8.

47.     Marder had multiple resource manuals in his office that explained how to establish programs to help ensure compliance with health care laws and regulations, but he never established any such programs. App. I, ¶11 and Ex. I3 and 4; App. G, ¶22; App. J, Answer 8.

48.     Both of Marder's office locations had equipment used to administer radiation to patients. Ex. G p. 98:8; App. H, ¶6-7.  The maximum power of the devices was limited to approximately 90,000 volts (90 keV), a power level which is universally considered to be "superficial radiation".  Ex. D ¶19; App. H, ¶8;  Affidavit of Farhad Kader attached hereto as App. K, ¶7. Marder's radiation equipment was approximately the size of dental x-ray machines and required no special shielding. App. K, ¶8. Second-hand equipment that can administer superficial radiation is available for approximately $15,000 and new equipment is available for approximately $150,000. Ex. E ¶52; Ex. D ¶20.

49.     The type of equipment powerful enough to generate radiation of 5MeV (5,000,000 electron volts) is known as a linear accelerator, or "linac" for short. Ex. E ¶53. Linacs are installed in concrete bunkers to provide shielding and cost between $2 million and $4 million or more. Ex. E ¶53; Ex. D ¶20.

50.     Marder only administered superficial radiation treatments to his patients. Ex. D, ¶19;
App. H, ¶8; App. K, ¶7. In general, after a few weeks of training, Marder allowed employees
with no previous experience administering radiation to handle the entire process. App. H, ¶5.

51.     Controls on the machines that would normally be used to adjust the radiation dose were
declared off-limits to employees. App. H, ¶9; App. I, ¶12 and Ex. I5.

52.     Marder established a standard radiation protocol which was used to treat his patients.
App. H, ¶9. This protocol was used as the basis for the treatment of all patients and was relied
upon by his employees as the basis for the entire radiation treatment rendered to patients. App.
H, ¶9. The same regimen was utilized regardless of the size, location or type of lesion with only
rare, minor modifications. App. H, ¶9; App. I, ¶¶41-65.

53.     Marder's protocols allowed his employees to subject his patients to an entire regimen of
radiation without additional direction.  App. H, ¶9; App. I, ¶¶49-50.

54.     They were not required to and did not perform a simulation. App. H, ¶9. They never took
notes or photographs of  the setup of the machine or position of the patient. Id.; App. I, ¶¶49-50.

55.     They were not required to determine if the medical physicist had confirmed or modified
the protocol because, with rare exceptions, no medical physicist rendered any patient related care
outside of an annual calibration of the equipment, and such services were not needed. App. H,
¶12. App. K, ¶13, 16.

56.     Marder never met with the patients during the course of the radiation. App. H, ¶13; App.
I, ¶¶49-50.

57.     Since at least 2008, the only medical physicist with which Marder has had a business
relationship is Farhad Kader ("Kader"). App. K, ¶5.

58.     The primary services rendered by Kader were to calibrate the radiation equipment
annually, and prepare reports of the calibration. App. K, ¶5.

59.     Kader rendered services related to the treatment being rendered to an individual patient
on a limited number of cases, and none at all after August 2011.  App. K, ¶13, 16.

60.     In addition, in those few cases where Kader rendered services, he always included an
original signature using a pen, and never authorized Marder to use his signature.  App. K, ¶16.

61.     In almost all cases, the services Kader rendered to Dr. Marder were in the evenings or on
the weekends.  App. K, ¶15; App. H, ¶12.

62.     Each of the daily radiation treatments is known as a "fraction" as it represents only a
portion of the total dose. Ex. E, ¶15; App. K, ¶10.

63.     If the daily fraction is split into two separate applications of radiation, as Marder mandated for every patient, it is known as "hyper-fractionation." Ex. D, ¶9.

64.     Marder billed for these twice-a-day treatments for every patient.  Ex. D, ¶9; App. I, ¶46.

65.     Dr. Marder's routine use of radiation therapy and the application of twice a day ("BID" or "hyperfractionation") treatment varies extremely from accepted medical care for the use of radiation therapy in the treatment of skin cancer. Ex. D, ¶9-10.

66.     Well known principles in the use of BID radiation treatment require a minimum of a 4 hours (6 hours is optimal) between treatment fractions to be beneficial. Ex. D, ¶11; App. E, ¶15.

