# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 1:13-cv-24503-KMM

UNITED STATES OF AMERICA and the
STATE OF FLORIDA, *ex rel.*
THEODORE A. SCHIFF, M.D.,

      Plaintiffs,

v.

GARY L. MARDER, D.O., ALLERGY,
DERMATOLOGY & SKIN CANCER
CENTER, INC., a Florida corporation,
ROBERT I. KENDALL, M.D., and
KENDALL MEDICAL LABORATORY,
INC., a Florida corporation,

      Defendants.

_____/

## ORDER

This is a *qui tam* action in which Theodore A. Schiff, M.D.—a double board certified

dermatologist based in Palm Beach County, Florida—brought this action as Relator[1] on behalf of

the United States (the "Government") under the False Claims Act, ("FCA"), 31 U.S.C. §§ 3729–

3733. In the Complaint (ECF No. 1) filed December 13, 2013, Relator alleges that Defendants

Gary L. Marder, D.O. ("Dr. Marder") and Allergy, Dermatology and Skin Cancer Center, Inc.

("ADSCC") (collectively, the "Marder Defendants") and Robert I. Kendall, M.D. ("Dr.

Kendall") and Kendall Medical Laboratory, Inc. ("KML") (collectively, the "Kendall

---

[1]  The FCA allows a private person, known as a relator, to bring an FCA suit on behalf of the government in a *qui tam* action. 31 U.S.C. § 3730(b)(1). A relator serves the Government with a copy of the complaint, and the Government then has sixty days to intervene and proceed with the action once served; otherwise, the relator individually proceeds with the action. 31 U.S.C. § 3730(b)(4).

Defendants") violated the FCA by knowingly creating and submitting false claims to Medicare for reimbursement of dermatology and pathology services.   On October 14, 2014, the Government notified the Court of its decision to intervene and filed its intervening complaint (ECF No. 30) on November 19, 2014.

This suit was shepherded to its current state over the fourteen months following the Government's intervention through these subsequent activities: (1) the parties' extensive, albeit troubled, discovery process;[2] (2) the Court's denial of defendants' motions to dismiss (ECF No. 75); and (3) the Court's grant of the parties' joint motion for a continuance wherein the Court reset the trial date from the two-week trial period beginning January 25, 2016 to the two-week trial period commencing June 13, 2016.  *See* (ECF No. 123).  On July 8, 2016, the Court entered its aforementioned third omnibus order and sua sponte reset the trial date for the two-week trial period beginning October 31, 2016.

Now pending before the Court is the Government's Motion for Summary Judgment (ECF No. 146).  Each set of defendants filed a Response (ECF Nos. 182, 204) and the Government replied (ECF No. 211).  Thus, the motion initially came ripe for review on May 6, 2016.  However, on June 16, 2016, the United States Supreme Court issued its unanimous decision in *Universal Health Services, Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989 (2016) where the Court held that "the implied false certification theory can be a basis for [FCA] liability."[3]

---

[2]  In an effort to keep this FCA litigation on track towards a final resolution the Court entered three omnibus orders of which the parties are intimately familiar with the contents of those orders.  *See* (ECF Nos. 196, 223, 242).  Accordingly, the Court will not reiterate its previous guidance here.

[3]  In the opinion authored by Justice Thomas, the Court held that the implied false certification theory can serve as a basis for FCA liability when two conditions are met.  According to the Court, when "the claim does not merely request payment, but also makes specific representations about the goods or services provided," the first condition is met.  *Id.*  Second, the implied

*Escobar*, 136 S. Ct. at 1995.  As briefing on the Government's Motion for Summary Judgment was already complete, the Court ordered the parties to conduct supplemental briefing to discuss the effects of *Escobar* on the Government's summary judgment motion.  (ECF No. 242) at 15–16.

## I.      Factual and Regulatory Background

The vast majority of facts set forth in this Order are taken exclusively from Plaintiff's Statement of Undisputed Material Facts in Support of Summary Judgment (ECF No. 147) as it comports with the Federal Rules of Civil Procedure and the Local Rules of this Court. Defendants also filed their Statements of Undisputed Material Facts opposing Summary Judgment (ECF Nos. 202, 204), which were rife with evidentiary objections and other deficiencies as explained more fully below.[4]

The Federal Rules of Civil Procedure expressly provide that a party opposing summary judgment may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  However, only disputes

---

certification theory also applies when a "defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Id.*

[4]  For example, the Marder Defendants' Amended Statement of Material Facts (ECF No. 202) sets forth thirteen separate evidentiary objections—labeled A through M—in opposition to the Government's Motion for Summary Judgment.  As a trial court in the Eastern District of California recognized, many types of evidentiary objections are superfluous at the summary judgment stage.  *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119–22 (E.D. Cal. 2006).  Here, the Marder Defendants' objections that (1) challenge the relevancy of the facts supporting the Government's summary judgment motion, (2) call for the exclusion of evidence based on Federal Rule of Evidence 403, and (3) challenge the Government's factual statements as improper legal opinions are all "duplicative of the summary judgment standard itself."  *Id.* at 1119; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").  The Kendall Defendants also assert four evidentiary objections in their opposition to the Government's motion, which suffer from similar maladies.

over material facts—that is, "facts that might affect the outcome of the suit under the governing law"—can properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. Where there is a dispute about a declaration or document that does "little more than provide cumulative evidence" on issues already established, summary judgment is not precluded. *See e.g., The Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 227 (5th Cir. 2010) ("Only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment.").

The primary deficiency in Defendants' *amended* statements of material facts is the dearth of facts or citations to the record contained within these documents. That is, the sheer amount of conclusory denials, unsubstantiated assertions and legal argument presented obfuscates any statements of material fact that are likely contained within their pages. *See Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."); *Hilburn v. Murata Elects. N. Am., Inc.*, 181 F.3d 1220, 1227–28 (11th Cir. 1999) (noting that a "conclusory statement is insufficient to create a genuine issue of a material fact").

In fact, a close review of the Marder Defendants' amended statement of material facts reveals that of the 178 numbered paragraphs submitted in opposition to the Government's statement of material facts approximately ten contain record citations. *See* (ECF No. 202). Additionally, the separately listed material facts listed at the end of that statement of material facts only provide broad record citations to various exhibits, which forces the Court into the position of choosing between either outright ignoring these purported facts or delving even deeper into the record in an attempt to unearth a genuine issue involving a material fact.