67.     Marder represented to Medicare that he performs all of the radiation therapy himself. Ex. C ¶28; App. I, ¶38, Ex. I25.

68.     Marder represented to Medicare that his hyper-fractionated treatments were administered four hours apart. Ex. C ¶27 and Ex. C13.

69.     The hyper-fractionated treatments administered to Marder's patients were always administered just 45 to 60 minutes apart.  App. G, p. 121:17 to 121:23; App. H, ¶14.

70.     The minimal separation of the two treatments was partly as a convenience to patients so that only one trip to the office was needed. App. G, p. 120:17 to 120:22; App. H, ¶14.

71.     It was Marder's general practice to bill for CPT Codes 77261, 77280, 77332/34, 77300, 77336 and 77427 and to bill multiple quantities of one or more of the radiation treatments (CPT Codes 77401, 77402, 77407 and 77412) for every patient. Ex. F, ¶22, 29.

72.     Radiation treatments were administered to multiple patients on a daily basis at both office locations. Ex. G p. 154:23-25; App. H, ¶6.

73.     Patients did not require appointments with Marder to receive radiation treatments, but would report directly for radiation. App. H, ¶13.

74.     There was never another doctor in either office on any occasion when Marder was absent. App. H, ¶6.

75.     Marder also billed for office visits, biopsies and pathology tests, much of it on days that he was not in the office. Ex. F, ¶23 and Ex. FA13.

76.     Every claim submitted by Marder identified himself as the rendering provider. Ex. F ¶20.

77.     A thorough review of the medical chart for the patients in the random sample was performed by the coding expert, App. E, ¶¶ 11-51 and by an assigned investigative agent, App. I, ¶¶41-65.  These medical charts, together with many other documents, were taken from Marder's two offices and his residence during the execution of search warrants.  App. I, ¶4.  In the large

majority of cases, the medical records were found to have no or altered documentation of numerous services.  App. I, ¶43

78.     The administration of the actual radiation treatments was tracked on a standard form titled "Tumor Dose Record" ("TDR") printed on cardstock. When unfolded, the two inside pages constituted one large, 17-inch wide by 11-inch high form.  App. I, ¶45.

79.     In most cases, the charts included a document identifiable as the original TDR because it was on the cardstock.  In total, the charts contained a total of approximately 132 original TDRs. Every original TDR was missing some information regarding the treatments. App. I, ¶46.

80.     In very few cases, some of the comments appeared to have been filled in by the employee writing the date of treatment and initialing each date of service.  However, in most cases, this column was also blank on the original TDR.  App. I, ¶47.

81.     In some cases, in addition to the original TDR, the medical charts also contained one or more photocopies of the TDR.  The documents were identifiable as photocopies because they were copied onto two letter sized 8.5 inch by 11-inch pieces of paper. App. I, ¶48.

82.     With respect to the services for which there was **no** photocopied TDR, with one exception, there was no documentation of the services billed using CPT Codes 77280, 77300, 77332, 77334, 77336 or 77427. App. I, ¶49.

83.     On several occasions, a form labeled as being documentation for 77261 was located in these file.  However, these forms were all cloned and most were not signed. App. I, ¶50.

84.     The services for which there was a photocopied TDR were very different. App. I, ¶51.

85.     For the services **with** a photocopied TDR, often the chart contained an "attestation letter" addressed signed by Marder under civil and criminal penalty that the enclosed documents were prepared in the course of treatment personally rendered by him.  App. I, ¶52 and Ex. I27

a.      The photocopied TDRs did not match the original version that was still located within the file.  Instead, it contained substantially more information than the original, including purported initials of Marder and the medical physicist on multiple dates. App. I, ¶53-54, Ex. I28 and I29.

86.     For the services with a photocopied TDR, the charts also contained numerous other pages purporting to document the billed services. App. I, ¶55.

87.     For example, for CPT Codes 77261, 77280, 77300 and 77332, there were usually entire pages for each lesion for each billed date of service, i.e., as many as four of each document. App. I, ¶56  and Ex 31, 32, 33, and 34, respectively.

88.     No documentation at all was found for CPT Code 77334. App. I, ¶57.

89.     The 77261 documents always indicated that "due to tumor shrinkage" the radiation was being revised upward from 25 to 40 treatments.  App. I, ¶58 and Ex. 31.