Our circuit has made clear that Local Rule 56.1(b) serves a vital purpose in "help[ing] the court identify and organize the issues in the case." *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1303 (11th Cir. 2009). It indubitably preserves scarce judicial resources by preventing a court from "having to scour the record and perform time-intensive fact searching." *Joseph v. Napolitano*, 839 F.Supp.2d 1324, 1329 (S.D. Fla. 2012); *see also Alsina-Ortiz v. Laboy*, 400 F.3d 77, 81 (1st Cir. 2005) ("Burying the district court in a mass of supposedly material contested facts, many irrelevant and many unsupported by citations, creates the very morass from which the rule aims to protect the district judge."). Given its import to the judicial process, the Eleventh Circuit holds the local rule governing summary judgment in "high esteem" much like its sister circuits. *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008); *see also Caban Hernandez v. Philip Morris USA, Inc*., 486 F.3d 1, 7 (1st Cir.2007) ("Given the vital purpose that such rules serve, litigants ignore them at their peril.").

A party engaging in a pattern of practice that comports with a court's local rules governing summary judgment greatly improves—rather than impedes—that court's ability to efficiently and fairly resolve a motion for summary judgment in a timely manner. This is why Local Rule 56.1 mandates that a parties' Statement of Material Facts "(1) [n]ot exceed ten (10) pages in length; (2) [b]e supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court; and (3) [c]onsist of separately numbered paragraphs." S.D. Fla. L.R. 56.1(a). Unfortunately, Defendants' non-compliance with Local Rule 56.1 has already been the subject of two of the Court's previous orders. *See* (ECF No. 196); *see also* (ECF No. 223) at 14 n.11 ("Whether the Court will afford yet another opportunity to the Marder Defendants to submit a coherent statement of material facts—given

the onslaught of evidentiary objections contained in the one the Marder Defendants have currently submitted—will be resolved in a forthcoming order.").

That forthcoming order has arrived.  To the extent either the Marder Defendants or the Kendall Defendants raised a genuine issue of material fact that precludes the entry of summary judgment, the Court will honor its commitment to draw all reasonable factual inferences in favor of Defendants as the non-moving parties at this stage of disposition.  However, to the extent Defendants merely objected to the evidentiary basis for an otherwise undisputed fact, set forth unsubstantiated assertions, or other unsupported legal arguments, the Court deems those facts set forth by the Government as uncontroverted under the Federal Rules of Civil Procedure and the Local Rules of the Court.  *See* S.D. Fla. L.R. 56.1(b).

The Court is essentially left with a "functional analog of an unopposed motion for summary judgment" given the fact that the individual defendants, Drs. Kendall and Marder, invoked the Fifth Amendment[5] throughout the course of the Government's investigation.  *See Reese*, 527 F.3d at 1268.  Despite the virtually unopposed summary judgment motion, the Government as the moving party "continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged."  *Id.*

---

[5] "Although the Fifth Amendment protects individuals from compelled, incriminating testimony, it does not do the same for corporations."  *Grand Jury Subpoena Dated Apr. 9, 1996 v. Smith*, 87 F.3d 1198, 1200 (11th Cir. 1996).  Accordingly, "[a]dverse inferences drawn against the individual defendants may also be drawn against the corporate defendant because the individual defendants were acting in the scope of their employment when they engaged in the conduct they refused to testify about."  *S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1263 (S.D. Fla. 2010).  "An individual's status as a corporate officer gives rise to a presumption of ability to control and the degree of their participation in business is probative as to their knowledge."  *F.T.C. v. Transnet Wireless Corp.,* 506 F.Supp.2d 1247, 1270 (S.D. Fla. 2007).

The Government contends that the Court should draw an adverse inference against Dr. Marder and Dr. Kendall for their invocation of the Fifth Amendment right against self-incrimination in their deposition testimony and other discovery responses. *See Baxter v. Palmigiano*, 425 U.S. 308 (1976). In *Baxter*, the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a Civil cause." *Id.* at 318 (internal citation and quotations omitted).

However, both sets of defendants challenge the Government's reliance on *Baxter* by arguing that the drawing of adverse inferences is improper in this case and the Government is merely attempting to circumvent its burden on summary judgment. *See* (ECF No. 204) at 3; (ECF No. 182) at 3–5. Defendants are correct that an exception exists to *Baxter's* general rule that prevents the Court from drawing an adverse inference in situations where the inference would result in the automatic grant of summary judgment against the party or parties invoking their constitutional right. *See United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir. 1991) ("[T]he Fifth Amendment is violated when a person, who is a defendant in both a civil and a criminal case, is forced to choose between waiving his privilege against self-incrimination or losing the civil case on summary judgment."). Contrary to Defendants' assertions, this argument does not sound the death knell of the Government's case.

The invocation of the privilege is not without its costs to both the party asserting this constitutional claim and their opposition. After all, it is widely recognized that "[u]se of the privilege in a civil case may . . . carry some disadvantages for the party who seeks its protection." *S.E.C. v. Graystone Nash, Inc*., 25 F.3d 187, 190 (3d Cir. 1994); *see also* 8 Wright,

Miller & Marcus, *Federal Practice & Procedure* § 2018 (3d ed. 2014) ("It is certainly true that a party may hurt his or her own cause by the claim of the privilege since that can deprive the party of whatever benefit his or her own testimony might provide.").  Additionally, the opponent, unable to obtain discovery, is likewise disadvantaged.  Yet, when considering these competing interests, the Court remains mindful of Justice Brandeis' famous declaration that "[s]ilence is often evidence of the most persuasive character."  *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) ("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader.").

Here, in light of the myriad uncontroverted evidence presented by the Government, any adverse inferences drawn against Defendants will not result in the automatic entry of summary judgment.  Although Defendants may have lost their best defense through invocation of the Fifth Amendment privilege against self-incrimination, the burdens on the parties at summary judgment remain the same.  Accordingly, the Court will draw adverse inferences where it deems appropriate and only in situations where the inference is complementary to the evidence presented by the Government rather than its proxy.

Given the muddled and delayed presentation of material facts by the parties, the Court—in ruling on the Government's Motion for Summary Judgment—relies predominantly on its own comprehensive review of the record.[6]  However, before turning to a recitation of the undisputed

---

[6] With this in mind, the Court implores the parties to consider Judge Zloch's admonition that "Federal Judges are not archaeologists.  We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment."  *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp. 2d 1337, 1340 (S.D. Fla. 2009) (internal citation omitted).

facts that are supported by the record evidence, the Court will set forth the relevant regulatory framework at issue in this case.