90.     For CPT Code 77300, there was often a second set of forms corresponding to the date on which the treatment was supposedly revised upward from 25 to 40 treatments. App. I, ¶59 and Ex. 33.

91.     For CPT Codes 77336 and 77427, the full page for each lesion would cover all of the applicable dates of service, usually five. App. I, ¶60 and Ex. 35 and 36.

92.     In many files there was also a two page document containing a narrative dated as of the first date of treatment.  This document always stated "I now prescribe 40 treatments - 2 treatments per day for 20 days at 130 rads with a total dose of 5200 rads." These documents contained undated copies of Marder's signature. App. I, ¶61.

93.     Except for the date and name of the patient, and the location and size of the lesions, these narrative reports contain identical language.  App. I, ¶62, Ex. I37.

94.     The radiation treatment on the two-page narrative (App. I, ¶60, Ex. I37) always indicated that 40 treatments were being ordered as of the first date of treatment.  This information directly contradicted information on the documentation of 77261 (App. I, ¶60, Ex. I31) which indicated that as of the first date of treatment only 25 services were ordered.  App. I, ¶63.

95.     The services on the photocopied TDRs also revealed that the initials of Marder and the medical physicist on 25 of the 38 letter-size photocopies of the Tumor Dose Records were exactly identical, including the dust spots copied on each page.  11 more of the photocopied TDRs only had an initial of Marder instead of a signature, and did not contain any initial or signature for a medical physicist. App. I, ¶64, and Ex. I38.

96.     The 25 identical sets of initials also exactly matched a strip of paper found in a folder located in Marder's in-house billing office at the direction of Marder.  App. I, ¶65 and Ex. I39.

97.     Two of Marder's employees confessed that they were tasked with creating the photocopied TDRs, including by cutting and pasting the initials from the strip of paper, and for creating the documents for 77261, 77280, 77300, 77332, 77336 and 77427.  App. I, ¶66.

98.     During the execution of the search warrant at Marder's primary clinic in Port St. Lucie, hundreds of pages of pre-printed, mostly blank forms already containing signatures or initials of Marder and medical physicist Farhad Kader ("Kader") were located.  App. I, ¶16.

99.     One folder contained almost 100 pages of pre-signed forms, including dozens of bits and pieces of forms containing signatures and initials of Marder or Kader. App. I, ¶17 and Ex. I9.

100.    Two additional folders were found which contained dozens of pages of different versions of blank forms that already contained signatures or initials of Marder and Kader.  One folder was labeled as "1 set Port St. Lucie" and "Port St. Lucie patients." App. I, ¶18, and Ex. I10 and I11.

101.    Two other forms pre-printed with handwritten" notes" were also located.  There were hundreds of copies of each of these forms.  App. I, ¶19, and Ex. I12 and I13.

102.    The missing and fake documentation also translated into a failure to satisfy coding guidelines, the failure to satisfy other applicable Medicare documentation guidelines and the failure to meet the standard of care, and raised serious concerns regarding a basic concept in radiation known as reproducibility.  App. E, ¶13.

103.    The poor documentation is a material concern if the patient has a recurrence near or in the area previously treated, especially because there were no photographs as is the standard of care.  In addition, there were an unusually high number of treatments per patient.  App. E, ¶14.

104.    No specific medical necessity documentation was found other than the cloned statements. App. E, ¶16.

105.    Physician's signatures were routinely undated, and it appeared that radiation services were routinely rendered without the required physician supervision. App. E, ¶17.

106.    Documentation of the services billed under 77261 were not consistently located. References to the radiation treatments located in the evaluation and management notes did not support this service. App. E, ¶19.

107.    "Treatment Prescription Sheet" failed to include a prescription for each area treated, and also contained contradictory information about the number of treatments.  App. E, ¶20.

108.    The forms contained identical, cloned verbiage to start with a 3cm cone and then at the time the 15 fractions were added to switch to a 1cm cone due to tumor shrinkage. App. E, ¶21.

109.    Some documents which said the patient was to receive 25 fractions also had other documents indicating that the patient was to receive 40 fractions. App. E, ¶22.

110.    One patient reviewed had an indication that they had actually received 54 treatments, but both items detailing the prescription only indicated 40 treatments. App. E, ¶23.