    A.    <u>Regulatory Framework for Medicare Reimbursement for Services Rendered</u>

The Marder and Kendall Defendants—like other physician group practices—are reimbursed for the services they provide to patients covered by government benefit programs. For example, Medicare[7] reimbursements, which make up the heart of the Government's intervening complaint, are made according to the Medicare Fee Schedule (the "Fee Schedule"). The Fee Schedule is based on the American Medical Association's ("AMA") Current Procedural Terminology ("CPT") codes,[8] which are assigned to different medical services and "provide a uniform terminology that accurately describes specific medical, surgical, and diagnostic services and procedures to facilitate efficient health care record keeping, information sharing, and efficient processing of claims for payment for services or procedures provided to patients." *Neotonus, Inc. v. Am. Med. Ass'n.*, 554 F. Supp. 2d 1368, 1370 (N.D. Ga. 2007), *aff'd sub nom. Neotonus, Inc. v. Am. Med. Ass'n*, 270 F. App'x 813 (11th Cir. 2008).

---

[7]  In 1965, Congress established Medicare as "a federally funded health insurance program for the elderly and disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994); *see also* 42 U.S.C. § 1395c.  Medicare is administered by the Center for Medicare and Medicaid Services ("CMS").  *Grant Med. Ctr. v. Burwell*, No. CV 15-480 (RMC), 2016 WL 4574648, at *2 (D.D.C. Sept. 1, 2016).  For outpatient beneficiary treatment, all Medicare reimbursements are subject to Part B, which covers the costs of, among other things, home health services, physician services, and outpatient physical therapy services.  See 42 U.S.C. § 1395k.

[8]  Congress directed the Secretary of Health and Human Services ("HHS") to "prescribe such regulations as may be necessary to carry out the administration of" Medicare, 42 U.S.C. § 1395hh(a)(1), and to "establish a uniform procedure coding system for the coding of all physicians' services," *id.* § 1395w–4(c)(5).  The Secretary of HHS acted on this authority by adopting the CPT code set drafted by the AMA.  45 C.F.R. § 162.1002; *see also United States v. Semrau*, 693 F.3d 510, 530 (6th Cir. 2012).

Under the Social Security Act, 42 U.S.C. § 1395y(a)(1)(A), Medicare is authorized to pay only for items and services that are medically "reasonable and necessary for the diagnosis or treatment of illness or injury." In limited circumstances, Medicare allows physicians to submit claims for "services and supplies" furnished by other employees of the physician "incident to"[9] the professional services personally rendered by the physician. 42 C.F.R. § 410.26(b)(5). Generally, Medicare covers 80 percent of the reasonable cost of medical services. *See* 42 U.S.C. § 1395l(a)(1). Accordingly, the patient is normally required to contribute the remaining 20 percent as a copayment.

Since at least 2003, Chapter 15, Section 90 of the Medicare Benefit Policy Manual, has stated, among other things, that radiation therapy "furnished in a nonprovider facility require[s] direct personal supervision of a physician. The physician need not be in the same room, but must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." Medicare Benefit Policy Manual,[10] ch. 15, § 90 (May 13, 2016). However, there is no direct supervision requirement for "incident to" services related to radiation therapy. *See United States v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1262 (M.D. Fla. 2015) (recognizing that radiation therapy is not included in the definition of "'services and supplies' because it is listed as a separate Medicare benefit . . . . Thus, the

---

[9]  "Incident to services" are services that are furnished by other employees of the physician—such as a PA or NP—incident to" the professional services personally rendered by the physician.

[10]  Available online at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf, at 115. Direct supervision, as consistently defined throughout the Medicare Benefit Manual and the Code of Federal Regulations, means the physician "must be present and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room where the procedure is performed." *See e.g.*, 42 C.F.R. §410.32. As originally defined in the 2011 Outpatient Prospective Payment System Final Rule, "immediately available" means "interruptible and able to furnish assistance and direction throughout the performance of the procedure but without reference to any particular physical boundary."

direct supervision requirement in § 410.26(b)(5) does not apply.") (citing 42 C.F.R. § 410.26(a)(7); 42 U.S.C. § 1395x(s)(4)).

Payment for services performed by either a physician's assistants ("PA") or nurse practitioner ("NP") (collectively, "NPP's"), must not be more than "85 percent of the physician fee schedule amount." *Landau v. Lucasti*, 680 F. Supp. 2d 659, 662, 667 (D.N.J. 2010) (citing 42 C.F.R. §§ 405.520(a), 414.52, 414.56); *see also U.S. ex rel. Heater v. Holy Cross Hosp., Inc*., 510 F. Supp. 2d 1027, 1035 (S.D. Fla. 2007) ("When the Government is billed for services rendered by a nurse or nurse practitioner which are not incident to the services of a physician, the provider is reimbursed at 85–percent of the rate otherwise paid.").

To ensure compliance with these laws and governing agency regulations, the "[s]ubmission of Medicare claims through a carrier requires providers to submit a '1500 Form'[11] that includes information regarding the patient, the provider, and the services rendered, including the CPT code." *Semrau*, 693 F.3d at 513. For every year at issue in this case, the first page of the Introduction to the CPT Code Book directed those submitting bills to select the code that accurately identifies the service performed, rather than one that merely approximates the service provided, and required that all services be adequately documented in the patient's medical record. Each CPT code corresponds to a different level of service and is used by insurance carriers to reimburse providers the appropriate amount depending on the code submitted. *Id.*

Having set forth the relevant regulatory framework, the Court now turns to the undisputed facts supported by the record evidence.

---

[11] The 1500 Form also includes a notice stating: "Anyone who misrepresents or falsifies essential information to receive payment from federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable federal laws." First Coast Service Options, Inc. ("FCSO") is the CMS contractor tasked with administering Medicare payment, processing and auditing functions in the geographic regions where Drs. Kendall and Marder operate.

B.      The Relevant Parties

It is undisputed that Dr. Marder is a physician practicing in Port St. Lucie and Okeechobee, Florida through the clinic he owns, ADSCC.  In this capacity, Dr. Marder has enrolled ADSCC in the Medicare program since at least 2003.  Doing so required Dr. Marder to sign certain statements acknowledging his familiarity with Medicare laws and regulations and affirming his intent to abide by them.  Dr. Marder also agreed that he would not present or cause to be presented any false or fraudulent claims.  Dr. Kendall is a board certified pathologist operating an independent laboratory, KML, in Coral Gables, Florida, which is approximately 130 miles from Dr. Marder's offices.  Dr. Kendall also signed a Medicare enrollment application for KML dating back to 2011 and made the same affirmations as Dr. Marder.