111.    The "tumor shrinkage" indicated on all of these forms was not documented anywhere else in the medical record. App. E, ¶4

112.    Simulation documentation is not located in the majority of the charts. App. E, ¶26.

113. Treatment devices covered by CPT Codes 77332 and 77334 may be fabricated specifically for the individual patient, but there are also devices that are pre-fabricated but could be appropriate for the course prescribed. These are simple devices. App. E, ¶28.

114. Specific documentation regarding the treatment device, how it is utilized, and the placement of the treatment device and photographs of the treatment device in place are standard of care. App. E, ¶29.

115. Treatment devices were routinely billed for the patients reviewed; however, only minimal or cloned documentation was located. App. E, ¶30.

116. There are also instances when a treatment device form was located, but the treatment record circled "No" treatment device was utilized. App. E, ¶31.

117. When documenting radiation dosage calculations, if any shielding, it should be documented with a picture or diagram so the operator knows where to place that block with every treatment. App. E, ¶33.

118. Using all these input factors, the dose calculation is performed, and the time of the dose and the actual dose entered into the treatment card. App. E, ¶34.

119. If at any time, the cone size is changed or reduced, a new calculation is necessary, and new documentation is necessary. App. E, ¶35.

120. In the records reviewed, documentation of a calculation was not located except in a minority of the cases where the information was cloned. App. E, ¶36.

121. There were instances where the date of service did not match the actual treatment due to cloned documents. App. E, ¶37.

122. 77401 was evaluated as to code selection and documentation. App. E, ¶38.

123. The only code for superficial/ortho-voltage treatment is 77401. App. E, ¶39.

124. The clinician delivering the radiation dose must record the information in the medical record. All areas should be completed by the operator. App. E, ¶42.

125. The majority of the treatment cards were left blank. App. E, ¶43.

126. Proper charting was not seen in any records provided for the review. App. E, ¶44.

127. 77336 services were not documented within the patient's record, and incomplete information in the charts indicated that no physicist actually rendered services. App. E, ¶47.

128. The initials of a physicist do not appear in the majority of the records, but when they are present, they appear to have been photocopied onto the page. App. E, ¶48.

129.    The separate form sometimes seen for 77336 contained a single signature and not a signature for each of the multiple dates on the form. App. E, ¶49.

130.    Services billed using 77427 were not found to be documented properly. App. E, ¶51.

131.    Reimbursement for 77401 was slashed started in 2009. The amount paid to Marder was 80% of the amounts described with 20% owed by the beneficiary as a co-payment. Ex. E. ¶54, Ex. 2 and 3. Reimbursement under codes 77402, 77407 and 77412 were as high as $250. *Id*.

132.    For dates of services from at least January 1, 2008 through to mid-June 2010, Marder submitted claims to Medicare and TRICARE utilizing *only* **CPT Code 77401** for radiation treatments. During that time period, Marder was paid less than $800,000 for 77401. No claims were submitted during that time frame using CPT Codes 77402, 77407 and 77412. Ex. F, ¶24.

133.    In 2008, total payments to Marder for CPT Code 77401 were $490,280.56, but those payments dropped to $169,178.48 in 2009 and just $130,363.75 in 2010. Ex. F, ¶25.

134.    From June 2010 through approximately August 2014, the total amount paid to Marder under 77402, 77407 and 77412 was over $6 million for over 40,000 services. Ex. F, ¶28.

135.    The 20% co-pay owed by the patients in the sample was $2,241,500 in total, an average of over $9,000 per patient, ranging from $2,000 to $38,200 for each beneficiary. Ex. F, ¶29.

136.    Marder never billed or collected co-pays from any patients in connection with their alleged radiation treatment. App. G, p. 139:14 to 139:19.

137.    Marder billed for numerous dermatology procedures using CPT codes ranging from 10060 through 69100. App. F, Ex. FA13.

138.    Pathology services are comprised of a Professional Component (PC) and a Technical Component (TC). App. C ¶18.

139.    The TC of physician pathology services refers to the preparation of the slide, involving tissue or cells that a pathologist will interpret. The pathologist's interpretation of the slide is the professional component (PC) service. App. C ¶19 and Ex. C10.

140.    Pathology services can be billed three ways. The TC and the PC can be together "globally", or the TC and PC can be billed separately. Ex. C ¶20.

141.    If a pathology claim is billed globally, the provider simply uses the applicable CPT Code. If the claim is being billed for only the TC or the PC used a "modifier". App. C, ¶21.