C.      Dr. Marder's Dermatology Practice

Dr. Marder treated Medicare beneficiaries at his main Port St. Lucie office and his satellite office in Okeechobee, Florida by providing radiation oncology services and other clinical laboratory services as part of his practice.  Dr. Marder is the only physician to have ever rendered services to patients in these offices.  Notably, no other doctor was present at either office on the occasions when Marder was absent.

Both offices were open Monday through Friday, but Marder was physically present in the offices on a more limited basis.  For example, Dr. Marder normally only spent Mondays and Wednesdays in the Port St. Lucie office, arriving between 10:30 and 11:00 a.m.  For the Okeechobee office, Dr. Marder spent one Tuesday every two weeks at that location.  Dr. Marder used appointment books at each office in order to schedule patient visits.  If the appointment book was blank for the entire day or said "Dr. Out," that meant that Dr. Marder was not in the

office that day.  From 2008 to 2014, a review of Dr. Marder's appointment book indicates that he spent more than fifty percent of all business days out of the office.

Dr. Marder also maintained tight control over the operations of both offices.  In fact, no claims were submitted to any insurance company for services rendered until he provided his approval.   Generally, Dr. Marder employed two individuals at any given time assigned exclusively to billing duties.  However, they had no experience or training in medical claims processing and billing, or in healthcare regulatory compliance.  Notably, Dr. Marder never sent his employees to any training on these subjects.

Radiation treatments were administered to multiple patients on a daily basis at both the Okeechobee office and the Port St. Lucie office.  The maximum power of the devices at Marder's offices was limited to approximately 90,000 volts ("90 keV"), a power level which is considered to be "superficial radiation" or ortho-voltage radiation.  Dr. Marder, or one of his NPP's, only administered "superficial radiation" to the patients under Dr. Marder's standard radiation protocol.[12]  Each of the daily radiation treatments allegedly performed by Marder are known as "fractions" as they represent only a portion of the total dose.  If the daily fraction is split into two separate applications of radiation, it is a treatment modality known as "hyper-fractionation."  Dr. Marder represented to Medicare that he performs all the radiation therapy himself and that the hyper-fractionated treatments are administered four hours apart.  However, Marder's current radiation protocol requires the treatments to be administered just forty-five to sixty minutes apart.

---

[12]  Superficial radiation can be distinguished from radiation provided by a linear accelerator (up to 5,000,000 volts), or "linac" for short.  Machines that can administer superficial radiation can be purchased new for $150,000 while a linac costs between $2 and $4 million and must be installed in a concrete bunker to provide adequate shielding.

Martin Burke, a PA employed by Dr. Marder from 2012 to 2014, provided a sworn affidavit regarding the daily operations of Dr. Marder's radiation practice. Specifically, Burke declared that Dr. Marder never met with patients during the course of radiation and that Burke individually provided radiation treatments to patients based on verbal instructions he received from Dr. Marder. Burke also testified that he was (1) instructed not to change any settings on the radiation machine; (2) not required to perform any simulations of treatment before commencing; (3) not required to make reference to any type of special instructions regarding the type of shield to use on each patient; and (4) unaware of any times that a medical physicist was involved in the care of patients.

Since at least 2008, the only medical physicist[13] with whom Dr. Marder had a business relationship is Farhad Kader. The primary services Kader rendered were the annual calibration of the radiology equipment and the preparation of calibration reports. Kader rarely provided services related to the treatment being rendered to an individual patient, and has not done so in any capacity since August 2011. In those few cases where he did render services, Kader did so only in evenings and on the weekend.

D.    Dr. Kendall's Pathology Services and Relationship with Marder

The biopsied specimens collected by Dr. Marder during the relevant time period were shipped over 130 miles to KML so that the Kendall Defendants could perform certain pathology services on a daily basis. Upon receipt from Marder, a KML histologist performed the Technical

---

[13] "A Qualified Medical Physicist is an individual who is competent to practice independently in one or more of the subfields in medical physics. The medical physicist has responsibility for overseeing the [radiological] equipment quality control program, and for monitoring performance upon installation and routinely thereafter." 75 Am. Jur. *Trials* § 43 (2000).

Component ("TC")[14] services.   The next day, a KML pathologist then reviewed the slides, rendered a diagnosis, and prepared a pathology report.   The pathology report prepared by KML was printed on a letterhead under the name of Marder Medical Laboratory ("MML").   At the time the report was printed by KML it already had Dr. Marder's signature.   The reports sent to Marder fully indicated the services that KML rendered.

In order to track the amount that Kendall was due for services provided, Dr. Kendall sent a monthly invoice to the Marder Defendants for the work done on each slide sent by Dr. Marder. The invoice reflected that Dr. Kendall was paid $12.50 per slide as full compensation from Marder for the pathology work that Kendall performed.   The invoice further indicated that payment was sought for only the TC by including the letters "TC" after the CPT Code 88305. Up until 2011, Dr. Marder paid the entire amounts owed on the invoices using a credit card.   The invoices represented the total amount –approximately $1,479,566.53—collected by Kendall from Marder during the relevant time period.   During this same period, Dr. Marder was paid over $2,829,000 for the pathology he billed on a global basis.

At some point in 2010, an attorney gave Marder advice regarding his pecuniary relationship with Dr. Kendall.   The attorney drafted a contract, which indicated that Kendall would become an employee of Marder.   An additional contract was drafted indicating that Dr. Marder was going to lease Kendall's laboratory. Page three of the lease agreement specifies that the lessee has responsibility for billing and collecting global fees for bone density scans

---

[14]   Pathology services are comprised of a Professional Component ("PC") and a Technical Component ("TC").   Pathology services can be billed in one of three ways: The TC and PC can be "globally" billed, or the TC and PC can be billed separately.   If a pathology claim is billed globally, the provider simply uses the applicable CPT Code.   If the claim is being billed for only the TC or PC, a modifier code is used.   The TC modifier indicates that reimbursement is sought only for the TC.   The "26" modifier indicates that reimbursement is sought only for the PC. During the relevant timeframe, Marder billed for approximately 35,000 pathology specimens, none of which were billed under the PC modifier.

conducted at KML's facility.  To date, no bone density scans have been performed by KML.  Dr. Kendall signed the purported employment agreement and sent it to Dr. Marder in 2010.  The version that Kendall sent Marder was undated and had not yet been signed by Dr. Marder.