142.    The "TC" modifier indicates that reimbursement is sought only for the TC. App. C, ¶22.

143.    The "26" modifier indicates that reimbursement is sought only for the PC. App. C, ¶23.

144.    Marder billed for over 35,000 pathology specimens. App. F, ¶21.

145.    Marder was paid $ 2,829,231.13 for pathology he billed on a global basis. App. F, ¶31.

146.    Marder did not bill Medicare for pathology claims using the 26 modifier. App. F, ¶30.

147.    Marder was paid $3,319.47 for pathology claims using the TC modifier. App. F, ¶30.

148.    Marder never owned the equipment or employed personnel with the necessary training to perform the TC of pathology tests.  App. G, p. 37:15 to 37:17, 116:22 to 116:25, 117:1 to 117:3.

149.    Marder owned a microscope, but he did not use it to perform the professional services. App. G, p.  37:15 to 37:17, 116:22 to 116:25, 117:1 to 117:3; App. H, ¶27.

150.    KML is 130 miles driving distance from Marder's offices in Port St. Lucie. App. I, ¶15.

151.    Both the TC and the PC for the pathology services billed by Marder were rendered by Kendall in Coral Gables, FL. App. G, p. 40:11 to 40:14; Boitel Deposition pp. 65:16 to 65:25, 71:15 to 71:25, 72:25, 73:1 to 73:25.

152.    The biopsied specimens collected by Marder were shipped over 130 miles to Kendall to perform all necessary pathology services on a daily basis. Ex. G, p. 40:11 to 40:14; Boitel, p. 18:21 to 18:25, 19:1 to 19:25, 20:1 to 20:19.

153.    Upon receipt from Marder, a KML histologist performed the TC services.  Boitel, 65:16 to 65:25; to 66:1 to 66:25.

154.    The next day, a KML pathologist then reviewed the slides, rendered a diagnosis, and prepared a **final** pathology report (the PC). Boitel Deposition pp. 45:19 to 45:25, 47:4 to 47:13**.**

155.    The pathology report prepared by Kendall was printed on a letterhead under the name of Marder Medical Laboratory ("MML"). Boitel Deposition p. 133:1 to 133:25, 134:25.

156.    MML has no independent legal existence. App. I, ¶20.

157.    At the time the final pathology report was printed by Kendall it already included Marder's signature, Boitel, 112:1 to 112:23, and was in final form before the slides were ever returned to Marder.  Boitel Deposition 165:1 to 165:25, 166:1, 166:23, Ex. 19.9.

158.    The final reports indicated that the TC services were rendered by KML. Boitel Deposition p. 163:19 to 164:25; 165:18 to 167:8 and Ex. 19.9 and 26; App. I, ¶21 and Ex. 14.

159.    Marder thereby collected approximately $55 to $80 per slide from Medicare. App. I, ¶23.

160.    In order to track the amount of Kendall's share in the scheme, Kendall sent a monthly invoice for the TC services of each slide to Marder. Boitel Deposition p. 74:1 to 74:25, 75:1 to 75:25.  The invoice reflected that Kendall was being paid $12.50 for the technical component of the pathology work on a per slide basis as full payment from Marder. App. L, p. 74:1 to 74:25, 75:1 to 75:25, 76:1 to 76:25 and Ex. 30.

161.     The invoice specified that it was only for the TC by including the letters "TC" after the CPT code 88305.  App. L, p. 74:1 to 74:25, 75:1 to 75:25, 76:1 to 76:25 and Ex. 30; App. I, ¶.

162.     The invoices included a separate line item for each date of service for each patient at $12.50 per specimen.  App. I, ¶23.

163.     Up until 2011, Marder paid the entire amounts owed on the invoices using a credit card. Boitel Deposition p. 123:10 to 14; 170:11 to 170:25, 171:1 to 171:4.

164.     The invoices represented the entire amount collected by Kendall from Marder. Kendall never billed Marder for and was never paid for any of the PC services. Boitel 164:15  to 164:25, Ex. 19, 165:1 to 165:25.  Marder paid Kendall approximately $1,479,566.53 during the time period at issue.  App. I, ¶23, 32-37, Ex. I21A, I21B, I22, I23 and I24.