With this factual and regulatory background in mind, the Court now turns to the merits of the Government's motion for summary judgment.

## II.     Legal Standard

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56.  A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  Speculation or conjecture cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party shoulders the initial burden of showing the absence of a genuine issue as to any material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  In deciding whether the movant has met this burden, "[t]he court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party." *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the moving party satisfies its initial burden, the non-moving party must come forward with evidence showing a genuine issue of material fact that precludes summary judgment.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the

materials cited do not establish the absence or presence of a genuine dispute." *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1195 (11th Cir. 2015) (quotation omitted).

"If reasonable minds could differ on any inferences arising from undisputed facts, summary judgment should be denied." *Twiss v. Kury*, 25 F.3d 1551, 1555 (11th Cir. 1994); *see also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) ("When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.") (quotation omitted). After all, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). A trial court has the discretion "to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing." *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991); *see also Anderson*, 477 U.S. at 255 (recognizing that a trial court has discretion to "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial") (citation omitted).

## III.   Discussion

The Government moves for summary judgment on the seven counts[15] it asserted in the Intervenor Complaint and additionally seeks summary judgment on all of Defendants' affirmative defenses. According to the Government, there remains no genuine issue of material fact that the claims Dr. Marder submitted in connection with the dermatology and radiation services he allegedly provided were false and provide a basis for FCA liability. As to the Kendall Defendants, the Government asserts that the pathology services KML provided to

---

[15]   The seven counts are: Presentation of False Claims in violation of §3729(a)(1)(A) (Counts I and II); Presentation of False Statements Material to False Claims in violation of 31 U.S.C. § 3729(a)(1)(B) (Counts III and IV); Conspiracy in violation of 31 U.S.C. § 3729(a)(3) (Count V); Unjust Enrichment (Count VI); and Payment by Mistake (Count VII).

Marder constituted impermissible "remuneration" under the Anti-Kickback Statute ("AKS") and the Stark Act. Additionally, the Government argues that the Kendall Defendants are liable for the false claims submitted by the Marder Defendants. In sum, the Government contends that the Defendants collectively violated the FCA in multiple ways: (1) submitting—or causing to be submitted—false claims with the requisite scienter; (2) engaging in a conspiracy to submit false claims; (3) and by falsely certifying compliance with AKS and Stark Act.

    A.    <u>False Claims Act</u>

The FCA was "enacted in 1863 with the principal goal of 'stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 78 (2000). At its core, "[t]he FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014). Despite its broad reach, courts acknowledge that the FCA "is not a vehicle to police technical compliance with complex federal regulations." *U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 717 (6th Cir. 2013) (quotation omitted).

In order to establish its prima facie case, a plaintiff asserting claims under Section 3729(a)(1)(A)[16] of the FCA must establish three elements: (1) a false or fraudulent claim; (2)

---

[16] In May 2009, Congress enacted the Fraud Enforcement & Recovery Act of 2009 ("FERA"), which amended the FCA and re-designated various sections including 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A), and 31 U.S.C. § 3729(a)(3) as 31 U.S.C. § 3729(a)(1)(C). *See* Fraud Enforcement & Recovery Act of 2009, Pub. L. 111–21, § 4(d), 123 Stat. 1617, 1624–25 (2009). The pre-FERA version of the Act imposed liability on any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). The amendments to this subsection only apply to conduct occurring on or after May 20, 2009. *See* 31 U.S.C. § 3729(a)(1)(C). Because the Government alleges that some conduct occurred before May 2009, the pre-FERA version of this subsection would apply to the alleged schemes involving that conduct. For ease of reference, only the post-FERA version, 31 U.S.C. §

which was presented, or caused to be presented, by the defendant to the Government for payment or approval; (3) with the knowledge that the claim was false.  31 U.S.C. § 3729(a)(1)(A); *see also McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.").

Additionally, the FCA prohibits an individual from knowingly making, using, or causing to be made or used, "a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).[17]  Under the statute, material[18] "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  § 3729(b)(4).

    1.    *Falsity*

False claims under the FCA may assume a variety of forms.  "A factually false claim occurs . . . when a supplier submits a claim that misidentifies the goods supplied or requests reimbursement for goods that it never provided."  *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1344 (S.D. Fla. 2015).  On the other hand, "[a] claim is legally false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *U.S. ex rel. Davis v. D.C.*, 793 F.3d 120, 124

---

3729(a)(1)(C) is cited throughout this Order, although many of the cases discussed cite the pre-FERA version.

[17]  The prior version of this section of the FCA, Section 3729(a)(2), was also amended pursuant to FERA and applies retroactively to all FCA cases pending on or after June 7, 2008.  *See Sanders v. Allison Engine Co.*, 703 F.3d 930, 936–42 (6th Cir. 2012).

[18]  As no party disputes Defendants' representations that they were in compliance with federal law are material to the Government's payment decisions in this case, the Court will not conduct an analysis of this element.

(D.C. Cir. 2015) (internal quotation marks omitted).  Legally false claims, otherwise known as false certifications, can "be either express or implied."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010).

### 2. *Presentment*

The submission of a false claim is the "*sine qua non*" of a [FCA] violation.  *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) ("Without the presentment of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act.").  Additionally, an individual or entity that does not directly submit a false claim to the government may still be liable under the FCA.  *See* 31 U.S.C. § 3729(a)(1)(A), (B).

Although the FCA does not define the phrase "cause to be presented," courts have applied traditional concepts of proximate causation "to determine whether there is a sufficient nexus between the Defendants' conduct and the ultimate presentation of the allegedly false claim."  *United States v. Abbott Labs.*, No. 3:06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016) (citing *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006)).  Under this analysis, a defendant's  "conduct may be found to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of [d]efendants' conduct."  *Id.* (citing *U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, No. CIV.A. 96-11651PBS, 2003 WL 22048255, at *5 (D. Mass. Aug. 22, 2003)).

### 3. Knowledge or Scienter

For purposes of the FCA, the term "knowingly" means that a person (1) has actual knowledge of the truth or falsity of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard[19] of the truth or falsity of the information. *See* 31 U.S.C. § 3729(b). Moreover, no proof of specific intent to defraud is required. *See* § 3729(b)(1)(B). Strict enforcement of the FCA's knowledge requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability." *U.S. ex rel. Purcell v. MWI Corp.,* 807 F.3d 281, 287 (D.C. Cir. 2015). Courts recognize that FCA's "'scienter requirement is actually quite nuanced.'" *Urquilla-Diaz*, 780 F.3d at 1058 (quoting *United States v. King–Vassel*, 728 F.3d 707, 712 (7th Cir. 2013)).