165.     In 2010, an attorney provided advice to Marder regarding their business relationship, which he shared with Kendall,.  App. I, ¶24.

166.     The attorney drafted a contract which on its face indicated that Kendall would become an employee of Marder.  App. I, ¶25 and Ex. 15.

167.     The attorney also drafted a contract which on its face indicated that Marder was going to lease Kendall's laboratory.  App. I, ¶26 and Ex. 16.

168.     Page three of that lease agreement, specifies that the lessee has responsibility for billing and collecting global fees for bone density scans conducted at the Facility.  Deposition of Patricia Boitel attached hereto as App. L, 146:22 to 147:12 and Ex. L37; App. I, ¶26 and Ex. I16. KML never performed any bone density scans.  App. L, 147:7 to 147:12.

169.     The attorney also advised that other steps needed to also be implemented. App. I, ¶27 and Ex. I15-I16.

170.     Kendall signed the purported employment agreement and sent it to Marder in 2010.  App. I, ¶28-28 and Ex. I17-I18.  The version sent by Kendall to Marder had no date filled in on the first page and had not been signed by Marder. *Id*.

171.     Marder signed the document, but ***backdated it by 10 years***. App. I, ¶30, Ex. I19.

172.     The lease agreement was never signed. App. I, ¶31, Ex. I20.  No lease payments were ever made.  App. L, p. 123:10 to 19

173.     Prior to the execution of the employment agreement in 2011, Marder paid the amounts reflected on Kendall's monthly invoices by credit card.  Boitel Deposition p. 170:11 to 170:25, 171:1 to 171:4.  App. I, ¶36 and Ex. I24.

174.     Following the execution of the employment agreement in 2011, there was no change in the monthly invoices billed by Kendall to Marder, and Marder continued to pay the amounts reflected on the invoices.  App. I, ¶32 and Ex. I21A and I21B.

175.     However, the amounts owed by Marder to Kendall were thereafter paid in part by the credit card and in part by crediting Kendall's monthly net "salary" of $8,333.33.  Boitel Deposition p. 80:13 to 81:9; 82:15 to 82:25.  App. I, ¶37.

176.     The substance of the relationship between Kendall and Marder following the execution of the "employment agreement" was unchanged as is reflected in the following facts:

      a.  There were no changes in the agreement between Marder and Kendall;
      b.  specimens from Marder were processed in the same manner as those received from all of Kendall's other clients;
      c.  the pathology services continued to be rendered on the premises of KML, using the equipment and employees of KML;
      d.  Marder never exercised any day to day control over Kendall's work;
      e.  Marder could not assign additional work to Kendall;
      f.  Marder never provided any equipment to Kendall;
      g.  Marder had no discretion over when and how long Kendall worked;
      h.  Marder had no knowledge about when or how long Kendall worked;
      i.  Marder did not even know whether the PC services had been rendered by Kendall or by an employee of Kendall;
      j.  Marder never tracked any vacation or sick days taken by Kendall;
      k.  Marder's office manager tracked and reported hours worked to the payroll company for every other employee of Marder, but not for Kendall;
      l.  Kendall was exempted from participation in the pension program offered by Marder to other employees.

Boitel Deposition p. 7:21 to 8:9; 115:19 to 121:1; 123:10 to 128:7.  Garcia Deposition p. 7:18 to 8:17; 72:13 to 73:13; 74:5 to 76:3; Modica Deposition 25:16 to 30:12; 45:15 to 45:8

177.     Every claim submitted by Marder to Medicare represented that the services were rendered by him.  App. F, ¶20.

178.     Marder maintained some level of laboratory licensure with the State of Florida and under the Clinical Laboratory Improvement Act (CLIA).  United States' Response to Marder's Request for Admissions attached as App. Q, ¶¶5-11.

Respectfully submitted,

_____
MARK A. LAVINE
Assistant United States Attorney
Fla. Bar No. 648876
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Tel. (561) 209-1043
Fax: (561) 805-9846
Mark.Lavine@usdoj.gov
Attorneys for United States of America

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on ____, 2016, I served the foregoing document on all counsel of record via electronic transmission.

Respectfully submitted,

_____
MARK A. LAVINE
Assistant United States Attorney
Fla. Bar No. 648876
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Tel. (561) 209-1043
Fax: (561) 805-9846
Mark.Lavine@usdoj.gov
Attorneys for United States of America