### 4. Conspiracy

Lastly, a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to FCA liability. 31 U.S.C. § 3729(a)(1)(C). Although the FCA does not define the elements of conspiracy, courts recognize that "general civil conspiracy principles apply." *U.S. ex rel. Durcholz v. FKW Inc*., 189 F.3d 542, 545 n.3 (7th Cir. 1999) (citing *U.S. v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)); *see also Corsello v. Lincare, Inc*., 428 F.3d 1008, 1014 (11th Cir. 2005). Thus, a plaintiff bringing a cause of action for FCA conspiracy must allege (1) that "an agreement existed to have false or fraudulent claims allowed or paid" to the government, (2) that each alleged member of the conspiracy "joined that

---

[19] "Congress added the 'reckless disregard' provision to the [FCA] in 1986." *Urquilla-Diaz v. Kaplan Univ*., 780 F.3d 1039, 1058 (11th Cir. 2015) (citation omitted). According to the legislative history, "this language was added to ensure that 'knowingly' captured "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *Id* (quoting S. Rep. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

agreement," and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871, 899 (D.C. Cir. 2010) (citations omitted); *Rutledge v. Aveda*, No. 2:14-CV-00145-AKK, 2015 WL 2238786, at *12 (N.D. Ala. May 12, 2015) (citing *Corsello*, 428 F.3d at 1014).

> B.        Marder Defendants Knowingly Submitted False Claims in Violation of the FCA

Based on the present record, there is no genuine issue of material fact that, during the relevant time period, the Marder Defendants knowingly submitted false claims to Medicare by requesting reimbursement for services that were never actually performed—or directly supervised by—Dr. Marder.  Specifically, the undisputed evidence shows that Dr. Marder acted at least with reckless disregard when he submitted claims for services he allegedly performed despite Marder's frequent absence from the offices (including expansive periods of foreign travel) on days corresponding to over fifty percent of the payments that Dr. Marder received from Medicare.  Quite simply, a reasonable jury could infer Dr. Marder's actual knowledge—or at least his reckless disregard for the veracity of his claims for Medicare reimbursement—simply from the physical impossibility of his seeking payment for services he claimed to have performed or directly supervised despite being absent from the office.

Dr. Marder also received $436,026 for services billed under the CPT code for a Medical Physicist (77336).  However, it is undisputed that since 2011 Mr. Kader—the only Medical Physicist to ever work with Dr. Marder and ADSCC—has not rendered care related to any patient except on a limited number of cases during nights and weekends.  Mr. Kader also confirmed that if he actually worked on a file he always signed in ink, yet the Government's review of the files revealed hundreds of copies of his signature, but not any originals.

Accordingly, all claims for Medical Physicist services submitted to Medicare by the Marder Defendants since 2011 are false as Dr. Marder had actual knowledge that the Mr. Kader did not perform the corresponding services.

Weighing all inferences in the Marder Defendants' favor, the Court is able to determine as a matter of law that Dr. Marder acted with reckless disregard when he *personally* billed for services, such as biopsies and office visits, using his own identification number rather than the number of his PA's. The result was that Dr. Marder was reimbursed at the 100% rate instead of the 85% rate assigned to PA's, which renders these submitted claims expressly false.

The Government also asserted that the Marder Defendants routinely submitted claims that were false because the services were (1) supported by false documentation,[20] (2) upcoded[21] to a higher CPT reimbursement rate, and (3) not medically necessary. As to the medical necessity of Dr. Marder's use of "hyperfractionation," the Government is essentially asking the Court to weigh the inferences in its favor by relying on its expert testimony to confirm the implausibility of twice a day treatments being medically necessary for a considerable number of patients. This position misconstrues the court's role at the summary judgment stage. *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh

---

[20]   The Government's theory of FCA liability based on document fabrication and duplication—an actionable claim under Section 3729(a)(1)(B)—is raised for the first time on summary judgment and thus it is improper for the Court to resolve it at this juncture. *Ganstine v. Sec'y, Florida Dep't of Corr.,* 502 F. App'x 905, 909 (11th Cir. 2012) ("A plaintiff may not, however, 'amend' his complaint at the summary judgment stage by raising a new claim.").

[21]   "Upcoding," refers to "the practice of billing Medicare for services or equipment designated under a code that is more expensive than what a patient actually needed or was provided" the submission of a claim containing a higher CPT code than the visit actually warranted." *United States ex rel. Bledsoe v. Cmty. Health Sys.,* 501 F.3d 493, 498 n.2 (6th Cir. 2007) (explaining that upcoding is a "common form of Medicare fraud") (internal citation and quotations omitted).

conflicting evidence or to make credibility determinations.").  Instead, this issue is one that needs to be submitted to the trier of fact.

Although the Government contends otherwise, the result is the same when reviewing the factual record as it relates to the allegations that the Marder Defendants engaged in Medicare "upcoding."  Even with an adverse inference, the Court cannot say as a matter of law that no reasonable jury could reach a verdict in favor of the Marder Defendants' use of certain CPT codes—77402, 77407, and 77412 (reimbursed as high as $249.59) versus 77401 (reimbursed between $19.51 and $26.03)—for the superficial radiation services provided at the Port St. Lucie and Okeechobee clinics.  Based on the briefs before the court, it is evident that the Government's theory of FCA liability based on a theory of "upcoding" is best left to the assessment of the factfinder.  As the Court could not conclude that the claims submitted under CPT Codes 77402, 77407, and 77412 were false as a matter of law, it need not determine whether Dr. Marder acted with the requisite deliberate ignorance or reckless disregard by taking advantage of a disputed legal question over which CPT Code superficial radiation is properly billed under.

Accordingly, the Government's Motion for Summary Judgment against the Marder Defendants as to Counts I and III of the Intervenor Complaint is GRANTED in PART and DENIED in PART for the reasons the Court previously enunciated.

C.    Factual Issues Remain on Whether Kendall Defendants Caused False Claims to be Submitted

While the Court was able to determine as a matter of law that the Marder Defendants knowingly submitted false claims in violation of Sections 3729(a)(1)(A) and (B), the record evidence does not support a related finding that the Kendall Defendants caused such false claims to be submitted.  Without any specific evidence that the Kendall Defendants acted "knowingly" for purposes of the FCA, summary judgment is not warranted on the Government's FCA claims

that are directed at the Kendall Defendants.[22]  Given that a factual dispute remains for trial as to whether the Kendall Defendants knowingly assisted in causing the submission of false claims to the United States, the Government's Motion on Count II of the Intervention Complaint as it pertains to the Kendall Defendants is DENIED.

      D.    <u>Lack of Record Evidence Regarding Alleged Conspiracy</u>

The Government has not met its initial summary judgment burden by demonstrating an absence of a genuine material dispute of fact regarding the parties' role in a conspiracy to submit a false claim pursuant to 31 U.S.C. § 3729(a)(1)(C).  First, there is no undisputed record evidence of an agreement between Marder and Kendall to submit a false claim.  Although the Government asserts that the employment agreement between Marder and Kendall was a "sham," such an unsubstantiated assertion does not present the type of situation where the Court can rule as a matter of law that the parties engaged in a conspiracy to submit a false claim.  At best, the evidence is conflicting and the decision now lies with the jury to weigh the inferences and judge the credibility of testimony surrounding the Defendants' employment arrangement or alleged conspiratorial behavior.

Accordingly, the Government's Motion for Summary Judgment as to Count V of the Intervenor Complaint is DENIED.

      E.    <u>Anti-Kickback Statute and Stark Act</u>

Because compliance with the AKS and the Stark Act is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes "can

---

[22]  Because the Government has failed to establish the requisite level of scienter, the Court need not consider whether the Kendall Defendants met the proximate causation standard set forth earlier in this Order.  Even if the Court could determine as a matter of law that the Kendall Defendants acted "knowingly," the Court finds in this instance the better approach is to submit the issue of causation to a jury. *See e.g. Hayes*, 943 F.2d at 1297.

form the basis of liability under the F[CA]."  *United States v. Baycare Health Sys*., No. 8:14-CV-73-T-23EAJ, 2015 WL 4878456, at *1 (M.D. Fla. Aug. 14, 2015).  The AKS prohibits the payment, receipt, offering, or solicitation of "remuneration" to induce business that is reimbursable under a federal health care program.  42 U.S.C. § 1320a–7b; *see also U.S. ex rel. Osheroff v. Humana Inc*., 776 F.3d 805, 808 (11th Cir. 2015).  However, there is no violation of the statute for a payment "by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. 1320a-7b(b)(3)(B).  The bona fide employee safe harbor is discussed further in 42 C.F.R. § 1001.952(i), which provides that payments to employees "for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs" are not remuneration and therefore cannot form the basis of AKS violation.  *See* 42 C.F.R. § 1001.952(i).  The AKS, while often criticized,[23] "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct.  Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal."  *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998).

Similarly, the Stark Act prohibits healthcare entities from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" with the entity.  42 U.S.C. § 1395nn; *see also United States ex rel. Mastej v. Health Mgmt. Assocs., Inc*., 591 F. App'x 693, 698 (11th Cir. 2014) ("In its most general terms, the Stark statute prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified

---

[23] "The Anti-Kickback Statute is a blunt rather than a precise weapon, an axe rather than a scalpel."  Joan H. Krause, *Skilling and the Pursuit of Healthcare Fraud*, 66 U. Miami L. Rev. 363, 371 (2012).

types of financial relationships with that hospital.").  Stark also proscribes a healthcare entity from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited self-referral.  42 U.S.C. § 1395nn(a)(1)(B).

The definition of "remuneration" under the AKS "is materially indistinguishable" from the Stark Act's definition.  *Ameritox, Ltd. v. Millennium Labs., Inc*., 803 F.3d 518, 521–22 (11th Cir. 2015).  The AKS definition includes "'any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind.'"  *See id*. at 522 (quoting 42 U.S.C. § 1320a–7b(b)).  Under Stark, "remuneration" is broadly defined as "'any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.'"  *See id.* (quoting 42 U.S.C. § 1395nn(h)(1)(B)).

Because the AKS and Stark Act do not create private rights of action, *see Ameritox*, 803 F.3d at 522, an FCA claim dependent on one of these statutory regimes needs to meet all of the other elements of an FCA violation.  *See e.g., U.S. ex rel. Hartwig v. Medtronic, Inc.*, No. 3:11CV413-CWR-LRA, 2014 WL 1324339, at *12 (S.D. Miss. Mar. 31, 2014) ("However, an AKS violation alone does not create a cause of action under the FCA because evidence of an actual false claim is essential to an FCA violation."); *see also McNutt*, 423 F.3d at 1259 ("When a violator of government regulations is ineligible to participate in a government program" for violating AKS or another condition of payment "and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims").

*1.    Factual Issues Remain on Whether Defendants Committed a FCA Violation based on Predicate Offenses of AKS and Stark Law*

To prevail at summary judgment, the Government must show not only that Defendants paid, or offered to pay, remuneration in exchange for referrals, but also that payments led to false certifications or claims.  Drawing every inference in favor of the Defendants, the Court cannot determine as a matter of law that the purported employment relationship between the Marder Defendants and the Kendall Defendants for pathology services was a mere smokescreen for kickbacks, sufficient to take it out of the safe harbor provisions expressly provided for by the AKS and Stark Act.  At the very least, there are factual issues remaining on whether (1) Dr. Kendall was an employee entitled to the applicable safe harbor protections and, (2) Dr. Marder actually performed the PC components of the pathology services for which he billed.[24]

The Court is also not convinced by the Government's argument that summary judgment is warranted based on the reasoning set forth in the district court's decision in *Ameritox*.  *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 20 F. Supp. 3d 1348, 1356 (M.D. Fla. 2014) (denying in part plaintiff's motion for summary judgment by concluding jury must determine whether provision of free services constituted remuneration).  Since it may be likely that Dr. Kendall's provision of discounted pathology services may be considered remuneration, and that one of the safe harbor exceptions may apply, the issue of whether the Marder Defendants and Kendall Defendants engaged in an impermissible referral scheme in violation of AKS and the Stark Act presents a question for the jury.  Notably, one specific matter the jury must weigh is whether Dr. Kendall's "fee" for his pathology services is consistent with the fair market value of the services he provided the Marder Defendants.  *See* 42 U.S.C. § 1395nn(e)(2).

---

[24]  To be clear, the Government bears the initial burden of proving no issues of material fact remains for each element of a violation of the Stark Act or AKS.  Once that occurs, the burden then shifts to Defendants to establish an affirmative defense that their conduct was protected by a safe harbor or exception.  *See e.g.*, *Halifax*, 2013 WL 6989775, at *4.

The next issue for the jury—and the crux of whether the AKS and the Stark Act were violated in this case—is whether Defendants possessed the requisite intent to violate the statutes. That is, a trier of fact must also determine whether the parties entered these business arrangements in exchange for, or to induce, patient referrals to Kendall.  As it is, the Court concludes that a rational jury could decide in either side's favor on the material questions of whether Defendants paid or obtained remuneration in exchange for referrals, and if so whether this wrongful conduct was willful.  *See United States v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-1002-ORL-31, 2013 WL 6989775, at *6 (M.D. Fla. Nov. 18, 2013).

Accordingly, the Government's Motion for Summary Judgment as to Counts II and IV of the Intervenor Complaint is DENIED as to any claims against the Marder and Kendall Defendants stemming from their alleged involvement in an illegal kickback scheme that violates either the AKS or Stark Act.

F.      Government's Common Law Claims

In addition to the aforementioned FCA claims, the Government also moves for summary judgment on its asserted common law claims: (1) Unjust Enrichment (Count VI); and (2) Payment by Mistake (Count VII).  Because these common-law claims involve rights of the United States under a nationwide federal program, federal common law governs.  *See United States v. Kimbell Foods, Inc*., 440 U.S. 715, 726 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67 (1943).

As these are common law claims, the Government may recover the amounts wrongfully or erroneously paid to Defendants by the Medicare program, but it is not entitled to recover any penalties or punitive damages.  Because summary judgment was granted as to the FCA claims against the Marder Defendants (Counts I and III), summary judgment is due for these claims as

well.  *See e.g.*, *United States v. Aegis Therapies, Inc.,* No. CV 210-072, 2015 WL 1541491, at *14 (S.D. Ga. Mar. 31, 2015).

    G.    <u>Affirmative Defenses</u>

The Marder Defendants assert twelve purported affirmative defenses including: (1) the Government failed to show that the Marder Defendants had the requisite scienter for FCA liability (Seventh Affirmative Defense); (2) the alleged false certifications were not material to payments made (Tenth Affirmative Defense); and (3) and the relationship between the Marder Defendants and the Kendall Defendants falls under various safe harbor provisions of the AKS and the Stark Law (Twelfth Affirmative Defense).  *See* (ECF No. 83) at 24–25.  Similarly, the Kendall Defendants plead twenty-one affirmative defenses that for the most part challenge the sufficiency of the Government's prima facie case.  *See* (ECF No. 84) at 35–38.  Both sets of defendants claim that these affirmative defenses preclude the entry of summary judgment as the Government has failed to rebut them.  *See* (ECF No. 182) at 20–21; *see also* (ECF No. 204) at 19.

Although "[e]ntry of a summary judgment is improper when there is no evidence contradicting or opposing an affirmative defense," *Acciard v. Whitney*, No. 2:07-CV-00476-FTM-36, 2011 WL 4552564, at *5 (M.D. Fla. Sept. 30, 2011), merely labeling what is otherwise a denial of an element of plaintiff's prima facie case as an affirmative defense does not preclude the entry of summary judgment.  *In re Rawson Food Service, Inc.,* 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense.").

In fact, "[t]he defending party must rely on or submit record evidence in support of the purported affirmative defenses to create a genuine issue of material fact preventing the entry of

summary judgment." *Meth Lab Cleanup, LLC v. Spaulding Decon, LLC*, No. 8:14-CV-3129-T-30TBM, 2015 WL 4496193, at *7 (M.D. Fla. July 23, 2015).   A review of the Defendants' affirmative defenses reveals that only four of the thirty-two actually qualify as such—the Kendall Defendants' Eighth, Tenth, and Eleventh Affirmative Defenses and the Marder Defendants Twelfth Affirmative Defense—and are fully addressed by the Government's summary judgment motion.

Specifically, the Kendall Defendants' Tenth Affirmative Defense overlaps significantly with the Marder Defendants' Twelfth Affirmative Defense in that the Defendants' claim that their relationship surrounding the pathology services Medicare reimbursed fits within the bona fide employment exceptions of AKS and the Stark Act.   Likewise, the Kendall Defendants' Eighth Affirmative Defense is based on the AKS's safe harbor provision.   As the Court has already identified that there remains a question of fact on these issues, the Government is not entitled to summary judgment on Defendants' actual affirmative defenses that involve a safe harbor or bona fide employment exceptions.   However, the Court finds no record support for the Kendall Defendants' in-office ancillary services affirmative defense to a potential Stark Act violation.   Therefore, the Government is entitled to summary judgment as to that affirmative defense.

## IV.    Conclusion

The FCA was designed by Congress to ". . . encourage private citizens to help the executive branch deter and redress violations of federal law."   Evan Carminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 344 (1989).   Throughout its approximate 150 years of existence, the FCA has broadly expanded its scope to recover fraudulent gains from a variety of government contractors.   No longer does the statute focus on solely protecting the

Government from purchasing "dying donkeys" or sand instead of sugar. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 722 F. Supp. 607, 609 (N.D. Cal. 1989) ("For sugar [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols, the experimental failures of sanguine inventors, or the refuse of shops and foreign armories") (quoting Tomes, *Fortunes of War*, 29 Harper's Monthly Mag. 228 (1864)).

Since the passage of the Patient Protection and Affordable Care Act ("PPACA"), a new billion dollar battlefield has emerged with the FCA serving as a "potent weapon in the [G]overnment's . . . arsenal" to combat alleged health care fraud. *See* David L. Douglass, Esq. & Matthew M. Benov, Esq., *Healthcare Fraud Enforcement After Healthcare Reform (or "More. More. More. How Do You Like It? How Do You Like It?")*, 23 No. 6 Health Law. 35 (Aug. 2011) (discussing the evolution of the Government's approach to healthcare enforcement and fraud reduction). While the Government may have scored a minor victory here, the skirmish in this *qui tam* action is far from over. For the counts of the Intervenor's Complaint not resolved by this Order for which there remains a genuine issue of material fact—and for purposes of a damages calculation—the litigants must march forth to trial in order to reach a resolution for any claims triggered by Defendants' allegedly wrongful actions. Therefore, consistent with the Court's most recent scheduling Order, the jury trial on the remaining counts in this cause of action will be held on Monday, October 31, 2016 at 9:00 AM. All other pretrial deadlines remain in effect.

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that the Government's Motion for Summary Judgment (ECF No. 44) is GRANTED in PART and DENIED in PART.

DONE AND ORDERED in Chambers at Miami, Florida, this <u>23rd</u> day of September, 2016.

_____
K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c:      All counsel of record